## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

|  |  |
|---|---|
| DREW ADAMS, a minor, by and through his next friend and mother, ERICA ADAMS KASPER, | Civil Action No. 3:17-cv-739-J-32PDB |
| *Plaintiff*, | |
| v. | |
| THE SCHOOL BOARD OF ST. JOHNS COUNTY, FLORIDA; TIM FORSON, in his official capacity as Superintendent of Schools for the St. Johns County School District; and LISA KUNZE, in her official capacity as Principal of Allen D. Nease High School, | FILED   2017 JUN 28   AM 9:40 |
| *Defendants*. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
## AND NOMINAL DAMAGES

### INTRODUCTION

1.     Drew Adams ("Drew" or "Plaintiff")[1] is a 16-year-old boy who attends Allen D. Nease High School ("Nease High School") in Ponte Vedra, Florida. Drew will enter his junior year in August of 2017. Drew is active in his local community, having received an award for his volunteerism, and currently is preparing for a future career as an adolescent psychiatrist by volunteering at the Mayo Clinic in Jacksonville. Drew plays four musical instruments, and like many other kids his age, enjoys video games. Drew also is transgender.

---

[1] Pursuant to Fed. R. Civ. P. 5.2(h), Drew Adams waives the privacy protections afforded by Fed. R. Civ. P. 5.2(a).

1

As a result, unfortunately, he has been subjected to discrimination at his school on a daily basis.

2.     Although Drew is a hard-working, high-achieving student, the school has discriminated against him by refusing him access to the boys' restrooms. This conduct has a negative and harmful impact on Drew, branding him as unfit to share the communal restrooms that all other boys use simply because he is transgender. Drew brings this suit because he has a simple request: to be treated like other boys who can use the restroom so that he too can focus on school, rather than the humiliation of being denied access to the facilities all others use for one of life's most basic functions.

3.     Drew seeks a declaratory judgment that his exclusion from the boys' restroom by Defendants The School Board of St. Johns County, Florida ("Defendant School Board" or "School Board"); Tim Forson, in his official capacity as Superintendent of Schools for the St. Johns County School District; and Lisa Kunze, in her official capacity as Principal of Nease High School (collectively, "Defendants") violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX"). Drew also seeks preliminary and permanent injunctive relief enjoining Defendants from denying him equal access to the boys' restroom, and nominal damages against the Defendant School Board only for the violation of Drew's rights under the Fourteenth Amendment to the U.S. Constitution and Title IX.

**PARTIES**

4.     Plaintiff Drew Adams is a 16-year-old boy who attends Nease High School within the St. Johns County School District ("District"). Drew is transgender. As a student

2

enrolled at Nease High School, Drew is subject to the policies of Defendants, including Defendants' policy, custom, or usage of barring transgender students from using restrooms that match their gender identity, while allowing non-transgender students to use the restrooms that match their gender identity. Drew sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his next friend and mother Erica Adams Kasper ("Erica").

5.      Defendant The School Board of St. Johns County, Florida, in accordance with the provisions of section 4(b) of Art. IX of the State Constitution and Fla. Stat. § 1001.32(2), operates, controls, and supervises all public schools in the District, including Nease High School. The School Board is empowered to determine the policies necessary for the effective operation of the school system, including the policy, custom, or usage challenged here that bars transgender students, and only transgender students, from using restrooms that match their gender identity. As a political subdivision of the State of Florida, the School Board is subject to civil suits pursuant to Fla. Stat. § 1001.41(4) and is a "person" acting under color of state law within the meaning of 42 U.S.C. § 1983.

6.      Defendant Tim Forson ("Superintendent Forson") is, or was at the time of the events giving rise to this action, the Superintendent of Schools for the District who has been delegated authority and responsibility for the administration and management of schools, including Nease High School, as the secretary and executive officer of the School Board pursuant to Fla. Stat. § 1001.32(3). Superintendent Forson has both the authority and responsibility to enforce the School Board's policies, including the policy, custom, or usage that bars Drew from using the boys' restrooms at Nease High School. Superintendent Forson was preceded in office by Dr. Joseph Joyner, who was the Superintendent of Schools for the

3

District at the time of some of the events giving rise to this action. Upon information and belief, Superintendent Forson has previously, and continues to, ratify and perpetuate all relevant actions and omissions by former Superintendent Joyner.

