**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| DREW ADAMS, a minor, by and through his next friend and mother, ERICA ADAMS KASPER, <br><br> *Plaintiff,* <br><br> v. <br><br> THE SCHOOL BOARD OF ST. JOHNS COUNTY, FLORIDA, <br><br> *Defendant.* | Civil Action No. 3:17-cv-00739-TJC-JBT |

## FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

### INTRODUCTION

1.     Drew Adams ("Drew" or "Plaintiff")[1] is a 16-year-old boy who attends Allen D. Nease High School ("Nease High School") in Ponte Vedra, Florida.  Drew entered his junior year in August of 2017.  Drew is active in his local community, having received an award for his volunteerism, and is preparing for a future career as an adolescent psychiatrist by volunteering at the Mayo Clinic in Jacksonville.  Drew plays four musical instruments, and like many other kids his age, enjoys video games.  Drew also is transgender.  As a result, unfortunately, he has been subjected to discrimination at his school on a daily basis beginning in 2015.

---

[1] Pursuant to Fed. R. Civ. P. 5.2(h), Drew Adams waives the privacy protections afforded by Fed. R. Civ. P. 5.2(a).

1

2.     Although Drew is a hard-working, high-achieving student, the school has discriminated against him by refusing him access to and use of the boys' restrooms.  This conduct has a negative and harmful impact on Drew, branding him as unfit to share the communal restrooms that all other boys use simply because he is transgender.  Drew simply wants to be treated like other boys so that he too can focus on school, rather than the humiliation of being denied access to the facilities all others use for one of life's most basic functions.  The discriminatory policy at issue characterizes Drew as different and stigmatizes him because he is transgender.  This sends a powerful signal to others not to treat Drew as any other boy.

3.     Drew seeks a declaratory judgment that his exclusion from the boys' restroom by Defendant The School Board of St. Johns County, Florida ("Defendant," "Defendant School Board," or "School Board") violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. ("Title IX").  Drew also seeks injunctive relief enjoining Defendant from denying him equal access to the boys' restroom, and compensatory, as well as nominal, damages against Defendant School Board for the violation of Drew's rights under the Fourteenth Amendment to the U.S. Constitution and Title IX.

**PARTIES**

4.     Plaintiff Drew Adams is a 16-year-old boy who attends Nease High School within the St. Johns County School District (the "District").  Drew is transgender.  As a student enrolled at Nease High School, Drew is subject to the policies of Defendant, including Defendant's policy, custom, or usage of barring transgender students from using

2

restrooms that match their gender identity, while allowing non-transgender students to use the restrooms that match their gender identity.  Drew sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his next friend and mother Erica Adams Kasper ("Erica").

5.      Defendant The School Board of St. Johns County, Florida, in accordance with the provisions of section 4(b) of Art. IX of the State Constitution and Fla. Stat. § 1001.32(2), operates, controls, and supervises all public schools in the District, including Nease High School.  The School Board is empowered to determine the policies necessary for the effective operation of the school system, including the policy, custom, or usage challenged here that bars transgender students, and only transgender students, from using restrooms that match their gender identity.  As a political subdivision of the State of Florida, the School Board is subject to civil suits pursuant to  Fla. Stat. § 1001.41(4) and is a "person" acting under color of state law within the meaning of 42 U.S.C.  § 1983.

6.      Defendant, through its duties and obligations, is responsible for the exclusion of Drew from the boys' restrooms within the school district.  The School Board, and those subject to its direction, supervision, or control, have or intentionally will perform, participate in, aid and/or abet in some manner the acts alleged in this complaint, have or will proximately cause the harm alleged herein, and have or will continue to injure Plaintiff irreparably if not enjoined.  Accordingly, the relief requested herein is sought against Defendant and its officers, agents, servants, employees, and attorneys, as well as any other persons who are in active concert or participation with them.

## JURISDICTION AND VENUE

7.      This action arises under 42 U.S.C. § 1983 to redress the deprivation under

3

color of state law of rights secured by the United States Constitution and under Title IX.

8.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because the matters in controversy arise under the Constitution and laws of the United States; and pursuant to 28 U.S.C. §1343(a)(3) and (4) because the action is brought to redress deprivations, under color of state authority, or rights privileges and immunities secured by the U.S. Constitution and seeks to secure damages and equitable relief under an Act of Congress, specifically 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights.

