# EXHIBIT B

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## COURT REPORTERS

**NO. 3:17-CV-00739-TJC-JBT**

**DREW ADAMS, ET AL.**

V.

**THE SCHOOL BOARD OF ST. JOHNS COUNTY, FLORIDA**

**DEPONENT:**

**ALLAN JOSEPHSON, M.D.**

**DATE:**

**November 28, 2017**



a courtroom **powerhouse**

schedule@kentuckianareporters.com
877.808.5856 | 502.589.2273

www.kentuckianareporters.com

```
1    UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF FLORIDA
3    JACKSONVILLE DIVISION
4    NO. 3:17-CV-00739-TJC-JBT
5
6    DREW ADAMS, ET AL.,
7    PLAINTIFFS
8
9    VS.
10
11   THE SCHOOL BOARD OF ST. JOHNS COUNTY, FLORIDA,
12   DEFENDANT
13
14   **ROUGH DRAFT**
15
16   DEPONENT:  DR. ALLAN JOSEPHSON, M.D.
17   DATE:  NOVEMBER 28, 2017
18   REPORTER:  MEGAN BROWN
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

| 1 | APPEARANCES |
|---|---|
| 2 | |
| 3 | ON BEHALF OF THE PLAINTIFFS, DREW ADAMS, ET AL.: |
| 4 | NATALIE NARDECCHIA |
| 5 | ANTHONY PINGGERA |
| 6 | LAMBDA LEGAL |
| 7 | WESTERN REGIONAL OFFICE |
| 8 | 4221 WILSHIRE BLVD, SUITE 280 |
| 9 | LOS ANGELES, CALIFORNIA 90010 |
| 10 | TELEPHONE: (213) 382-7600 |
| 11 | E-MAIL: NNARDECCHIA@LAMBDALEGAL.ORG |
| 12 | |
| 13 | ON BEHALF OF THE PLAINTIFFS, DREW ADAMS, ET AL.: |
| 14 | JENNIFER ALTMAN |
| 15 | PILLSBURY WINTHROP SHAW PITTMAN, LLP |
| 16 | 600 BRICKELL AVENUE, SUITE 3100 |
| 17 | MIAMI, FLORIDA 33131 |
| 18 | TELEPHONE: (786) 913-4880 |
| 19 | E-MAIL: JENNIFER.ALTMAN@PILLSBURYLAW.COM |
| 20 | |
| 21 | ON BEHALF OF THE DEFENDANT, THE SCHOOL BOARD OF ST. JOHNS |
| 22 | COUNTY, FLORIDA: |
| 23 | KEVIN KOSTELNIK |
| 24 | TERRY HARMON |
| 25 | SNIFFEN & SPELLMAN, P.A. |

Page 3

1 123 NORTH MONROE STREET
2 TALLAHASSEE, FLORIDA 32301
3 TELEPHONE: (850) 205-1996
4 E-MAIL: KKOSTILNIK@SNIFFENLAW.COM

Page 4

| 1 | EXHIBITS | |
|---|---|---|
| 2 | | |
| 3 | 1 | POWERPOINT |
| 4 | 2 | EXPERT DISCLOSURE |
| 5 | 3 | ARTICLE |
| 6 | 4 | POWERPOINT |
| 7 | 5 | ARTICLE |
| 8 | 6 | ARTICLE |

Page 5

STIPULATION

The VIDEO deposition of DR. ALLAN JOSEPHSON taken at KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET, SUITE 100, LOUISVILLE, KENTUCKY 40202 on TUESDAY, the 28TH day of NOVEMBER, 2017 at approximately 9:01 A.M.; Said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. It is agreed that MEGAN BROWN, being a Notary Public and Court Reporter for the State of Kentucky, may swear the witness.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ALLAN JOSEPHSON, M.D., taken on November 28, 2017
6..9

Page 6

1   PROCEEDINGS
2   VIDEOGRAPHER: Okay. We are now on record. My
3   name is Alex Glasnovic. I'm the video technician
4   today, and Megan Brown is the court reporter. Today
5   is the 28th day of November, 2017. The time is 9:01
6   a.m. We are at the offices of the Kentuckiana Court
7   Reporters located in Louisville Kentucky to take the
8   deposition of Allan Josephson, M.D. in the matter of
9   Drew Adams, et al. v. the School Board of St. Johns
10  County, Florida, pending in the United States
11  District Court for the Middle District of Florida,
12  Jacksonville Division, Number 3:17-CV-00739-TJC-JBT.
13  Will Counsel please identify themselves for the
14  record?
15      MS. NARDECCHIA: Good morning. Natalie
16  Nardecchia for the plaintiff.
17      MR. KOSTELNIK: Good morning. Kevin Kostelnik
18  for the defendant.
19      MS. ALTMAN: Jennifer Altman from Pillsbury
20  Winthrop Shaw Pittman for the plaintiff.
21      MR. PINGERRA: Anthony Pingerra for the
22  plaintiff.
23      VIDEOGRAPHER: Thank you. Dr. Josephson, will
24  you please raise your right hand to be sworn in by
25  the reporter?

Page 7

1       COURT REPORTER: Do you solemnly swear or
2   affirm that the testimony you're about to give will
3   be the truth, the whole truth and nothing but the
4   truth?
5       THE WITNESS: I do.
6       COURT REPORTER: Thank you.
7       MR. KOSTELNIK: Natalie, are you okay with just
8   saying "form" for any objections rather than "object
9   to form"?
10      MS. NARDECCHIA: Sure.
11      MR. KOSTELNIK: Just to speed things up.
12      MS. NARDECCHIA: That's fine.
13      MR. KOSTELNIK: Okay.