7.    Defendant Lisa Kunze ("Principal Kunze") is, or was at the time of the events giving rise to the action, the Principal of Nease High School, who has been delegated authority and responsibility for the administration of Nease High School, pursuant to Fla. Stat. § 1001.32(4). Principal Kunze is an employee of the District and is under the general supervision of, and subject to the direction of Superintendent Forson. Principal Kunze has both the authority and responsibility to enforce the School Board's policies, including the policy, custom, or usage that bars Drew from using the boys' restrooms at Nease High School. Principal Kunze was preceded in office by Kyle Dresback, who was Principal of Nease High School at the time of some of the events giving rise to this action. Upon information and belief, Principal Kunze has previously, and continues to, ratify and perpetuate all relevant actions and omissions by former Principal Dresback.

8.    Superintendent Forson and Principal Kunze are each sued in their official capacities. Each of them is a "person" within the meaning of 42 U.S.C. § 1983 and is, and was, acting under color of state law at all times relevant to this complaint.

9.    Defendants, through their respective duties and obligations, are responsible for the exclusion of Drew from the boys' restrooms within the school district. Each Defendant, and those subject to their direction, supervision, or control, has or intentionally will perform, participate in, aid and/or abet in some manner the acts alleged in this complaint, has or will proximately cause the harm alleged herein, and has or will continue to injure

Plaintiff irreparably if not enjoined. Accordingly, the relief requested herein is sought against each Defendant and their successors, as well as all persons under their supervision, direction, or control, including, but not limited to, their officers, employees, and agents.

## JURISDICTION AND VENUE

10.     This action arises under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by the United States Constitution and under Title IX.

11.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because the matters in controversy arise under the Constitution and laws of the United States; and pursuant to 28 U.S.C. §1343(a)(3) and (4) because the action is brought to redress deprivations, under color of state authority, or rights privileges and immunities secured by the U.S. Constitution and seeks to secure damages and equitable relief under an Act of Congress, specifically 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) and Local Rule 1.02(c) because Defendants reside within this judicial district and division, and all Defendants reside within the State of Florida; and because a substantial part of the events that gave rise to the Plaintiff's claims took place (or will take place going forward through continued enforcement of the unlawful policy) within this judicial district and division.

13.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, and 28 U.S.C. §§ 2201 and 2202.

14.     This Court has personal jurisdiction over Defendants because they are domiciled in Florida.

## FACTUAL ALLEGATIONS

15.     Drew is 16 years old, and will begin his junior year at Nease High School on August 10, 2017.

16.     Drew hopes to attend medical school. He is an honor student, is enrolled in a number of Advanced Placement classes in school, and participates in the International Baccalaureate ("IB") Pre-IB/IB Diploma Program.

17.     Drew is also active in a number of extra-curricular, volunteer and community service activities. He is on the Board of Leaders of Nease High School's Gay Straight Alliance, which works to improve the school climate for lesbian, gay, bisexual, and transgender ("LGBT") students. Drew was selected from more than 700 applicants to serve as one of only 18 students on the Gay, Lesbian, and Straight Education Network's ("GLSEN") National Student Council, which educates people about LGBT youth and does anti-bullying work. Drew helps raise money each year for the Jacksonville Area Sexual Minority Youth Network ("JASMYN"), which provides programs and services to support local LGBT youth. Starting the summer before high school, Drew has volunteered each summer at a local hospital, and he currently volunteers at the Mayo Clinic in Jacksonville. In May of 2017, Drew received the HandsOn Youth in Action Award from HandsOn Jacksonville, a non-profit that encourages volunteerism in the local community. He plays four musical instruments and also really enjoys playing video games. And, like lots of other kids his age, Drew wants to be treated equally and accepted for who he is.