9.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) and Local Rule 1.02(c) because Defendant resides within this judicial district and division, and within the State of Florida; and because a substantial part of the events that gave rise to the Plaintiff's claims took place (or will take place going forward through continued enforcement of the unlawful policy) within this judicial district and division.

10.    This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, and 28 U.S.C. §§ 2201 and 2202.

11.    This Court has personal jurisdiction over Defendant because it is domiciled in Florida.

## FACTUAL ALLEGATIONS

12.    Drew is 16 years old, and began his junior year at Nease High School on August 10, 2017.

4

13.     Drew hopes to attend medical school.  He is an honor student, is enrolled in a number of Advanced Placement classes in school, and participates in the International Baccalaureate ("IB") Pre-IB/IB Diploma Program.

14.     Drew is also active in a number of extra-curricular, volunteer and community service activities.  He is on the Board of Leaders of Nease High School's Gay Straight Alliance, which works to improve the school climate for lesbian, gay, bisexual, and transgender ("LGBT") students.  Drew previously served on the Student Council for the Gay, Lesbian, and Straight Education Network ("GLSEN"), which educates people about LGBT youth and does anti-bullying work.  He currently serves on the Youth Ambassador Council for the Trevor Project, which provides suicide prevention services to LGBT youth.  Drew helps raise money each year for the Jacksonville Area Sexual Minority Youth Network ("JASMYN"), which provides programs and services to support local LGBT youth.  Starting the summer before high school, Drew has volunteered each summer at a local hospital.  In May of 2017, Drew received the HandsOn Youth in Action Award from HandsOn Jacksonville, a non-profit that encourages volunteerism in the local community.  He plays four musical instruments and also really enjoys playing video games.  And, like lots of other kids his age, Drew wants to be treated equally and accepted for who he is.

15.     After high school, Drew hopes to attend the University of Florida to study pre-medicine.  Ultimately, he would like to attend medical school and become an adolescent psychiatrist.

16.     Drew is a boy.

5

17. Drew also is transgender. At birth, Drew was incorrectly designated "female" on his birth certificate, even though he is, in fact, a boy.

18. Each person has multiple sex-related characteristics, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity. These characteristics may not always be in alignment.

19. The phrase "sex assigned at birth" refers to the sex recorded on a person's birth certificate at the time of birth. Typically, a person is assigned a sex on their birth certificate solely on the basis of the appearance of external reproductive organs at the time of birth. Other sex-related characteristics (such as a person's chromosomal makeup and gender identity, for example) are typically not assessed or considered at the time of birth.

20. Gender identity—a person's core internal sense of their own gender—is the primary factor in determining a person's sex. Every person has a gender identity. There is a medical consensus that gender identity is innate and that efforts to change a person's gender identity are unethical and harmful to a person's health and well-being.

21. Transgender persons are people whose gender identity diverges from the sex they were assigned at birth. A transgender boy's sex is male (even though he was assigned the sex of female at birth) and a transgender girl's sex is female (even though she was assigned the sex of male at birth).

22. Cisgender persons are people whose gender identity aligns with the sex they were assigned at birth. A cisgender boy's sex is male (matching his assigned sex of male at birth) and a cisgender girl's sex is female (matching her assigned sex of female at birth).

23.     The incongruence between a transgender person's gender identity and sex assigned at birth can sometimes be associated with gender dysphoria.  Gender dysphoria is a serious medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Ed. (2013) ("DSM-V"), and by the other leading medical and mental health professional groups, including the American Medical Association and the American Psychological Association.

24.     Gender dysphoria refers to clinically significant distress that can result when a person's gender identity differs from the person's sex assigned at birth.  If left untreated, gender dysphoria may result in psychological distress, anxiety, depression, and even suicidal ideation or self-harm.

25.     Treatment of gender dysphoria is usually provided pursuant to the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("Standards of Care"), published by the World Professional Association of Transgender Health.  The Standards of Care are recognized as authoritative by major medical and mental health professional organizations.

26.     Treatments for gender dysphoria align the transgender person's body and lived experience with the person's true sex.  Steps that transgender people may take to treat their gender dysphoria pursuant to the Standards of Care include: (1) social transition; (2) hormone therapy; and/or (3) gender-affirming surgery. These treatments do not change a transgender person's sex, which is determined by their gender identity.