14           DIRECT EXAMINATION
15  BY MS. NARDECCHIA:
16  Q   Okay. Good morning, Dr. Josephson. Could you
17  please state and spell your full name for the record?
18  A   Allan Mark Josephson. A-L-L-A-N, M-A-R-K, J-
19  O-S-E-P-H-S-O-N.
20  Q   Now, the oath that you've just taken is the
21  same that you would take as if you were in the court of
22  law. Do you understand that you're testifying under
23  penalty of perjury?
24  A   Yes.
25  Q   Okay. You've had your deposition taken

Page 8

1   before, correct?
2   A   Yes.
3   Q   How many times?
4   A   Oh, boy. Maybe ten. Testing my memory. I'm
5   just estimating ten.
6   Q   Okay. So I'll just be quick then in going
7   over the deposition ground rules. So everything that's
8   being said in the room today is being transcribed by the
9   court reporter. So please speak clearly, audibly so
10  that she can take down everything that's being said.
11  Please give a verbal response such as "yes" instead of
12  "uh-huh" or nodding. And please also wait for me to
13  finish asking my question even though you may know what
14  I'm going to ask. And sometimes I take a minute to
15  finish my question. Just let me finish before you
16  respond and I will wait for you to answer before I ask
17  you another question, okay?
18  A   (NO VERBAL RESPONSE.)
19  Q   Yes?
20  A   Yes.
21  Q   Okay. I will take it that you understand my
22  question if you respond to it. So if you don't
23  understand my question let me know.
24  A   Okay.
25  Q   Okay. And if I've asked you a question I'd

Page 9

1   prefer that you answer my question before you take a
2   break if you need to take one, okay?
3   A   Okay.
4   Q   Is there any reason, either your own physical
5   health or any medications you may be under, that would
6   prevent you from giving your best testimony today?
7   A   No.
8   Q   Okay. Can you please start off by telling me
9   all the opinions you intend to offer in this case?
10  A   That's a broad question. Could you focus that
11  a little more? I mean?
12  Q   Not really.
13  A   Well, I'm here to provide information related
14  to the diagnosis of gender dysphoria, how it might
15  develop, how I as a physician and psychiatrist go about
16  identifying these problems, helping youth and their
17  families with these problems. And that would be the
18  main thing. The nature of the condition and how it's
19  treated and how that information might be relevant to
20  the attorneys working on this case.
21  Q   Okay. You mentioned the nature of the
22  condition. Which condition are you referring to?
23  A   Gender dysphoria.
24  Q   Have you ever spoken to the Plaintiff in this
25  case, Drew Adams?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA COURT REPORTERS

Page 10

1   A   I have not.
2   Q   You never examined him?
3   A   I have not examined him.
4   Q   You've never evaluated him?
5   A   No.
6   Q   Never treated him?
7   A   No.
8   Q   Have you asked for an independent medical exam
9   of Drew Adams?
10  A   No.
11  Q   Do you believe that speaking to Drew Adams
12  would have enabled you to provide more accurate opinions
13  in this case?
14  A   The information that I've had has been very
15  useful and helpful. Speaking to a patient always
16  clarifies things. But I'm more than able to offer an
17  opinion on this case.
18  Q   Did you request of counsel for the school
19  board to interview or meet with Drew?
20  A   No.
21  Q   Okay. Did anyone tell you you could not meet
22  or evaluate Drew Adams?
23  A   No.
24  Q   And --
25  A   It's my understanding if, you know, I don't

Page 11

1   have a license in the state of Florida and that
2   precludes doing any clinical practice in the state of
3   Florida. If someone was going to fly him up here that
4   would have been a different issue. But it never came
5   up.
6   Q   So your understanding is that since you don't
7   have a license in Florida you're precluded from doing
8   what in the state of Florida?
9   A   Practicing medicine in any way. In other
10  words, treating a patient, assessing a patient, that
11  kind of thing.