18.     After high school, Drew hopes to attend the University of Florida to study pre-medicine.  Ultimately, he would like to attend medical school and become an adolescent psychiatrist.

19.     Drew is a boy.

20.     Drew also is transgender.  At birth, Drew was incorrectly designated "female" on his birth certificate, even though he is, in fact, a boy.

21.     Each person has multiple sex-related characteristics, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity.  These characteristics may not always be in alignment.

22.     The phrase "sex assigned at birth" refers to the sex recorded on a person's birth certificate at the time of birth.  Typically, a person is assigned a sex on their birth certificate solely on the basis of the appearance of external reproductive organs at the time of birth.  Other sex-related characteristics (such as a person's chromosomal makeup and gender identity, for example) are typically not assessed or considered at the time of birth.

23.     Gender identity—a person's core internal sense of their own gender—is the primary factor in determining a person's sex.  Every person has a gender identity.  There is a medical consensus that gender identity is innate and that efforts to change a person's gender identity are unethical and harmful to a person's health and well-being.

24.     Transgender persons are people whose gender identity diverges from the sex they were assigned at birth.  A transgender boy's sex is male (even though he was assigned the sex of female at birth) and a transgender girl's sex is female (even though she was assigned the sex of male at birth).

7

25.     Cisgender persons are people whose gender identity aligns with the sex they were assigned at birth.  A cisgender boy's sex is male (matching his assigned sex of male at birth) and a cisgender girl's sex is female (matching her assigned sex of female at birth).

26.     The incongruence between a transgender person's gender identity and sex assigned at birth can sometimes be associated with gender dysphoria.  Gender dysphoria is a serious medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Ed. (2013) ("DSM-V"), and by the other leading medical and mental health professional groups, including the American Medical Association and the American Psychological Association.

27.     Gender dysphoria refers to clinically significant distress that can result when a person's gender identity differs from the person's sex assigned at birth.  If left untreated, gender dysphoria may result in psychological distress, anxiety, depression, and even suicidal ideation or self-harm.

28.     Treatment of gender dysphoria is usually provided pursuant to the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("Standards of Care"), published by the World Professional Association of Transgender Health.  The Standards of Care are recognized as authoritative by major medical and mental health professional organizations.

29.     Treatments for gender dysphoria align the transgender person's body and lived experience with the person's true sex.  Steps that transgender people may take to treat their gender dysphoria pursuant to the Standards of Care include: (1) social transition; (2)

hormone therapy; and/or (3) gender-affirming surgery. These treatments do not change a transgender person's sex, which is determined by their gender identity.

30.     Social transition entails a transgender person living in accordance with the person's gender identity. For example, for a transgender boy, social transition can include, among other things, changing his first name to a name typically associated with boys, using male pronouns, changing his identity documents to indicate a male gender, wearing clothing and adopting grooming habits stereotypically associated with boys, using restrooms and other facilities for boys, and otherwise living as a boy in all aspects of life.

31.     Social transition requires that a transgender boy be recognized as a boy and treated the same as all other boys by family members, educators, and others in the community.

32.     The ability to live in a manner consistent with one's gender identity is critical to the health and well-being of all transgender people.

33.     Living in a manner consistent with one's gender identity, including the use of restroom facilities that match one's gender identity, also is a key aspect of treatment for gender dysphoria for those who suffer from it.

34.     Even though Drew's sex assigned at birth was female, and even before he was aware that transgender people existed, Drew knew that his body did not feel like it fit him. Erica saw that he was having a difficult time too. She saw that he was becoming increasingly anxious, depressed, and withdrawn as he went through female puberty.

35.     Drew first began to understand why he felt the way he did when he was 14 years old, and saw a transgender man interviewed on television. When Drew heard the man

9

describe what it meant to be transgender, everything clicked for Drew, and he immediately realized that he felt the same way. Erica was watching television with Drew at the time, and noticed right away how mesmerized he was by the interview; she felt like she could see the wheels turning in his head.

36.     Erica had a moment of dread, and thought to herself, "things are about to get really hard." But she also knew that Drew was profoundly unhappy, so she waited for Drew to become ready to talk to her. Not long after, her son came out as transgender.