27.     Social transition entails a transgender person living in accordance with the person's gender identity.  For example, for a transgender boy, social transition can include,

among other things, changing his first name to a name typically associated with boys, using male pronouns, changing his identity documents to indicate a male gender, wearing clothing and adopting grooming habits stereotypically associated with boys, using restrooms and other facilities for boys, and otherwise living as a boy in all aspects of life.

28.     Social transition requires that a transgender boy be recognized as a boy and treated the same as all other boys by family members, educators, and others in the community.

29.     The ability to live in a manner consistent with one's gender identity is critical to the health and well-being of all transgender people.

30.     Living in a manner consistent with one's gender identity, including the use of restroom facilities that match one's gender identity, also is a key aspect of treatment for gender dysphoria for those who suffer from it.

31.     Even though Drew's sex assigned at birth was female, and even before he was aware that transgender people existed, Drew knew that his body did not feel like it fit him. Erica saw that he was having a difficult time too.  She saw that he was becoming increasingly anxious, depressed, and withdrawn as he went through female puberty.

32.     Drew first began to understand why he felt the way he did when he was 14 years old, and saw a transgender man interviewed on television.  When Drew heard the man describe what it meant to be transgender, everything clicked for Drew, and he immediately realized that he felt the same way.  Erica was watching television with Drew at the time, and noticed right away how mesmerized he was by the interview; she felt like she could see the wheels turning in his head.

33.     Erica had a moment of dread, and thought to herself, "things are about to get really hard."  But she also knew that Drew was profoundly unhappy, so she waited for Drew to become ready to talk to her.  Not long after, her son came out as transgender.

34.     Drew began researching what it meant to be transgender, and in 2015 began taking steps toward aligning his lived experience with his gender identity, *i.e.*, living as a boy.  Drew cut his hair short, and began wearing a binder on his chest to minimize the appearance of his breasts.  Each step brought him a sense of relief and happiness, and he felt like he was finally starting to live the way he was meant to live.  This confirmed for Drew that transitioning was the only way he would ever feel fully comfortable in his own skin.

35.     Drew has since been diagnosed with gender dysphoria, and that diagnosis has been confirmed by multiple providers.

36.     Drew is receiving medical treatment through the Duke Child and Adolescent Gender Care ("Duke Clinic") in North Carolina.  Drew began taking testosterone in June 2016, and he remembers thinking that was the happiest day of his life.  When Drew learned that he could get "top surgery" (a double mastectomy to masculinize his chest), he was so overcome with joy that he cried.  Erica also saw a dramatic change in Drew's happiness and wellbeing.  As he continued to transition, Drew became an increasingly confident and positive kid.  As a result, Erica quickly realized that transitioning was the only way Drew could ever be truly happy and reach his full potential as a person.

37.     Along with taking these medical steps to relieve his gender dysphoria and bring his body into alignment with his gender identity, Drew also began taking other steps to

9

live fully as the boy that he is.  For example, Drew updated the gender marker on his driver's license from female to male, in order to have his identification accurately reflect who he is.

38.     By the time Drew began his freshman year at Nease High School, he was living full-time as a boy, and wanted to start school as a boy too.  This was especially important to him because relatively few of the kids who knew him before his transition in middle school would be attending this high school, which gave him a chance for a fresh start.

39.     Before the 2015-2016 school year started, Drew emailed his teachers to explain that the female gender marker on his school records was wrong, and to ask them to use male pronouns for him instead.  He continued using the gender neutral name "Drew" that his parents had given him at birth.

40.     When Drew began his freshman year, he was generally perceived by students and staff alike as a boy.  His peers and teachers generally used male pronouns, and he was generally treated as a boy in every respect.

41.     When Drew first started at Nease High School in August of 2015, he did not even imagine that anyone would try to prevent him from using the boys' restroom, so he used those restrooms along with all the other boys.  On every occasion, he used one of the stalls.

42.     Drew used the boys' restrooms at school without any incident until on or around September 22, 2015, when he was pulled out of class to meet with three guidance counselors, including IB Program guidance counselor Kim Hollis.  The guidance counselors informed him that someone had anonymously reported that he was using the boys' restroom.  Drew was instructed to use a gender neutral restroom from that point forward.

43.     Drew was shocked and confused.  He asked if he had done anything wrong, and was told "no."  That answer was frustrating, because it made Drew feel like he was being punished even though he had not done anything to deserve it.

44.     Drew did not want to get in trouble or have any disciplinary reports on his school record, so he reluctantly began using gender neutral restrooms at the school, and has not used the boys' restroom since.  But doing so has had a negative emotional and social impact on Drew, who simply wants to be treated like all of the other boys at the school.