12  Q   What precludes you?
13  A   Usually state law.
14  Q   Which law?
15  A   Laws that have to do with practicing medicine.
16  I don't have a license to practice medicine in Florida.
17  Q   You could have spoken to Drew Adams, though,
18  right?
19  A   Well, it would have been an interesting
20  question. I suppose I could have but what would the
21  nature of that been would be the question. I, as a
22  psychiatrist, why would I speak to him unless it was in
23  a doctor-patient relationship. I'm not an attorney. Put
24  it that way.
25  Q   What date did you submit your -- well, let me

Page 12

1   strike that. You submitted your expert report in this
2   case on October 2, 2017; is that right?
3       MR. KOSTELNIK: Form.
4   A   That's correct.
5   Q   All right. And when you submitted your expert
6   report had you reviewed any of Drew's medical records?
7   A   Yes, I had seen some of them at that point.
8   Q   Are you sure?
9   A   I'm trying to think. October 2nd. I may not
10  have. I may not have. That report was quite general in
11  nature regarding gender dysphoria and I had seen records
12  on the case about the school district's policies and so
13  forth. But I don't think at that point I had seen his
14  medical records.
15  Q   Did you speak with any of Drew's treating
16  physicians at any point?
17  A   No.
18  Q   Did anyone advise you you could not speak to
19  his treating physicians?
20  A   No.
21  Q   Do you believe speaking to his treating
22  physicians would have enabled you to provide more
23  accurate opinions in this case?
24  A   Perhaps. The materials that I saw and that
25  I've seen subsequently, I've seen the patient himself on

Page 13

1   self-produced videos and so forth. So I've got a lot of
2   information. If you talk with a physician who treated
3   him it might have given more information.
4   Q   Which videos have you seen of Drew Adams?
5   A   Four or five of them that he produced. I
6   think he was talking about various aspects of his gender
7   dysphoria, his activism, these types of things.
8   Q   Okay. But you hadn't seen those videos prior
9   to submitting your report in this case?
10  A   No.
11  Q   Have you ever spoken to Drew's mother?
12  A   No.
13  Q   His father?
14  A   No.
15  Q   Have you ever evaluated them?
16  A   No.
17  Q   Do you know if Drew has any siblings?
18  A   I believe he does. But I'd have to check
19  that. I'm not sure.
20  Q   You can't say for the record as you sit here
21  today if he has a brother or sister or how many?
22  A   Not with certainty, no.
23  Q   Are you offering an opinion in this case on
24  whether Drew Adams is transgender?
25  A   No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00739-TJC-JBT   Document 107-2   Filed 11/29/17   Page 7 of 9 PageID 2666
The Deposition of ALLAN JOSEPHSON, M.D., taken on November 28, 2017
14..17

Page 14

1  Q  Would you agree with me that Drew Adams is a
2  boy?
3  A  Depends on how you define boy.
4  Q  Is there any definition of boy that you would
5  agree -- sorry -- that you would agree Drew Adams is?
6     MR. KOSTELNIK: Form.
7  A  Drew Adams is a genetic born natal female. At
8  this point in his life he believes he is male.
9  Q  And his doctors also say that he is male,
10 correct?
11    MR. KOSTELNIK: Form.
12 A  Well, he's had a number of different doctors.
13 I think some have been involved with hormone treatments,
14 that kind of thing. And they are helping him transition
15 to be male. But he is a genetic natal female.
16 Q  Do you know where Drew is in his transition?
17 A  He certainly had hormones. I think he has
18 been, from what he said, he's been desiring that he has
19 more male characteristics develop, i.e., facial hair and
20 so forth. So the hormonal treatments are going on. And
21 I'm not exactly sure where the rest of the transitioning
22 treatments are.
23 Q  Okay. So you don't know whether or not he's
24 had any surgeries?
25 A  I'm not sure the extent of that, no.

Page 15

1  Q  Okay. So you said Drew believed he is male.
2  So I take it you do not believe he is male?
3  A  He is a genetic female who feels that he is