37.     Drew began researching what it meant to be transgender, and in 2015 began taking steps toward aligning his lived experience with his gender identity, *i.e.*, living as a boy. Drew cut his hair short, and began wearing a binder on his chest to minimize the appearance of his breasts. Each step brought him a sense of relief and happiness, and he felt like he was finally starting to live the way he was meant to live. This confirmed for Drew that transitioning was the only way he would ever feel fully comfortable in his own skin.

38.     Drew has since been diagnosed with gender dysphoria, and that diagnosis has been confirmed by multiple providers.

39.     Drew is receiving medical treatment through the Duke Child and Adolescent Gender Care ("Duke Clinic") in North Carolina. Drew began taking testosterone in June 2016, and he remembers thinking that was the happiest day of his life. When Drew learned that he could get "top surgery" (a double mastectomy to masculinize his chest), he was so overcome with joy that he cried. Erica also saw a dramatic change in Drew's happiness and wellbeing. As he continued to transition, Drew became an increasingly confident and

10

positive kid. As a result, Erica quickly realized that transitioning was the only way Drew could ever be truly happy and reach his full potential as a person.

40.      Along with taking these medical steps to relieve his gender dysphoria and bring his body into alignment with his gender identity, Drew also began taking other steps to live fully as the boy that he is. For example, Drew updated the gender marker on his driver's license from female to male, in order to have his identification accurately reflect who he is.

41.      By the time Drew began his freshman year at Nease High School, he was living full-time as a boy, and wanted to start school as a boy too. This was especially important to him because relatively few of the kids who knew him before his transition in middle school would be attending this high school, which gave him a chance for a fresh start.

42.      Before the 2015-2016 school year started, Drew emailed his teachers to explain that the female gender marker on his school records was wrong, and to ask them to use male pronouns for him instead. He continued using the gender neutral name "Drew" that his parents had given him at birth.

43.      When Drew began his freshman year, he was generally perceived by students and staff alike as a boy. His peers and teachers generally used male pronouns, and he was generally treated as a boy in every respect.

44.      When Drew first started at Nease High School in August of 2015, he did not even imagine that anyone would try to prevent him from using the boys' restroom, so he used those restrooms along with all the other boys. On every occasion, he used one of the stalls.

45.      Drew used the boys' restrooms at school without any incident until on or around September 22, 2015, when he was pulled out of class to meet with three guidance

11

counselors, including IB Program guidance counselor Kim Hollis. The guidance counselors informed him that someone had anonymously reported that he was using the boys' restroom. Drew was instructed to use a gender neutral restroom from that point forward.

46.     Drew was shocked and confused. He asked if he had done anything wrong, and was told "no." That answer was frustrating, because it made Drew feel like he was being punished even though he had not done anything to deserve it.

47.     Drew did not want to get in trouble or have any disciplinary reports on his school record, so he reluctantly began using gender neutral restrooms at the school, and has not used the boys' restroom since. But doing so has had a negative emotional and social impact on Drew, who simply wants to be treated like all of the other boys at the school.

48.     Using the gender neutral restrooms immediately felt like an insult to Drew's identity. He felt humiliated having to walk halfway across the school, passing several boys' restrooms, to find one of the gender-neutral restrooms to use. His transgender status was not widely known among the school administrators, and he was anxious about encountering staff in the hallway who would have thought he was skipping class if he had said he was going to the restroom – while he was walking past right past a boys' restroom. It also created an inaccurate and discriminatory distinction between Drew as a boy and all other boys. Rather than treat Drew equally and in all material respects like a boy, he is singled out as different from the other boys at the school, which interferes with treatment for his gender dysphoria.

49.     In contrast to boys' restrooms located throughout the school, there are, at most, three gender neutral restrooms for the entire school (with one minor exception for art class, described below): Two of these restrooms are located in the administrative building,

12

including one restroom in the main office, and one in the guidance office. Generally, no one uses the restroom in the main office, because individuals must enter the nurse's office to get to it.