45.     Using the gender neutral restrooms immediately felt like an insult to Drew's identity.  He felt humiliated having to walk halfway across the school, passing several boys' restrooms, to find one of the gender-neutral restrooms to use.  His transgender status was not widely known among the school administrators, and he was anxious about encountering staff in the hallway who would have thought he was skipping class if he had said he was going to the restroom – while he was walking past right past a boys' restroom.  It also created an inaccurate and discriminatory distinction between Drew as a boy and all other boys.  Rather than treat Drew equally and in all material respects like a boy, he is singled out as different from the other boys at the school, which interferes with treatment for his gender dysphoria.

46.     This discriminatory environment has resulted in Drew's avoiding using the restroom at all, whenever he could physically manage it, so as not to subject himself to this demeaning treatment.  He began restricting his fluid intake and planning his day around when he might have to use the restroom.  He worried about what other students would think if they saw him going to the gender neutral restrooms.  Despite the fact that this meant missing class, Drew would sometimes attempt to go to the restroom in the middle of the

class, so that fewer students in the hallways would see him walking past the boys' restrooms to a special restroom instead.  Drew also held his bladder as much as he could, which was extremely – at times, excruciatingly – uncomfortable.  Erica recalls Drew needing to rush home to use the restroom at the end of the school day after trying to hold his bladder for hours.

47.     In addition, unlike the boys' restrooms located throughout the school, the gender neutral restrooms on the campus are far fewer in number and often far less accessible. For example, during Drew's current class schedule, he does not have access to a gender neutral restroom in any of the buildings where his classes are held before lunch.  When he needs to use a restroom during, or in between, any of those classes, he must walk much farther than his classmates to reach a gender neutral restroom.  It is not feasible to do so based on the location of his classes without missing some class time.  This is extremely stressful, given that every minute of class time in his advanced classes matters.  It forces Drew to weigh the importance of the information that he would miss in class, against the anxiety, stress, and distraction that come with trying to hold one's bladder.  This creates a Hobson's choice for Drew, one that forces him to choose between the importance of learning and being present in class, with the physiological need to use the restroom.  Ignoring that physiological need can be incredibly uncomfortable, and when Drew holds his bladder that makes it difficult to concentrate or participate equally in class.  Equally as bad is the constant reminder that he is being treated differently and not accepted for who he is, something important for anyone, much less a young man in Drew's situation.  No cisgender boy at the school has to cope with this kind of discriminatory burden.

48.     Given the importance of living as a boy in all respects, this distinction creates an emotional and social hardship on Drew. Defendant's policy creates a false and discriminatory distinction by separating Drew from other boys; this differential treatment causes Drew to feel anxious by reinforcing a message that he is "different," rather than simply allowing him to live as he is: a boy. The policy is a constant reinforcement by Defendant that it does not view Drew as a real boy and believes he should be treated differently. This creates and nurtures a stigma that has no place in the school system and telecasts to others that Drew should not be treated as a boy in all respects.

49.     Defendant's policy also caused Erica to feel hurt and angry as she observed the enormous toll that the policy took on Drew. She tried to address it with school officials in an effort to avoid taking legal action. Erica sent letters to Principal Dresback and Superintendent Joyner right after Drew was first instructed on September 22, 2015 not to use boys' restrooms, requesting that he be treated as equal to all other boys in the school. Superintendent Joyner never responded to her letter. Erica and Drew then met with Principal Dresback, social workers Holly Arkin and Christy McKendrick, and Director of Student Services Sallyanne Smith in early October 2015. Erica and Drew were told during the meeting that this was "a District issue," and that the school's hands were tied.

50.     Erica met with District officials on or around November 23 or 24, 2015, including Associate Superintendent Cathy Mittelstadt and Assistant Superintendent Brennan Asplen. Mr. Asplen repeatedly raised the issue of "biology" during the meeting, which he used to refer to genitals. Erica had brought an assortment of studies, articles, and other materials about transgender students to help the District officials understand how important

13

equal treatment is, but Mr. Asplen explained his view that "98% of the people in this District would not understand" if Drew were allowed to use the boys' restroom. Mr. Asplen said he was more concerned about legal action by the parent of a cisgender child than legal action by Drew. Erica offered during that meeting, and later via email, to help educate other parents in the district about transgender children, but was rebuffed. Mr. Asplen again focused his attention on the issue of genitals and asked what would happen if a transgender girl were to come out of a stall and "wave her penis around." Erica said words to the effect of, "Sir, I don't know what kind of bathrooms you've been in, but I've never seen a naked person in a bathroom." Erica pointed out that lewd behavior by *any* student is already against the law. Unfortunately, Mr. Asplen's comments are precisely the type that foster negative stereotypes and misperceptions, all of which are both discriminatory and unsupported by any evidence, meaning that there is no evidence that a transgender child is any more likely to engage in inappropriate behavior. Comments like these highlight the discriminatory nature of the policy itself, one predicated on others' unsupported fears, rather than actual evidence.