4  male.
5  Q  Do you accept that when people transition at
6  some point they are the other gender?
7     MR. KOSTELNIK: Form.
8  A  They believe they're the other gender. But
9  they're not the other sex.
10 Q  Even if they have legal documents saying that
11 they were now transitioned to a different gender?
12    MR. KOSTELNIK: Form.
13 A  Well, the and I'm not sure where that process
14 is at, either. But once that legal process took place,
15 then he could be called a male.
16 Q  As you sit here today do you know whether or
17 not Drew Adams has legal documents identifying him as
18 male?
19 A  I think he has. He's under 18, which would be
20 a little unusual in some states. But I think there have
21 been moves toward that, from what I've seen or heard him
22 say on the video.
23 Q  Do you know for --
24 A  But that would make -- legally then that would
25 make him had a male, yes.

Page 16

1  Q  Okay. So do you know whether his driver's
2  license says he's male?
3  A  I don't know.
4  Q  Or his birth certificate?
5  A  I think the birth certificate may have been
6  changed.
7  Q  Okay.
8  A  And that would allow him to say then that he -
9  - he is male.
10 Q  And you would accept that?
11 A  Yes. Although I would say that the discussion
12 we're having is going from fact to a feeling. The fact
13 of sex, the fact of his male female is a fact and that
14 cannot change. And that will remain. Now he has felt
15 that he's female. He is now a legal -- moves to be
16 female -- I'm sorry -- to be male and those should be
17 respected and accepted. And where he's actually at on
18 that journey I'm not sure I have the full information.
19 Q  You say it should be respected and accepted
20 that he's male if he's transitioned?
21 A  Well, once he goes through the legal
22 procedures and made that statement how he presents
23 himself legally to society, yes.
24 Q  Okay.
25 A  Then he would be male.

Page 17

1  Q  And you said the fact is he's natal sex. By
2  that do you mean that his sex when he was born was --
3  A  XX, female.
4  Q  Female. Okay. And he was identified as being
5  female?
6  A  Yes.
7  Q  Okay. Did you ever do a chromosome test on
8  Drew Adams?
9  A  No. That is usually not indicated and has
10 been for hundreds of years, visual inspection is enough
11 for most people. It is not done in medicine at all
12 unless there's a disorder of sexual differentiation,
13 that kind of thing.
14 Q  You said "visual inspection", you meant of the
15 external genitalia?
16 A  Physical examination, yeah.
17 Q  I'm sorry, of the external genitalia, correct?
18 A  That's typically the most standard way of
19 doing it. There may be other things pediatricians do,
20 but a physical exam, yeah.
21 Q  The reason I asked if you'd done a chromosome
22 test because as you mentioned XY, which is you're
23 referring to chromosomes, correct?
24 A  Right. Yeah. And so that being natal female,
25 he would have XX and then XY is the male pattern, yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00739-TJC-JBT  Document 107-2  Filed 11/29/17  Page 8 of 9 PageID 2667
The Deposition of ALLEN JOSEPHSON, M.D., taken on November 20, 2017
18..21

Page 18

1  Q  But I mean you didn't test to know?
2  A  No, no, I did not.
3  Q  So it sounds like you agree with me that if
4  someone says that they're male you use male pronouns; is
5  that right?
6  A  That's kind of by convention. It's out of
7  respect for the person. But it doesn't change the
8  biological nature of the individual.
9  Q  Okay.
10 A  It's what they want to be called and that's
11 what they feel they should be called. And so I will
12 usually respect that, yeah.
13 Q  By "biological nature" again you're referring
14 to natal sex, right?
15 A  That's correct.
16 Q  Okay. Do you have any reason to doubt that
17 Drew identifies as male?
18 A  No.
19 Q  Do you have any reason to doubt his medical
20 providers attesting that he is male?
21 A  No. I believe they've probably done that,
22 yeah.
23 Q  But you don't know?
24 A  I'm not sure. I mean the records I -- I think
25 I've seen a couple of attestations they attest that he