50.     The third gender neutral restroom has been available only intermittently to students in a building called the "H-pod." For approximately half of Drew's academic career at the school, this restroom has been restricted to staff, with a "Staff Only" sign appearing periodically on the door; on one occasion, Drew and other students had to petition Principal Kunze to re-open the restroom to students. On each occasion that the restroom was made available to students, no public announcement was made, which made Drew nervous about getting in trouble with staff who had not realized that the restroom was re-designated.

51.     To access any of these gender neutral restrooms, Drew usually has to walk past at least one, if not two, boys' restrooms to get to the gender neutral restrooms. This fact alone highlights the false and discriminatory distinction that Defendants impose on Drew by separating him from other boys; this differential treatment causes Drew to feel anxious by reinforcing a message that he is "different," rather than simply allowing him to live as he is: a boy.

52.     None of the gender neutral restrooms is as convenient to classes Drew has had as the restrooms that all the other boys get to use. For example, when Drew has had classes in the portable classrooms, it takes approximately 15 to 20 minutes to get to and from the gender neutral restrooms in the administrative building. Because the pass time between classes is only five minutes, using the gender neutral restrooms generally required Drew to miss significant amounts of class time. That was extremely stressful, given that every minute

of class time in his advanced classes matters. It forces Drew to weigh the importance of the information that he would miss in class, against the anxiety, stress, and distraction that come with trying to hold one's bladder. No cisgender boy at the school has to cope with that stress or loss of classroom time just to do something as basic as go to the restroom. This creates a Hobson's choice for Drew, one that forces him to choose between the importance of learning and being present in class, with the physiological need to use the restroom. Equally as bad is the constant reminder that he is being treated differently. Given the importance of living as a boy in all respects, this distinction creates an emotional and social hardship on Drew.

53.     This discriminatory environment resulted in Drew's avoiding using the restroom at all, whenever he could physically manage it. He began restricting his fluid intake and planning his day around when he might have to use the restroom. He worried about what other students would think if they saw him going to the gender neutral restrooms. Despite the fact that this meant missing class, Drew would sometimes attempt to go to the restroom in the middle of the class, so that fewer students in the hallways would see him walking past the boys' restrooms to a special restroom instead. Drew also held his bladder as much as he could, which was extremely – at times, excruciatingly – uncomfortable. Erica recalls Drew needing to rush home to use the restroom at the end of the school day after trying to hold his bladder for hours.

54.     By a stroke of luck, Drew had an art class last year in the middle of the day, with a single-user restroom inside the classroom. Having access to a restroom in the middle of his day provided some relief, but he was still careful about how much he drank before and during school, so that he could try to limit himself to one restroom break during the school

14

day. While he intends to take art class again, it could be scheduled for any period of the day; an early or late art class would once again leave him in the terrible, anxiety-provoking position of not having reliable or convenient access to a restroom. And even when he did have art class in the middle of the day, he still felt very anxious about needing to use the restroom during other parts of his day. Further, Drew should not be forced to take classes (or not take others) because of the proximity or access to neutral bathrooms when there are boys' restrooms available throughout the school. The policy is a constant reinforcement by the school that, according to them, Drew is not a real boy and should be treated differently. This creates and nurtures a stigma that has no place in the school system.

55.     Erica felt hurt and angry as she watched the school's policy take an enormous toll on Drew. She tried to address it with school officials in an effort to avoid taking legal action. Erica sent letters to Principal Dresback and Superintendent Joyner right after Drew was first instructed on September 22, 2015 not to use boys' restrooms, requesting that he be treated as equal to all other boys in the school. Superintendent Joyner never responded to her letter. Erica and Drew then met with Principal Dresback, social workers Holly Arkin and Christy McKendrick, and Director of Student Services Sallyanne Smith in early October 2015. Erica and Drew were told during the meeting that this was "a District issue," and that the school's hands were tied.