51.     Erica contacted the U.S. Department of Education's Office for Civil Rights ("OCR") in November 2015 to file a complaint, and OCR opened an investigation. OCR offered District officials an opportunity to mediate the matter, but the District declined. OCR's assigned investigator conducted a full investigation, later suggesting that Erica meet with officials again to see if the issue could be resolved. On April 8, 2016, Erica met with Ms. Mittelstadt, Ms. Arkin, and Ms. McKendrick. Ms. Mittelstadt described this as a "civil rights issue," but said that the district is "too conservative" and "not there yet." Erica pointed out that other Florida school districts, like Broward County Public Schools, treat their

transgender students equally in restrooms.  Unfortunately, the meeting too yielded no progress.  Erica and Drew met again with Ms. Mittelstadt on May 4, 2016, but they were once again unsuccessful in securing a policy change that would allow Drew equal access to the boys' restrooms.

52.     Throughout the summer of 2016 and the 2016-2017 school year, and still hoping to avoid taking legal action, Erica reached out to OCR officials on other occasions to ascertain the status of their investigation into Defendant's discriminatory policy.  Her efforts were in vain.  Following the rescission on February 22, 2017 of prior guidance clarifying the scope of Title IX's protections of transgender students by OCR and the U.S Department of Justice, Erica and Drew came to the conclusion that they OCR would no longer be able to address their plight.  As a result, Erica and Drew sought legal representation to take legal action against Defendant's discriminatory policy.

53.     At no point has any school or District official ever provided Erica or Drew with information suggesting that his use of the boys' restroom harms anyone else.  When Drew is in all other settings outside of school, he uses the men's restroom.  To Drew's knowledge, there has never been an incident or complaint by others with his restroom use outside of school.  Drew has never, and would never, invade anyone else's privacy in a restroom.  He just wants to use the restroom, wash his hands, and leave like everyone else does.  He wants to be treated as the normal boy that he is and blend in.

54.     Access to the boys' restroom is important to Drew because he wants to interact with his peers like an equal.  Drew is recognized as the boy that he is in every respect by peers and teachers, except at the moment he needs to enter a restroom.  It does not work

for him to be a boy in every other part of his school life, but not when he needs to perform one of life's most basic functions.  And, more particularly, it suggests to others a false distinction:  that a transgender boy is not a "real" boy.  Such stigma is not only deleterious for Drew, it is a harmful statement to others, creating a stigma associated with being transgender.

55.     Being banned from the boys' restrooms is humiliating to Drew.  It sends a signal to other students that Drew is not a real boy, and treats him as if he is unfit to share a communal space with others.  It also creates a negative perception and reinforces stereotypes—all of which are unfounded—that transgender children are more likely to behave inappropriately or that they are inferior to other children.  Drew feels like he has enough to manage in a world that is still learning to understand transgender people without his school making the situation worse, and teaching his peers that he is not worthy of the same dignity and respect as all other boys.

56.     By mandating and relegating Drew to use single-stall gender neutral restrooms, a condition not imposed on cisgender students, Defendant isolates and separates Drew based on his sex and transgender status.

57.     By barring Drew from the restrooms consistent with who he is, Defendant refuses to recognize Drew's gender identity even as it recognizes the gender identity of all of his cisgender peers.  Indeed, through its policy, Defendant effectively seeks to erase and invalidate Drew's gender identity.

58.     As a result, Drew has experienced and continues to experience the harmful effects of being separated from, and treated differently than, his cisgender classmates of the

same gender identity at Nease High School, including emotional distress, lowered self-esteem, embarrassment, humiliation, social isolation, and stigma. All of these harmful effects have also heightened the symptoms, including depression and anxiety, of the gender dysphoria suffered by Drew.