Page 19

1  is now male.
2  Q  Are you rendering an opinion as to whether
3  Drew Adams suffers from gender dysphoria?
4  A  No, because I haven't examined him.
5  Q  Do you agree, then, that it would be improper
6  to offer a diagnosis about a patient that you've never
7  examined?
8      MR. KOSTELNIK: Object to form.
9  A  Well, it depends on the context. I think when
10 you take a psychiatrist, for example, in this case me,
11 who has 45 years of experience, has seen thousands of
12 patients, has seen thousands of records and has a broad
13 base in psychopathology, in other words, how to diagnose
14 and treat the problems of youth, and then given the
15 history and given the story and let them look at the
16 records, that's a pretty significant thing. And
17 depending on the accuracy of the records, I would feel
18 comfortable in saying this appears to be that type of
19 patient, but I stop short of saying I know the diagnosis
20 because, of course, I would not have seen him.
21 Q  Okay. And just so I'm clear, when you said
22 the kind -- you said one of the things you'd want to
23 look at are the records. You're referring to the
24 person's medical records?
25 A  Well, any records. School, medical, that

Page 20

1  reflect his experience, his statements, the way he
2  presents himself, that kind of thing.
3  Q  Do you agree that Drew Adams was diagnosed
4  with gender dysphoria by his medical providers?
5  A  Yes.
6  Q  Okay. And I noticed -- well, I think based on
7  your own testimony you described your expert report as
8  being general in nature with regard to gender dysphoria.
9  Is that accurate?
10 A  Right. It was a broad, broad report about
11 these -- these issues and the particular case as it was
12 presented to me and the documents that I read regarding
13 the complaint, the school's position, the policies and
14 so forth.
15 Q  So then are you not offering -- sorry. Let me
16 start over so it's a clear question. So then are you
17 offering any opinions on whether Drew Adams gender
18 dysphoria has or will persist?
19 A  I'm not offering an opinion on that. I mean I
20 could be asked one and would probably, I think it would
21 be fairly accurate. But I'm not offering it in this
22 case.
23 Q  Okay. Are you offering any opinion on whether
24 Drew Adams will seek to identify as being transgender?
25 A  No.

Page 21

1  Q  And you're not offering any opinion on the
2  causes of Drew's gender dysphoria; is that also correct?
3  A  No. I mean that is correct.
4  Q  Yes. Thank you. Are you offering any
5  opinions about the propriety of Drew's transition-
6  related medical care he's received?
7  A  No.
8  Q  Are you offering any opinions about Drew's
9  home life or anything about his relationship with his
10 family?
11 A  No.
12 Q  Are you offering any opinions that are
13 specific to the facts of this case?
14 A  Yeah. I would be offering the opinion that
15 the school district's policy appears to have responded
16 to his needs. And I have the opinion that, you know,
17 they're not forcing him to go to a female restroom.
18 They're giving him close proximity to a gender-neutral
19 restroom. And that any statements that he is going
20 through significant stress, harm, irreparable harm,
21 these kinds of terms, I'm not supporting that by my
22 opinion.
23 Q  Okay.
24 A  He seems to be quite comfortable in his
25 current status.


Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00739-TJC-JBT  Document 107-2  Filed 11/29/17  Page 9 of 9 PageID 2668
The Deposition of ALLAN JOSEPHSON, M.D., taken on November 28, 2017
102..105

Page 102

1 she's an independent practitioner. She doesn't have a
2 supervisor.
3    Q    And she works with Dr. Kingery, the pediatric
4 endocrinologist; is that right?
5    A    Yeah. That's their -- part of their team over
6 there. That's correct.
7    Q    Let me just step back to the earlier line of
8 questions just for a second. Can you identify for the
9 record what specific qualifications you have to hold
10 yourself out as an expert in gender dysphoria?
11       MR. KOSTELNIK: Objection. Form.
12    A    I haven't held myself out as an expert.