56.     Erica met with District officials on or around November 23 or 24, 2015, including Associate Superintendent Cathy Mittelstadt and Assistant Superintendent Brennan Asplen. Mr. Asplen repeatedly raised the issue of "biology" during the meeting, which he used to refer to genitals. Erica had brought an assortment of studies, articles, and other

15

materials about transgender students to help the District officials understand how important

equal treatment is, but Mr. Asplen explained his view that "98% of the people in this District

would not understand" if Drew were allowed to use the boys' restroom. Mr. Asplen said he

was more concerned about legal action by the parent of a cisgender child than legal action by

Drew. Erica offered during that meeting, and later via email, to help educate other parents in

the district about transgender children, but was rebuffed. Mr. Asplen again focused his

attention on the issue of genitals and asked what would happen if a transgender girl were to

come out of a stall and "wave her penis around." Erica said words to the effect of, "Sir, I

don't know what kind of bathrooms you've been in, but I've never seen a naked person in a

bathroom." Erica pointed out that lewd behavior by *any* student is already against the law.

Unfortunately, Mr. Asplen's comments are precisely the type that foster negative stereotypes

and misperceptions, all of which are both discriminatory and unsupported by any evidence,

meaning that there is no evidence that a transgender child is any more likely to engage in

inappropriate behavior. Comments like these highlight the discriminatory nature of the

policy itself, one predicated on others' unsupported fears, rather than actual evidence.

57.    Erica contacted the U.S. Department of Education's Office for Civil Rights

("OCR") in November 2015 to file a complaint, and OCR opened an investigation. OCR

offered District officials an opportunity to mediate the matter, but the District declined.

OCR's assigned investigator conducted a full investigation, later suggesting that Erica meet

with officials again to see if the issue could be resolved. On April 8, 2016, Erica met with

Ms. Mittelstadt, Ms. Arkin, and Ms. McKendrick. Ms. Mittelstadt described this as a "civil

rights issue," but said that the district is "too conservative" and "not there yet." Erica pointed

out that other Florida school districts, like Broward County Public Schools, treat their transgender students equally in restrooms. Unfortunately, the meeting too yielded no progress. Erica and Drew met again with Ms. Mittelstadt on May 4, 2016, but they were once again unsuccessful in securing a policy change that would allow Drew equal access to the boys' restrooms.

58.     At no point has any school or District official ever provided Erica or Drew with information suggesting that his use of the boys' restroom harms anyone else. When Drew is in all other settings outside of school, he uses the men's restroom. To his knowledge, there has never been an incident or complaint by others with his restroom use outside of school. Drew has never, and would never, invade anyone else's privacy in a restroom. He just wants to use the restroom, wash his hands, and leave like everyone else does. He wants to be normal and blend in.

59.     Access to the boys' restroom is important to Drew because he wants to interact with his peers like an equal. He is recognized as the boy that he is in every respect by peers and teachers, except at the moment he needs to enter a restroom. It does not work for him to be a boy in every other part of his school life, but not when he needs to perform one of life's most basic functions. And, more particularly, it suggests to others a false distinction: that a transgender boy is not a "real" boy. Such stigma is not only deleterious for Drew, it is a harmful statement to others, creating a stigma associated with being transgender.

60.     Being banned from the boys' restrooms is humiliating to Drew. It sends a signal to other students that Drew is not a real boy, and treats him as if he is unfit to share a

17

communal space with others. It also creates a negative perception and reinforces stereotypes—all of which are unfounded—that transgender children are more likely to behave inappropriately or that they are inferior to other boys. Drew feels like he has enough to manage in a world that is still learning to understand transgender people without his school making the situation worse, and teaching his peers that he is not worthy of the same dignity and respect as all other boys.

61.    By mandating and relegating Drew to use single-stall gender neutral restrooms, a condition not imposed on cisgender students, Defendants isolate and separate Drew based on his sex and transgender status.

62.    By barring Drew from the restrooms consistent with who he is, Defendants refuse to recognize Drew's gender identity even as they recognize the gender identity of all of his cisgender peers.

63.    As a result, Drew has experienced and continues to experience the harmful effects of being separated from, and treated differently than, his cisgender classmates of the same gender identity at Nease High School, including lowered self-esteem, embarrassment, humiliation, social isolation, and stigma. All of these harmful effects have also heightened the symptoms, including depression and anxiety, of the gender dysphoria suffered by Drew.