59.     Through its actions, Defendant has purposefully disrupted Drew's education.

## CLAIMS FOR RELIEF

## COUNT I

### Denial of Equal Protection
### U.S. Const. Amend. XIV

60.     Plaintiff incorporates paragraphs 1 through 59 as though fully set forth herein.

61.     Plaintiff challenges, both facially and as applied to him, Defendant's policy of excluding transgender students from the single-sex facilities that match their gender identity.

62.     Defendant is a person acting under color of state law for purposes of 42 U.S.C. § 1983.

63.     Defendant is the final policy maker for Nease High School within the St. Johns County School District.

64.     The Fourteenth Amendment to the U.S. Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall deny to any person within its jurisdiction the equal protection of the laws.

65.     Defendant's exclusion of transgender students such as Drew from the single-sex facilities matching their gender identity treats transgender students differently from cisgender students who are similarly situated. Under Defendant's discriminatory policy, cisgender students are able to access restrooms and other single-sex facilities consistent with

17

their gender identity, but transgender students are banned from single-sex facilities consistent with their gender identity.

66. **Discrimination based on sex:** Under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

a. Discrimination based on sex includes, but is not limited to, discrimination based on gender, gender nonconformity, transgender status, gender expression, and gender transition.

b. Defendant's exclusion of Drew from boys' restrooms in the school district discriminates against him on the basis of sex.

c. Defendant's policy also discriminates against Drew based on gender nonconformity and sex stereotyping. For example, although Drew is a boy, is perceived as a boy in public, and has had medical treatment to bring his body into alignment with his male gender identity, he does not conform to Defendant's sex-stereotyped expectations for boys because his sex assigned at birth was female.

67. **Discrimination based on transgender status:** Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on transgender status is presumptively unconstitutional and subject to strict, or at least heightened scrutiny.

a. Transgender people have suffered a long history of extreme discrimination in Florida and across the country, and continue to suffer such discrimination to this day.

18

b.      Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process.  Transgender people have largely been unable to secure explicit state and federal protections to protect them against discrimination.

c.      A person's gender identity or transgender status bears no relation to a person's ability to contribute to society.

d.      Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

e.      Gender identity generally is fixed at an early age and highly resistant to change through intervention.

68.      Defendant's discrimination against Drew is not narrowly tailored or substantially related to any compelling or important government interest.  Indeed, it is not even rationally related to any legitimate government interest.  The discriminatory policy does not promote the safety, privacy, security, or well-being of any students, including cisgender students, but it does undermine the safety and privacy of transgender students such as Drew, who is publicly marked as different and inferior every time he has to access a different restroom from other boys.

69.      Defendant's discriminatory policy deprives Drew and other transgender students of their right to equal dignity, liberty, and autonomy by branding them as second-class citizens.  Defendant thus denies Drew equal protection of the laws in violation of the Equal Protection Clause of the Fourteenth Amendment.

70.     Defendant School Board has conduct is wrongful and violates the Equal

Protection Clause of the Fourteenth Amendment, for which Drew is entitled to

compensatory, as well as nominal, damages against Defendant School Board.

## COUNT II

### Violation of Title IX
### 20 U.S.C. § 1681, *et seq*.

71.     Plaintiff incorporates paragraphs 1 through 59 as though fully set forth herein.

72.     Title IX provides that no person in the United States shall, on the basis of sex,

be excluded from participation in, be denied the benefits of, or be subjected to discrimination

under any education program or activity receiving Federal financial assistance.

73.     Under Title IX, discrimination on the basis of sex includes, but is not limited

to, discrimination based on gender, gender nonconformity, transgender status, gender

expression, and gender transition.

74.     Defendant School Board is a recipient of federal financial assistance from the

United States Department of Education, and therefore subject to Title IX.

75.     Under Defendant School Board's discriminatory policy, cisgender students

are able to access restrooms and other single-sex facilities consistent with their gender

identity, but transgender students are banned from single-sex facilities consistent with their

gender identity.

76.     By banning Drew from access to and use of boys' restrooms consistent with

his gender identity, Defendant School Board excludes Drew from participation in, denies him

the benefits of, and subjects him to discrimination in educational programs and activities

within the District, particularly at Nease High School, on the basis of sex, in violation of

20

Title IX.  For example, Drew's being forced to access far away gender neutral restrooms means that Drew must sometimes miss classroom time simply to relieve himself; and when Drew attempts to hold his bladder so as not to miss instruction time, he struggles to concentrate on the teacher's material instead of the significant discomfort of holding his bladder.