13    Q    Okay.
14    A    I'm an expert in child and adolescent
15 psychiatry, family psychiatry, developmental
16 psychopathology, and that's what I do. Yeah.
17    Q    Okay. Are you holding yourself out in this
18 case as an expert in issues relating -- I'm sorry. Let
19 me strike that. Are you holding yourself out in this
20 case as an expert regarding transgender healthcare?
21    A    I feel -- feel I am qualified and fully
22 conversed in the issues about transgender healthcare
23 and, over the last several years, have dramatically
24 increased my involvement with these patients and seeing
25 kind of how it fits or doesn't fit with development

Page 103

1 psychopathology and family psychopathology, other
2 problems. But when you say holding yourself out, I --
3 it's kind of an interesting term I'm not sure how to
4 interpret.
5    Q    Any other qualifications that you would say
6 make you an expert in transgender healthcare or -- well,
7 let me strike that. So are you saying you are an expert
8 in transgender healthcare or not?
9       MR. KOSTELNIK: Form.
10    A    I don't know what definition of "expert"
11 you're using.
12    Q    Well, you're identified as an expert witness -
13 -
14    A    Well, an expert --
15    Q    -- in this case, right?
16    A    I -- I would say yes in the sense of that I
17 know a great deal about adolescent psychopathology, how
18 kids develop problems, all the psychiatric disorders
19 that many transgender kids have, and am quite adept at
20 sorting out what's cause and effect; in other words,
21 what -- what issues do the transgender experience cause
22 or what predisposing factors kind of lead to transgender
23 issues, all of that kind of -- kind of thing. I'm very
24 expert, and maybe more expert than some who -- to use
25 the phrase, "If all you have is a hammer, everything

Page 104

1 looks like a nail." I mean, to -- to take these -- in
2 fact, I have said this publicly recently that this is
3 becoming the only disorder in medicine that it appears
4 in some cases, we make the diagnosis based on what the
5 patient tells us. In other words, they have it, so
6 that's what we do. And it's -- you need to approach it
7 in a different way.
8    Q    At the gender clinic, does Dr. Brady approach
9 it that way? If some -- a patient comes in a tells --
10    A    I'm not sure --
11    Q    Excuse me. Just let me finish.
12    A    Okay.
13    Q    If the patient comes in and just says, "This
14 is who I am," then they just accept that?
15       MR. KOSTELNIK: Form.
16    A    I -- I doubt that she does that. There's a
17 range of responses, and you'd have to ask her. I don't
18 know.
19    Q    Okay.
20    A    She kind of --
21    Q    Do you know of any --
22    A    -- practice.
23    Q    -- gender clinics where they just -- the
24 patient comes in and just says, "This is what I need,"
25 and they just rubber stamp it and do what the patient

Page 105

1 wants, not evaluating them?
2    A    Nobody would tell you that, but I talked with
3 individuals who say that's basically what happens.
4    Q    Who -- which --
5    A    In other words --
6    Q    Which individuals --
7    A    In other words --
8    Q    -- say that?
9    A    In other words, people -- once they come in,
10 they're rarely turned around, and the level of
11 psychological evaluation is questionable. Now, in the
12 standards of care and so forth, it's certainly demanded
13 and expected. My point is: You need to take time and
14 give some time to sort through these issues. But -- but
15 there are clinics where it's -- the -- the affirmation
16 of the patient is confused with affirmation of the
17 diagnosis. Every patient should be affirmed, cared for
18 --
19    Q    Okay. But my question was: Which specific
20 individuals say that's what happens, that a patient
21 comes in and demands something and that's rubber
22 stamped?
23    A    I -- this is my impression. I -- this is a
24 very specific question, but Dr. Ruse would be one
25 individual who's had experience with -- see, these

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com