64.    Through their actions, Defendants have purposefully disrupted Drew's education.

## CLAIMS FOR RELIEF

### COUNT I

### Denial of Equal Protection
### U.S. Const. Amend. XIV
### (Against All Defendants)

65.　Plaintiff incorporates paragraphs 1 through 64 as though fully set forth herein.

66.　Plaintiff states this cause of action against all Defendants for purposes of seeking declaratory and injunctive relief, and against the School Board only for purposes of seeking nominal damages, and challenges Defendants' policy of excluding transgender students from the single-sex facilities that match their gender identity both facially and as applied to him.

67.　Each of the Defendants is a person acting under color of state law for purposes of 42 U.S.C. § 1983.

68.　Defendant School Board is the final policy maker for Nease High School within the St. Johns County School District.

69.　The Fourteenth Amendment to the U.S. Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall deny to any person within its jurisdiction the equal protection of the laws.

70.　Defendants' exclusion of transgender students like Drew from the single-sex facilities matching their gender identity treats transgender students differently from cisgender students who are similarly situated. Under Defendants' discriminatory policy, cisgender students are able to access restrooms and other single-sex facilities consistent with their

gender identity, but transgender students are banned from single-sex facilities consistent with their gender identity.

71.   **Discrimination based on sex:** Under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

   a.   Discrimination based on sex includes, but is not limited to, discrimination based on gender, gender nonconformity, transgender status, gender expression, and gender transition.

   b.   Defendants' exclusion of Drew from boys' restrooms in the school district discriminates against him on the basis of sex.

   c.   Defendants' policy also discriminates against Drew based on gender nonconformity and sex stereotyping. For example, although Drew is a boy, is perceived as a boy in public, and has had medical treatment to bring his body into alignment with his male gender identity, he does not conform to Defendants' sex-stereotyped expectations for boys because his sex assigned at birth was female.

72.   **Discrimination based on transgender status:** Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on transgender status is presumptively unconstitutional and subject to strict, or at least heightened scrutiny.

   a.   Transgender people have suffered a long history of extreme discrimination in Florida and across the country, and continue to suffer such discrimination to this day.

b.      Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process. Transgender people have largely been unable to secure explicit state and federal protections to protect them against discrimination.

c.      A person's gender identity or transgender status bears no relation to a person's ability to contribute to society.

d.      Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

e.      Gender identity generally is fixed at an early age and highly resistant to change through intervention.

73.     Defendants' discrimination against Drew is not narrowly tailored or substantially related to any compelling or important government interest. Indeed, it is not even rationally related to any legitimate government interest. The discriminatory policy does not promote the safety, privacy, security, or well-being of cisgender students, but it does undermine the safety and privacy of Drew, who is publicly marked as different and inferior every time he has to access a different restroom from other boys.

74.     Defendants' discriminatory policy deprives Drew and transgender students like him of their right to equal dignity, liberty, and autonomy by branding them as second-class citizens. Defendant thus denies Drew equal protection of the laws in violation of the Equal Protection Clause of the Fourteenth Amendment.

75.     Defendant School Board has intentionally violated the Equal Protection Clause of the Fourteenth Amendment, for which Drew is entitled to nominal damages against Defendant School Board.

## COUNT II

### Violation of Title IX
### 20 U.S.C. § 1681, *et seq.*
### (Against Defendant School Board)

76.     Plaintiff incorporates paragraphs 1 through 64 as though fully set forth herein.

77.     Title IX provides that no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

78.     Under Title IX, discrimination on the basis of sex includes, but is not limited to, discrimination based on gender, gender nonconformity, transgender status, gender expression, and gender transition.

79.     Defendant School Board is a recipient of federal financial assistance from the United States Department of Education, and therefore subject to Title IX.

80.     Under Defendant School Board's discriminatory policy, cisgender students are able to access restrooms and other single-sex facilities consistent with their gender identity, but transgender students are banned from single-sex facilities consistent with their gender identity.