77.     Defendant's discriminatory exclusion of Drew from boys' restrooms because he is transgender harms Drew by stigmatizing him and treating him as lesser than other boys, which causes Drew to experience emotional distress, anxiety, embarrassment, humiliation, and pain and anguish.

78.     Defendant School Board has intentionally violated and continues to violate Title IX, for which Drew is entitled to compensatory, as well as nominal damages, against the School Board.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant on all claims, as follows:

A.     Enter a declaratory judgment that Defendant's exclusion of Drew from boys' restrooms within the District violates Drew's rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

B.     Enter a declaratory judgment that Defendant School Board's exclusion of Drew from boys' restrooms within the District violates Drew's rights under Title IX;

C.     Issue injunctive relief enjoining Defendant (i) from treating Drew differently from other boys in any respect, including but not limited to by denying Drew equal access to

boys' restrooms within the District on the same terms as all other boys, and (ii) from denying any students, including those who are transgender, from using single-sex multi-user facilities in accordance with their gender identity;

E.     Award Drew, by and through his next friend Erica Adams Kasper, compensatory, as well as nominal, damages against Defendant School Board in an amount that would fully compensate Drew for the emotional distress and suffering, embarrassment, humiliation, pain and anguish, violation of his dignity, and other damages that have been caused by Defendant's conduct in violation of Drew's rights under the Fourteenth Amendment to the U.S. Constitution and Title IX;

F.     Award Drew his costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

G.     Grant such other and further legal and equitable relief as the Court deems appropriate, just, and proper.

H.     The declaratory and injunctive relief requested in this action is sought against Defendant and its officers, agents, servants, employees, and attorneys, as well as any other persons who are in active concert or participation with them.

* * *

Dated:  September 7, 2017

Respectfully submitted,

/s/  Tara L. Borelli
Tara L. Borelli (*admitted pro hac vice*)
LAMBDA LEGAL DEFENSE AND EDUCATION
    FUND, INC.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30308-1210
Telephone:  404-897-1880
Facsimile:  404-897-1884
tborelli@lambdalegal.org

Jennifer Altman
Florida Bar No: 881384
Markenzy Lapointe
Florida Bar No: 172601
Shani Rivaux
Florida Bar No: 42095
Aryeh Kaplan
Florida Bar No: 60558
PILLSBURY WINTHROP SHAW PITTMAN, LLP
600 Brickell Avenue Suite 3100
Miami, FL 33131
Telephone:  786-913-4900
Facsimile:  786-913-4901
jennifer.altman@pillsbury.com
markenzy.lapointe@pillsburylaw.com
shani.rivaux@pillsbury.com
aryeh.kaplan@pillsbury.com

Richard M. Segal (*admitted pro hac vice*)
Nathaniel R. Smith (*admitted pro hac vice*)
PILLSBURY WINTHROP SHAW PITTMAN LLP
501 W. Broadway, Suite 1100
San Diego, CA 92101
Telephone:  619-234-5000
Facsimile:  619-236-1995
richard.segal@pillsburylaw.com
nathaniel.smith@pillsburylaw.com

Kirsten Doolittle, Trial Counsel
Florida Bar No. 942391
THE LAW OFFICE OF KIRSTEN DOOLITTLE,
    P.A.
The Elks Building
207 North Laura Street, Ste. 240
Jacksonville, FL 32202
Telephone:  904-551-7775
Facsimile:  904-513-9254
kd@kdlawoffice.com

Paul D. Castillo (*admitted pro hac vice*)
LAMBDA LEGAL DEFENSE
    AND EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, Texas 75219
Telephone:  214-219-8585
Facsimile:  214-219-4455
pcastillo@lambdalegal.org

Omar Gonzalez-Pagan (*admitted pro hac
    vice*)
LAMBDA LEGAL DEFENSE
    AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, New York 10005-3919
Telephone: 212-809-8585
Facsimile:  212-809-0055
ogonzalez-pagan@lambdalegal.org

*Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 7, 2017, I electronically filed the foregoing with

the Clerk of the Court by using the CM/ECF system, causing a copy of the foregoing and all

attachments to be served on all counsel of record.

/s/ Tara L. Borelli
Tara L. Borelli (*admitted pro hac vice*)
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30308-1210
Tel.: 404-897-1880 | Fax: 404-897-1884
tborelli@lambdalegal.org