81.     By banning Drew from use of boys' restrooms consistent with his gender identity, Defendant School Board excludes Drew from participation in, denies him the benefits of, and subjects him to discrimination in educational programs and activities within

22

the District, particularly at Nease High School, on the basis of sex, in violation of Title IX. For example, Drew's need to access far away gender neutral restrooms means that Drew must sometimes miss classroom time simply to relieve himself; and when Drew attempts to hold his bladder so as not to miss instruction time, he struggles to concentrate on the teacher's material instead of the significant discomfort of holding his bladder.

82.     Defendants' discriminatory exclusion of Drew from boys' restrooms because he is transgender harms Drew by stigmatizing him and treating him as lesser than other boys, which causes Drew to feel anxious and humiliated.

83.     Defendant School Board has intentionally violated Title IX, for which Drew is entitled to nominal damages against the School Board.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants on all claims, as follows:

A.     Enter a declaratory judgment that Defendants' exclusion of Drew from boys' restrooms within the District violates Drew's rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

B.     Enter a declaratory judgment that Defendant School Board's exclusion of Drew from boys' restrooms within the District violates Drew's rights under Title IX;

C.     Issue preliminary and permanent injunctive relief enjoining all Defendants, including but not limited to Defendants Superintendent Forson and Principal Kunze, in their official capacities, (i) from treating Drew differently from other boys in any respect, including but not limited to by denying Drew equal access to boys' restrooms within the

District on the same terms as all other boys, and (ii) from denying any students, including those who are transgender, from using single-sex multi-user facilities in accordance with gender identity;

     E.     Award Drew, by and through his next friend Erica Adams Kasper, nominal damages against Defendant School Board in the amount of $1.00 for violation of Drew's rights under the Fourteenth Amendment to the U.S. Constitution and Title IX;

     F.     Award Drew his costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

     G.     Grant such other and further relief as the Court deems just and proper.

     H.     The declaratory and injunctive relief requested in this action is sought against each Defendant and their successors; against each Defendant's officers, employees, and agents; and against all persons acting in active concert or participation with any Defendant, or under any Defendant's supervision, direction, or control.

* * *

Dated: June 28, 2017

Respectfully submitted,

/s/ Kirsten Doolittle
Kirsten Doolittle, Trial Counsel
Florida Bar No. 942391
THE LAW OFFICE OF KIRSTEN DOOLITTLE, P.A.
The Elks Building
207 North Laura Street, Ste. 240
Jacksonville, FL 32202
Telephone: 904-551-7775
Facsimile: 904-513-9254
kd@kdlawoffice.com

Jennifer Altman
Florida Bar No: 881384
Shani Rivaux
Florida Bar No: 42095
Aryeh Kaplan
Florida Bar No: 60558
PILLSBURY WINTHROP SHAW PITTMAN, LLP
600 Brickell Avenue Suite 3100
Miami, FL 33131
Telephone: 786-913-4900
Facsimile: 786-913-4901
jennifer.altman@pillsbury.com
shani.rivaux@pillsbury.com
aryeh.kaplan@pillsbury.com

Richard M. Segal*
Nathaniel R. Smith*
PILLSBURY WINTHROP SHAW PITTMAN LLP
501 W. Broadway, Suite 1100
San Diego, CA 92101
Telephone: 619-234-5000
Facsimile: 619-236-1995
richard.segal@pillsburylaw.com
nathaniel.smith@pillsburylaw.com

Tara L. Borelli*
LAMBDA LEGAL DEFENSE AND EDUCATION
   FUND, INC.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30308-1210
Telephone: 404-897-1880
Facsimile: 404-897-1884
tborelli@lambdalegal.org

Paul D. Castillo*
LAMBDA LEGAL DEFENSE
   AND EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, Texas 75219
Telephone: 214-219-8585
Facsimile: 214-219-4455
pcastillo@lambdalegal.org

Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE
   AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, New York 10005-3919
Telephone: 212-809-8585
Facsimile: 212-809-0055
ogonzalez-pagan@lambdalegal.org

*Counsel for Plaintiff*

* *Pro hac vice* applications forthcoming.