# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

|  |  |
|---|---|
| DREW ADAMS, a minor, by and through his next friend and mother, ERICA ADAMS KASPER,<br><br>    *Plaintiff,*<br><br> v.<br><br>THE SCHOOL BOARD OF ST. JOHNS COUNTY, FLORIDA,<br><br>    *Defendant.* | Civil Action No. 3:17-cv-00739-TJC-JBT |

## PROPOSED *AMICUS CURIAE* BRIEF OF SCHOOL ADMINISTRATORS FROM 29 STATES AND THE DISTRICT OF COLUMBIA

BOIES SCHILLER FLEXNER LLP

Rosanne C. Baxter
333 Main Street
Armonk, NY 10504
Phone: (914) 749-8200
Fax: (914) 749-8300
rbaxter@bsfllp.com
*Pro hac vice* motion pending

Karen Dyer
Florida Bar No. 716324
121 South Orange Avenue
Suite 840
Orlando, FL 32801
Phone: (407) 425-7118
Fax: (407) 425-7047
kdyer@bsfllp.com

*Attorneys for Amici*
*School Administrators*

Dated: December 6, 2017

**TABLE OF CONTENTS**

INTEREST OF *AMICI CURIAE* ............................................................................. 1

SUMMARY OF ARGUMENT ............................................................................. 5

ARGUMENT ............................................................................. 6

   I.   In *Amici*'s Experience, Inclusive Policies toward Transgender Students Have Led to Positive Results, not Adverse Consequences.................................... 6

     A.   Students' Experiences in Schools with Inclusive Policies Have Been Positive. .............. 8

     B.   *Amici* Report Positive—Not Negative—Results from Inclusive Policies. .................... 13

        1.   Problems with Behavior in Restrooms or Locker Rooms Have Not Occurred. .......... 14

        2.   In Amici's Experience, Students Have Not "Posed" as Transgender to Gain Improper Access to Facilities.................................................................. 15

   II.   Schools Can and Should Fully Respect Both the Gender Identity and the Privacy Concerns of All Students. ............................................... 17

   III.  Gender-Segregated Spaces and Activities Are Fully Consistent with School Policies Respecting Every Student's Gender Identity.................................. 20

CONCLUSION.................................................................................................. 21

# TABLE OF AUTHORITIES

**Miscellaneous Authorities**

Arthur DiBenedetto Interview, Nov. 29, 2016 ........................................................................ 19

Brian Schaffer Interview, June 1, 2016 ................................................................................. 17

Denise Palazzo Interview, Oct. 3, 2015 ............................................................................ 13, 15

Diana Bruce Interview, Oct. 5, 2015 ................................................... 8, 9, 15, 17, 19, 20

Dr. David Vannasdall Interview I, Sept. 23, 2015 ........................................... 10, 11, 15

Dr. David Vannasdall Interview II, Sept. 9, 2016 .................................................... 9, 18

Dr. Eldridge Greer Interview, Oct. 14, 2016 ............................................................. 9, 16

Dr. Judy Chiasson Interview, Sept. 23, 2015 ....................................... 9, 15, 16, 18, 21

Dr. Pamela Retzlaff Interview, Nov. 17, 2016 ...................................................... 14, 21

Dr. Rachel Santa Interview, May 27, 2016 ...................................................... 9, 13, 16

Dr. Thomas Aberli Interview, Oct. 7, 2015 ....................................... 12, 13, 14, 18, 20

Howard Colter Interview, June 6, 2016 ........................................................................ 8

John O'Reilly Interview, Sept. 20, 2015 ...................................................................... 21

Ken Kunin Interview, June 10, 2016 ............................................................... 15, 19, 20

Letter from Dr. Judy Chiasson to Dr. Thomas Aberli, May 29, 2014 ................... 16, 21

Mary Doran Interview, Oct. 16, 2015 ......................................................................... 15

Matthew Haney Interview, June 6, 2016 .................................................................... 18

Peyton Chapman Interview, May 27, 2016 ................................................................. 13

Roger Bourgeois Interview, Oct. 8, 2015 ..................................................... 9, 16, 19, 21

Sherie Hohs Interview, Oct. 15, 2015 ........................................................................... 9

**Internet Sources**

*Age of Individuals Who Identify as Transgender in the United States*, Jody L. Herman, Andrew R. Flores, Taylor N.T. Brown, Bianca D.M. Wilson, Keirth J. Control, The Williams Institute, UCLA School of Law, January 2017. Available at

https://williamsinstitute.law.ucla.edu/wp-content/uploads/TransAgeReport.pdf ...................... 5

Dr. Judy Chiasson Testimony to the California Senate Education Committee on A.B. 1266 (June 12, 2013), available at
https://www.youtube.com/watch?v=Xmq9dIQdsNE  (last visited Nov. 16, 2017).................... 6

Dr. Thomas Aberli Testimony before the Kentucky Senate Education Committee on S.B. 76 (Feb. 19, 2015) ("Aberli Testimony"), video excerpt available at
https://www.youtube.com/watch?v=QodplMWsEvQ ............................................................. 12

Julie Bosman & Motoko Rich, *As Transgender Students Make Gains, Schools Hesitate Over Bathroom Policies*, N.Y. TIMES, Nov. 4, 2015, at available online at:
https://www.nytimes.com/2015/11/04/us/as-transgender-students-make-gains-schools-hesitate-at-bathrooms.html ....................................................................................................................... 11

Kathy Canavan, *Transgender bathrooms already happening in Delaware*, DELAWARE BUSINESS TIMES, May 13, 2016 Available at:
http://www.delawarebusinesstimes.com/transgender-bathrooms- already-happening-delaware/ ................................................................................................................. 9, 13

Lauren Slager, *Schools Take Steps to Address Needs of LGBTQ Students*, mLIVE Michigan, Apr. 21, 2016 Available at:
http://www.mlive.com/news/ann-arbor/index.ssf/2016/04/schools_take_steps_to_address.html................................................. 18

Letter from DOJ and OCR to Arcadia School District (July 24, 2013), available at
http://www.justice.gov/sites/default/files/crt/legacy/2013/07/26/arcadialetter.pdf .................. 11

Resolution Agreement Between the Arcadia Unified School District, the U.S. Department of Education, Office for Civil Rights, and the U.S. Department of Justice, Office of Civil Rights, OCR Case No. 09-12-1020/DOJ Case No. 09-12-1020 (July 24, 2013), available at
http://www.justice.gov/sites/default/files/crt/legacy/2013/07/26/arcadiaagree.pdf.................. 11

*Amici* are school districts, superintendents, principals, school board members, social workers, and other officials and educators from schools and school districts across the country that have adopted, or are in the process of adopting, inclusive policies and practices for their transgender students.[2]  Together, *amici* represent a broad cross-section of schools and districts from 29 states and the District of Columbia.  *Amici* offer valuable perspectives on a number of the issues in this case, based on their broad collective experience with adopting, implementing, and enforcing such policies in their schools.

Below is a list of *amici* and their background and relevant experience:

| AMICUS | BACKGROUND |
|---|---|
| **Thomas A. Aberli, Ed.D.** | Principal, J.M. Atherton High School, Louisville, Kentucky |
| **Achievement First Public Charter Schools** | Achievement First Public Charter Schools, located throughout Connecticut, New York, and Rhode Island |

---

[1]Counsel for *amici*, Boies Schiller Flexner LLP ("BSF"), has prepared and filed this brief, with no participation by counsel for any party.  This brief on behalf of *amici* is based upon similar briefs submitted in other cases regarding policies toward transgender students, which were prepared and filed by Pillsbury Winthrop Shaw Pittman LLP and Lambda Legal Defense and Education Fund., Inc.  Pillsbury Winthrop and Lambda Legal did not participate in the preparation of this brief. BSF contacted *amici* independently to confirm their willingness to participate in this brief as well as the content and accuracy of their statements.  Those not quoted directly have confirmed that they support the statements in this brief.

In accord with Local Rule 3.01(g), and after conferring with counsel for the parties, BSF informs the Court that counsel for Plaintiffs consents to the filing of this brief.  Counsel for Defendant objects to the filing of this brief.

[2] With the exception of *amici* San Diego Cooperative Charter Schools, Achievement First Public Charter Schools, Washoe County School District, School District of South Orange and Maplewood, Los Angeles Unified School District, and Las Cruces Public Schools, or where otherwise indicated, *amici* join this brief in their individual capacities based on their experiences as school administrators and not as representatives of their respective schools or districts.

| | |
|---|---|
| **Emily Banks** | Principal, Achievement First Hartford High School, Hartford, Connecticut |
| **Morgan Barth** | Principal, Achievement First Amistad High School, New Haven, Connecticut |
| **Beth Bazer, Ed.D.** | Principal, LaSalle Language Academy, Chicago, Illinois |
| **Roger Bourgeois** | Retired Superintendent-Director, Greater Lowell Technical Regional School District, Massachusetts |
| **Diana K. Bruce** | Director of Health and Wellness, District of Columbia Public Schools, Washington, DC |
| **Karen Carney** | Head of School, Chicago Friends School, Chicago, Illinois |
| **Heidi Carter** | Former Chair (term ended June 2016), Durham Public Schools Board of Education, Durham, North Carolina |
| **Tommy Chang, Ed.D.** | Superintendent, Boston Public Schools, Boston, Massachusetts |
| **Peyton Chapman** | Principal, Lincoln High School, Portland, Oregon |
| **Howard Colter** | Interim Superintendent, Cape Elizabeth School Department, Cape Elizabeth, Maine; former Superintendent, Mount Desert Island Regional School System, Bar Harbor, Maine |
| **Sherri Cyra** | Assistant Superintendent, Middleton-Cross Plains Area School District, Middleton, Wisconsin |
| **Bryan Davis, Ph.D.** | Superintendent, Shorewood School District, Shorewood, Wisconsin |
| **Lizbeth DeSelm** | Member, Melrose School Committee, Melrose, Massachusetts |
| **Arthur DiBenedetto** | Superintendent, Vernon Township Public Schools, Sussex County, New Jersey |
| **Mary Doran** | Former School Board Chair (term ended 12/31/15), Saint Paul Public Schools Board of Education, St. Paul, Minnesota |
| **Eric Doss** | Former Executive Director, Tulsa School of Arts and Sciences, Tulsa, Oklahoma |

| Gregory Ewing, Ed.D | Superintendent, Las Cruces Public Schools, Las Cruces, New Mexico |
|---|---|
| Eldridge Greer, Ph.D. | Associate Chief, Student Equity and Opportunity, Denver Public Schools, Denver, Colorado |
| Adelita Grijalva | Board Member, Tucson Unified School District, Tucson, Arizona |
| Jill Gurtner | Principal, Clark Street Community School, Middleton, Wisconsin |
| Matthew Haney | Principal, Mount Desert Island High School, Bar Harbor, Maine |
| Kellie M. Hargis, Ed.D. | Executive Principal, Hume-Fogg Magnet High School, Nashville, Tennessee |
| Sherie Hohs | Social Worker, Madison Metropolitan School District, Madison, Wisconsin |
| Tim Kenney | Principal, Shorewood High School, Shorewood, Wisconsin |
| Ken Kunin | Superintendent, South Portland Public Schools, South Portland, Maine |
| Las Cruces Public Schools | Las Cruces Public Schools, Las Cruces, New Mexico |
| Laura H. Love | Director of Teaching and Learning for Secondary Education, Middleton-Cross Plains Area School District, Middleton, Wisconsin |
| Los Angeles Unified School District | Los Angeles Unified School District, Los Angeles, California |
| Jeremy Majeski | Former Principal, Komensky Elementary School, Berwyn, Illinois |
| Craig McCalla | Principal, Cornerstone Elementary School, Dexter, Michigan |
| Gregory R. Meece | Director, Newark Charter School, Newark, Delaware |
| James C. Morse, Sr., Ed.D. | Superintendent, Oyster River Cooperative School District, Durham, New Hampshire |

| | |
|---|---|
| **Ziad W. Munson, Ph.D.** | Member, School Board, East Penn School District, Emmaus, Pennsylvania |
| **John O'Reilly** | Principal, Academy of Arts and Letters, Public School/Middle School 492, Brooklyn, New York |
| **Denise Palazzo** | Statewide Safe Schools Director, Equality Florida; Former Instructional Facilitator and Diversity and LGBTQ[3] Coordinator, Broward County, Florida Public Schools |
| **Lindsey Pollock, Ed.D.** | Principal, Garden Oaks Montessori Magnet School, Houston, Texas |
| **Wendy Ranck-Buhr, Ph.D.** | Instructional Support Officer, San Diego Unified School District, San Diego, California |
| **Pamela Retzlaff, Ed.D.** | Former Associate Principal, Hixson Middle School, Webster Groves, Missouri. Principal, The Biome School St. Louis, Missouri |
| **San Diego Cooperative Charter Schools** | San Diego Cooperative Charter Schools, San Diego, California |
| **Rachel Santa, Ed.D.** | Director of Special Education, Cumberland, Rhode Island Schools |
| **Brian Schaffer** | Principal, Lamoille Union High School, Hyde Park, Vermont |
| **Monica Schommer** | Principal, Park Elementary School, Middleton-Cross Plains Area School District, Middleton, Wisconsin |
| **School District of South Orange and Maplewood** | School District of South Orange and Maplewood, Essex County, New Jersey |
| **Paru Shah, Ph.D.** | President, Board of Education, Shorewood School District, Shorewood, Wisconsin |
| **Sarah Shirk** | Clerk of the Board of Trustees, Chicago Friends School, Chicago, Illinois |
| **DeLois Cooke Spryszak** | Principal, Detroit School of Arts, Detroit, Michigan |

---

[3] The acronym "LGBTQ" stands for lesbian, gay, bisexual, transgender, and questioning.

| Emily Sutherland | Principal, Treasure Mountain Junior High School, Park City, Utah |
| --- | --- |
| Michaelle Valbrun-Pope | Executive Director, Student Support Initiatives, Broward County Schools, Florida |
| Cyndy Taymore | Superintendent of Schools, Melrose Public Schools, Melrose, Massachusetts |
| David Vannasdall, Ed.D. | Superintendent, Arcadia Unified School District, Arcadia, California |
| Craig Vaughn | Superintendent/Principal, Springfield Township School District, Springfield Township, New Jersey |
| Julie Vitale, Ph.D. | Superintendent, Romoland School District, Riverside County, California |
| Washoe County School District | Washoe County School District, Reno, Nevada |
| Thomas Weber | Head of School, Scattergood Friends School & Farm, West Branch, Iowa |

## SUMMARY OF ARGUMENT

Recent estimates show that approximately 150,000 teenagers across the United States identify as transgender.[4] School districts across the country have faced issues on the appropriate policies and procedures to be applied to transgender students. In some cases, these decisions have occurred after students have requested more inclusive policies. In other instances, school districts have precipitated the discussions either by developing inclusive district-wide policies or instituting more restrictive rules, which have been challenged by the affected students. In this

---

[4] See *Age of Individuals Who Identify as Transgender in the United States*, Jody L. Herman, Andrew R. Flores, Taylor N.T. Brown, Bianca D.M. Wilson, Kerith J. Control, The Williams Institute, UCLA School of Law, January 2017, at 2. Available at https://williamsinstitute.law.ucla.edu/wp-content/uploads/TransAgeReport.pdf, last visited on November 16, 2017.

brief, *amici* present their experiences and conclusions after grappling with these issues. *Amici* express their opinion that all educators are obligated to provide support and respect to all students in their care—including transgender students—and that inclusive policies benefit all students.

In response to the request by Plaintiff Drew Adams for access to the restrooms corresponding to his gender identity—to be treated like all other students—Defendant raised the specter of possible harms that had not occurred. At the same time, Defendant failed to recognize the very real harm their policies caused Drew. The collective experiences of *amici* show that the adverse consequences feared by the Defendant have not occurred. Instead, *amici* show that inclusive policies, based on actual experience and knowledge, create a supportive educational environment not just for transgender students but for all.

## ARGUMENT

### I. In *Amici*'s Experience, Inclusive Policies toward Transgender Students Have Led to Positive Results, not Adverse Consequences.

*At first, we had our concerns – would letting students participate in activities and facilities that were consistent with their gender identity create problems? What would happen?*

*Ultimately, we decided that we as the adults needed to manage our fears and give students the respect and dignity that they deserved. And I'm pleased to say that none of our fears has materialized.*

Dr. Judy Chiasson[5] Testimony to the California Senate Education Committee on A.B. 1266 (June 12, 2013) ("Chiasson Testimony"), available at https://www.youtube.com/watch?v=Xmq9dIQdsNE (last visited Nov. 16, 2017).

As educators who have devoted their professional lives to young people, *amici* recognize that all students deserve equal respect from and equal treatment by their educators. *Amici's*

---

[5] Dr. Chiasson is the Program Coordinator for the Office of Human Relations, Diversity and Equity, Los Angeles Unified School District, which is a signatory to this brief.

schools and districts allow transgender students access to the same facilities and opportunities as other students of the same sex. *Amici's* collective experience is that inclusive policies are necessary for a learning environment that is accessible, safe, and welcoming, which in turn enhances the educational experience for all students. Respecting students' gender identity eliminates the disruption that results from singling out, stigmatizing, and discriminating against transgender students, and avoids disrupting the normal social interactions involved in use of communal facilities.

Defendant has barred plaintiff Drew Adams from using the restrooms that correspond to his gender identity, despite the absence of concrete and compelling evidence of actual harm. Document Number ("D.N.") 60 at ¶¶ 2, 42. This policy was imposed after Drew had attended his high school—and used the boys' restroom—for approximately two months. *Id*. at ¶ 42. This change was not the result of any action or misbehavior by Drew, as confirmed to Drew by his guidance counselor. *Id*. at ¶ 43. When Drew's mother, Erica Adams Kasper, tried to address the issues with authorities at his high school, she and Drew were told that the school district had set the policy. *Id*. at ¶ 49. Erica met with District officials, who repeatedly referred to "biology." *Id*. at ¶ 50. District officials also told Erica that people in the community "would not understand" if Drew were allowed to use the boys' restroom. *Id*. District officials also asked what would happen if a transgender girl were to "wave her penis around" in a girls' bathroom. *Id*.

The policy change forbidding Drew from using the restroom that corresponds to his gender identity did have an immediate and lasting negative effect on Drew, however. He reported feeling insulted, humiliated, singled out, and discriminated against. *Id*. at ¶ 45. Because of the difficulty in using the gender neutral restrooms, as those restrooms are limited in number and often far from his classes, Drew began to avoid using the restrooms at school

and instead waiting until he reached the safety of home. *Id*. at ¶ 46. Further, he began to worry about restroom access during the school day, thus interfering with his ability to concentrate on his studies. *Id*. at ¶ 47.

In contrast to the speculative adverse consequences raised by Defendant and its administrators in response to the request that Drew continue to use the restroom corresponding to his gender identity, the experiences related herein by *amici* show that adverse consequences do not result from inclusive policies. *Amici's* experiences show that educational decisions based on actual results, rather than speculation, benefit students, and inclusive, respectful policies can have an overwhelmingly positive effect on the broader student population. As Diana Bruce of the District of Columbia observes, "A policy that requires equal treatment is not difficult to implement. Beyond sorting it out at the beginning, it's not an ongoing, lingering issue[.]" Diana Bruce Interview, Oct. 5, 2015 ("Bruce Interview"). As educators, "[o]ur goal is to make sure that every young person is as present and as able to engage in academic work as possible. Promoting a safe and welcoming environment is a way to promote education." *Id*. The results have been overwhelmingly successful, not only for transgender students, but for all students, faculty, administrators, and communities as a whole.

A. **Students' Experiences in Schools with Inclusive Policies Have Been Positive.**

As noted above, *amici*'s professional experience shows that educational policies—particularly those that bear on the fair and equitable treatment of vulnerable students—should be driven by fact and evidence. As *amici* relate, in many instances opposition to inclusive policies seems to spring from adults' personal beliefs or fears of the unknown. In fact, *amici* have found that it is often *students* who set a leading example recognizing transgender

students' rightful place in school facilities that match their gender identity. *E.g.*, Howard Colter Interview, June 6, 2016 ("As to the students, I am most impressed. They are very understanding and accepting of their classmates. It feels like the adult community is struggling with it more."); Bruce Interview ("Young people are pretty savvy and comfortable, and can understand and empathize with someone who just wants to use the bathroom."); Roger Bourgeois Interview, Oct. 8, 2015 ("Bourgeois Interview") ("Most of the problem is with the adults; the students are pretty accepting of these issues."); Dr. Eldridge Greer Interview, Oct. 14, 2016 ("Greer Interview") ("Students are much more resilient and forward-thinking than we as adults are."); Dr. Rachel Santa Interview, May 27, 2016 ("Santa Interview") ("Adults have more issues than the students do."); Dr. David Vannasdall Interview, Sept. 9, 2016 ("Vannasdall Interview II") (with students, "there hasn't been a problem at all."); Kathy Canavan, *Transgender bathrooms already happening in Delaware*, DELAWARE BUSINESS TIMES, May 13, 2016 ("Meece Interview") (quoting Gregory Meece) ("We had a few parents ask some questions, and we've had some express thoughts on it, but the students are 100% accepting.")[6]; Sherie Hohs Interview, Oct. 15, 2015 ("This isn't a kid issue. It's an adult issue."). Based on her more than ten years' experience working with the inclusive policies in place at Los Angeles Unified School District ("LAUSD"), the second-largest school district in the country, Dr. Judy Chiasson recounts:

> Our experience has been that the fears of the adults rarely play out. The students are very affirming and respectful of their classmates. Most of the reaction that I've ever encountered has been in response to people's fears, not the students' experiences. The students' experiences have been overwhelmingly positive. I have yet to be called into a situation to respond to an actual incident; I've only had to respond to fears, and the fears are unfounded.

---

[6] *Available at* http://www.delawarebusinesstimes.com/transgender-bathrooms-already-happening-delaware/ (last visited Nov. 16, 2017).

Dr. Judy Chiasson Interview, Sept. 23, 2015 ("Chiasson Interview").

Several *amici* have themselves wrestled with many of the same concerns Defendant-Appellee has raised, when first faced with the need to adopt an inclusive policy. Dr. Vannasdall's district was investigated by the U.S. Department of Justice ("DOJ") and the U.S. Department of Education, Office for Civil Rights ("OCR") regarding policies toward a transgender student. According to Dr. Vannasdall, he understands what it is like to grapple with the actual and anticipated negative reactions from some parents and community members. Administrators and others within the school district were concerned that respecting the transgender student's gender identity by treating him like any other boy would be disruptive and burdensome. Dr. David Vannasdall Interview, Sept. 23, 2015 ("Vannasdall Interview I").

A simple, open conversation with the student and his family revealed the administrators' concerns to be erroneous assumptions. *Id.* In that conversation, it became "obvious that this student had no intentions of creating a disruption—he just wanted a home and a place to learn, and not worry about which restroom to use." *Id.* Once the administrators understood that the student was simply asking to be treated like any other boy, their obligation as educators became clear: to help this student, and all of their students, "come to school ready to learn." *Id.*

> If they're worrying about the restroom, they're not fully there to learn, but
> instead just trying to navigate their day. Give students the opportunity to just be
> a kid, to use the bathroom, and know that it's not a disruption, it just makes
> sense.

*Id.*

Dr. Vannasdall's district reached a voluntary resolution agreement in 2013 with the DOJ and OCR. The resolution agreement included permitting the student at issue to access to all sex-specific facilities consistent with the student's gender identity, as well as adopting a

comprehensive policy respecting students' gender identity, including recognition that gender-based discrimination includes discrimination based on a student's gender identity or transgender status.[7]   The outcome over the past three years has been "very positive for the school, the district, and the students."  *Id.*

Dr. Vannasdall now regularly consults with educators across the country, giving informal advice and guidance on inclusive policies for transgender students.  *Id.*  He understands what it is like to grapple with the actual and anticipated concerns from parents and the community, but when those are the primary concern, "you have people making decisions from the basis of fear and extremes, and that's never good for kids."  Julie Bosman & Motoko Rich, *As Transgender Students Make Gains, Schools Hesitate Over Bathroom Policies*, N.Y. TIMES, Nov. 4, 2015, at A14 (quoting Dr. Vannasdall).[8]  The "game-changer" for Dr. Vannasdall's district and for other districts with which he has consulted is when educators "remember what we are here to do," *i.e.*, to help kids learn. Vannasdall Interview I. Dr. Vannasdall believes that generally school administrators new to dealing with transgender students are "overthinking this issue. This doesn't need to be as tough as some people make it. It can be a good experience for that student and other students as well."  Vannasdall Interview II.

Similarly, Dr. Thomas Aberli of Louisville, Kentucky was unfamiliar with this issue

---

[7] *See* Resolution Agreement Between the Arcadia Unified School District, the U.S. Department of Education, Office for Civil Rights, and the U.S. Department of Justice, Office of Civil Rights, OCR Case No. 09-12-1020/DOJ Case No. 09-12-1020 (July 24, 2013), available at http://www.justice.gov/sites/default/files/crt/legacy/2013/07/26/arcadiaagree.pdf (last visited Nov. 16, 2017). See also Letter from DOJ and OCR to Arcadia School District (July 24, 2013), available at http://www.justice.gov/sites/default/files/crt/legacy/2013/07/26/arcadialetter.pdf (last visited Nov. 22, 2017).

[8] A version of this article is available online at: https://www.nytimes.com/2015/11/04/us/as-transgender-students-make-gains-schools-hesitate-at-bathrooms.html (last visited Nov. 16, 2017).

when it first arose, and had concerns about possible disruptions or privacy issues. But Dr.

Aberli tried to understand the student's request on both a personal level and in terms of the

legal obligations of the schools. Dr. Thomas Aberli Interview, Oct. 7, 2015 ("Aberli

Interview"). He then developed a policy through an extensive collaborative effort with a

panel of school administrators, teachers and parents, in which "[w]e considered the issue very

carefully and thoughtfully, and posted all of the evidence we reviewed online." Aberli

Interview.[9] Some in the community expressed the view that inclusive policies might be fine

for schools in Los Angeles, but not in their own community (Kentucky). As Dr. Aberli

pointed out in his testimony to the Kentucky Senate Education Committee, however, empathy

and equality do not stop at state borders:

> The value of human life is the same in Kentucky as it is anywhere else in this
> nation. And when we're talking about an issue of civil rights, we're talking
> about the value we put on human individuals.

Aberli Testimony. Understanding that the policy is about protecting students' basic civil

rights helped clarify the issue.

> It helped people to understand that this wasn't about providing a special
> accommodation or "special rights" – this is about eliminating discrimination.
> When you tell a person you will do something that makes them stand out from
> everyone else, that's when you start discriminating against them.

Aberli Interview. When the issue was unfamiliar to many in the community, adults and a

handful of students questioned the new policy.

> I respect that some people may disagree or even feel uncomfortable with the
> policy, because honestly, for many people – including myself until a few
> months ago – they simply weren't knowledgeable, or it wasn't a close enough
> personal issue in terms of interacting with openly LGBT people to have a

---

[9] See *also* Dr. Thomas Aberli Testimony before the Kentucky Senate Education Committee on
S.B. 76 (Feb. 19, 2015) ("Aberli Testimony"), video excerpt available at
https://www.youtube.com/watch?v=QodplMWsEvQ (last visited Nov. 19, 2017). The materials
Dr. Aberli references as having been posted online are available at
http://schools.jefferson.kyschools.us/High/Atherton/SBDM.html (last visited Nov. 19, 2017).

comfort level. I acknowledge and respect that. But I am not going to use someone's discomfort as a means for discriminating against a protected population.

*Id*. Despite the initial opposition, in practice Dr. Aberli "received zero complaints regarding a specific incident of concern for a violation of privacy. The concerns raised by individuals have all been philosophical." *Id*.

Indeed, in *amici*'s experience, "an affirming policy has a positive effect on other students as well. If everyone is taken care of, students see that and they value that." Denise Palazzo Interview, Oct. 3, 2015 ("Palazzo Interview"). "When kids see that you are respecting all students, then they know that they will be respected. We are showing them how to treat people respectfully and know they will be treated the same." Santa Interview.

As Principal Peyton Chapman of Oregon relates:

> Students have high integrity radars – if some youth are made fun of, then they know it could happen to them. These fears keep all students in small boxes. They don't try things out, engage their creativity and figure out who they are and can be. If schools define "who" students need to be and how they should behave, then they are less free to explore themselves, cultures and communities.

Peyton Chapman Interview, May 27, 2016. A policy respectful of every student's gender identity, by contrast, fosters mutual respect and "creates open and innovative environments." *Id*.; *see also* Meece Interview ("I'm really proud of the students who see a student as a human being before they see gender or disability or race.")

### B. *Amici* Report Positive—Not Negative—Results from Inclusive Policies.

*There have not been any issues regarding this policy in locker rooms or bathrooms. But it has brought greater awareness of how we can increase privacy for all students.*

Aberli Interview.

No student should be denied access to any gender-specific facilities that are available to

other students of the same gender identity solely because he or she is transgender. The experience of *amici* shows that while questions are at times raised about the consequences of inclusive policies, actual results have shown those concerns to be wholly unfounded in practice.

**1.      Problems with Behavior in Restrooms or Locker Rooms Have Not Occurred.**

"Questions about bathrooms come up in every staff training, and it's an important thing that school staff want to understand. I think there's an assumption that there will be disruption around restrooms." Bruce Interview. But all schools routinely "deal[] with many more adolescent behavior issues than just who's using the bathroom based on gender identity," and are adept at addressing those issues. *Id*. As with any behavior issue, "oftentimes disruption in our experience has been around inconsistency by staff – and that's why clear guidance for schools is important[.] . . . Our transgender students just want to use the restroom and be safe when they do it, and that's all they're trying to do." *Id*.

Dr. Aberli of Kentucky similarly reports that Atherton has

> multiple transgender individuals in our school, and restroom access has not been an issue. . . . [T]here has not been any issue at all with respect to the implementation. It's not a big deal when you look at it from a standpoint of, we're dealing with real people, we're dealing with children. Even at the high school level we're dealing with people who have had a hard enough time as it is, and they're just looking for reasonable support from the school in a very challenging social context, or during a very difficult process, as it is for many of them.

Aberli Interview; *see also Gender Inclusive Leadership in Action*, Video Interview by Gender Spectrum with Dr. Pamela Retzlaff, Nov. 17, 2016 ("Retzlaff Interview")[10] ("He's interested in using the toilet, that's it. Not looking at anybody's genitals. Not doing anything else in the bathroom. It's just using the toilet.").

---

[10] *Available at* https://www.genderspectrum.org/blog/gender-inclusive-leadership-in-action-episode-1/
 (last visited Nov. 19, 2017).

Although this case focuses on restroom policies, *amici*'s experiences with inclusive locker room policies have also been positive. Diana Bruce explains that "our transgender students are not interested in walking around the locker rooms and checking out anatomy. They're just trying to get through P.E. safely." Bruce Interview. Similarly, transgender students often have their own sense of modesty, particularly about differences in their bodies that do not match their gender identity. As Dr. Vannasdall explains, "Transgender [s]tudents dealing with this are very discreet. . . . The student's goal is just not to stand out." Vannasdall Interview I. Mary Doran of Minnesota concurs: "[W]hen the *coaches* tell me 'this [transgender policy] isn't an issue, isn't a big deal,' that really says something." Mary Doran Interview, Oct. 16, 2015.

Indeed, in the rare instances that *amici* have needed to address locker room issues, it has been to ensure the safety of the transgender students. "The sad truth is that our transgender children are significantly more likely to be the targets of student misconduct, rather than the perpetrators of it." Chiasson Interview; *see also* Ken Kunin Interview, June 10, 2016 ("Kunin Interview") ("The risk is to people who identify as transgender, or gay, or just 'other.'"). And even there, "[l]ocker rooms aren't a [special] concern because we are already accustomed to dealing with students who have unique or special needs in the locker room context. This is just one more type of student that may need additional support in that space." Palazzo Interview.

> **2.      In *Amici's* Experience, Students Have Not "Posed" as Transgender to Gain Improper Access to Facilities.**

*Amici* have also frequently addressed the concern that transgender students might just be "confused" or likely to change their minds often about their gender identity, or that non-transgender students might falsely claim to be transgender for some nefarious purpose. Those concerns have not materialized, in *amici's* experience. Moreover, *amici*'s policies allow

schools to make reasonable assessments of individual requests for accommodation. As Dr.

Chiasson explained in a letter to Dr. Aberli:

> It is reasonable to expect that a student will exercise consistency with respect to their identity and access to facilities. Students cannot switch their identity arbitrarily or opportunistically. [. . .]
>
> If the school strongly suspects that the request is not legitimate, they should provide accommodation for the student while continuing the conversation to better understand the student's motivation for the request. Being transgender is a deeply rooted identity. . . . It is not subject to arbitrary whims.

Letter from Dr. Judy Chiasson to Dr. Thomas Aberli, May 29, 2014 ("Chiasson Letter").[11]

Similarly, Mr. Bourgeois explains that at his school in Massachusetts,

> A student can't just show up and say, "I'm a male, but I want to start using the girls' locker room today." People worry some football player will show up and want to get into the girls' locker room, but we would not allow that. There's a process we go through to work with them and their families, and verify their identity.

Bourgeois Interview. All *amici*'s schools follow a similar policy, and as a general matter, it is

easy to identify genuine requests.

> Some people fear someone will masquerade . . . as transgender to be predatory. . . . I've never had that happen, where someone has pretended to be transgender for nefarious reasons. It's just plain silly to think that [a male student] is going to come to school for months on end, wear female attire, present as female to all of his friends and teachers, just so he can go into the female locker room.

Chiasson Interview; *see also* Santa Interview ("The hysteria is from misunderstanding. The

concern is that the policy will allow a typical high school boy to say he is transgender so he

can go peek at girls in the bathroom. I haven't seen it[.]"). Indeed, schools are very adept at

dealing with instances of misbehavior in restrooms and locker rooms precisely because it is

not particularly difficult for a student to gain access to another gender's facilities. *See* Greer

---

[11] A copy of Dr. Chiasson's letter to Dr. Aberli is included among the materials posted by Atherton. *See* footnote 7, *supra*.

Interview ("There are easier ways to get into the girls' bathroom [than posing as transgender] – and we have policies and consequences to address that.").

In other words, schools routinely deal with all sorts of behavioral problems – and *amici* "would have a problem" with any student actively violating another student's privacy, and would deal with that misconduct as it arises. Brian Schaffer Interview, June 1, 2016. Parents, teachers, and administrators alike are always looking out for the safety of all students. A policy respecting transgender students is far more likely to thwart misbehavior in these spaces than to cause it.

## II. Schools Can and Should Fully Respect Both the Gender Identity and the Privacy Concerns of All Students.

To the extent that Defendant or its administrators are worried that the presence of transgender students will violate the privacy or comfort of other students, the experiences of *amici* show that districts can and should address specific concerns of students without discriminating against transgender students. To the extent that a student has concerns about sharing facilities with transgender students, schools must help the student deal with that discomfort in a way that does not impinge upon other students' rights to equal treatment.

Most of *amici*'s schools offer private facilities that may be used by persons of either gender, in addition to gender-segregated facilities. Ms. Bruce recounts that, in her schools,

> [a]ccording to our policy guidance, if a student has a problem, we can make another bathroom available to that student. I haven't heard from our schools, however, of students that have asked to use a different restroom in that circumstance. When I train our school staff, some want to ask hypotheticals, but in our experience, this has not been an issue.

Bruce Interview. Indeed, some students may prefer to use these private facilities for any number of reasons, and are permitted to do so without the need to provide an explanation – including in the rare circumstance that a student might not want to use the same facility as a transgender

student.

> [A]ny student who, for whatever reason, feels uncomfortable in a communal setting – whether because of weight, personal comfort, body image, social anxiety, or other reasons – we will accommodate that without the need for explanation, and they can use a private setting such as a nurse's room.

Chiasson Interview.  Likewise, Dr. Aberli's school allows any student who wants to use a private restroom to do so.

> What I have clearly communicated in public is that any student may use the front office restroom.  We don't ask why. There's a thousand reasons that a student needs privacy, so it's our responsibility to accommodate any student for any reason. It could be shyness, or trauma.

Aberli Interview.

When separate facilities are not available or practical to meet student requests for additional privacy, there are other means of providing extra privacy to students when needed, such as using a curtain to create a separate area, or allowing a student to use the locker room before or after other students.  Matthew Haney Interview, June 6, 2016.  Accommodating individual students' needs is "something educators do every day," and educators have proven themselves "very flexible and adaptable in adopting new policies for their students" in order to meet their needs. Vannasdall Interview II.  Providing transgender students what they need to thrive in school is no different.  Lauren Slager, *Schools Take Steps to Address Needs of LGBTQ Students*, mLIVE Michigan, Apr. 21, 2016 (quoting Craig McCalla) ("We make accommodations for all kids in all different ways.  We always have, and there's no reason not to for a specific group of people.").[12]

Even in the rare case where a student might express discomfort with sharing facilities

---

[12] Available at http://www.mlive.com/news/ann-arbor/index.ssf/2016/04/schools_take_steps_to_address.html last visited Nov. 19. 2017.

with a transgender student, the solution is not to deny access to the transgender student. Any student expressing such discomfort should be offered alternative facilities or arrangements to address their concerns. As Mr. Bourgeois explains:

> [W]e're not going to tell the transgender student they can't go where they're comfortable. I can still remember the remnants of white people being uncomfortable with black people being in same locker rooms and restrooms, so it's not about whether everyone is "comfortable." Just because some people were uncomfortable didn't mean you treated people as second-class citizens.

Bourgeois Interview; *see also* Arthur DiBenedetto Interview, Nov. 29, 2016 ("The outcry will be similar to the arguments put forth by those who were faced with black students in white schools when desegregation became the law."). Mr. Kunin of Maine agrees that "being uncomfortable doesn't overrule someone's rights," but he also emphasizes that "there are also ways to support the person who is uncomfortable – we would want that person to feel safe and participate, too." Kunin Interview. Although schools should accommodate requests for extra privacy from any student, no transgender student should ever be forced to use separate facilities in order to accommodate the actual or anticipated discomfort of other students.

Particularly in the educational context, policies like that of Gloucester County School Board single out and create a serious dilemma for transgender students like Drew requiring him either to use a separate restroom simply because he is transgender, or to use facilities that are patently inconsistent with his gender. Having to navigate this problem daily seriously interferes with transgender students' education, impairs their ability to learn and socialize, and results in real physical and emotional harm. Ms. Bruce explains that when transgender students "have reported worrying about whether they can use the restroom that matches their gender identity, they have said they just don't go to the bathroom at school. That can't possibly help them learn." Bruce Interview.

> We don't want them preoccupied with trying not to use the bathroom when
> they're supposed to pay attention to trigonometry…We want them to know where
> they can use the restroom, so they can feel more like anyone else in their school
> and not like an outsider.

*Id.*; see also Kunin Interview ("A school day is too long a time to wait to use the restroom

because one is uncomfortable with the options."). Although, as noted above, *amici* routinely

offer separate facilities to any student requesting additional privacy for any reason (including

but certainly not limited to transgender students), no student should ever be forced to use a

separate facility simply because they are transgender.  Dr. Aberli agrees that "making

transgender students use the nurse's room" is no answer at all:

> Tell me what we would say to that child – that there's something so freakish
> about you, and so many people are uncomfortable with you, that you have to use a
> completely separate restroom than the one you feel like you should be using?

Aberli Interview. Instead, in *amici's* experience, all students' needs are best served when

educators can treat all students equally.

### III. Gender-Segregated Spaces and Activities Are Fully Consistent with School Policies Respecting Every Student's Gender Identity.

*Amici* have also addressed the lurking hypothetical concern that permitting individuals

to use facilities consistent with their gender identity will lead to the abolition of gender-

specific facilities.  Contrary to that "slippery slope" argument, however, all *amici* continue to

maintain gender-segregated facilities in their schools.  In fact, respecting the gender identity of

transgender students *reinforces* the concept of separate facilities for girls and boys; requiring a

girl who is transgender to use the boys' restroom or a boy who is transgender to use the girls'

restroom *undermines* the notion of gender-specific spaces.

Dr. Chiasson offers an example from her own district, in which a new male student

who was transgender had been using the female facilities, incorrectly assuming that, because

he was assigned a female sex at birth,

> that he would be required to do so.  It was equally uncomfortable for him to use the girls' facilities as it was for the girls themselves. When the administration learned of the situation, they told the young man that he could use the boys' facilities. Everyone was relieved.

Chiasson Letter; *see also* Retzlaff Interview ("[H]is classmates were also somewhat relieved because they knew, too, something's not right [about a boy who is transgender being forced to use the girls' restroom].").  Mr. O'Reilly similarly commented that, until he considered the effect of forcing a transgender student to use a restroom inconsistent with gender identity, he "hadn't really understood the literal meaning of the word 'misfit.'  When forced to use the restroom for the gender they do not associate with, a student literally becomes a *mis*fit: someone being forced into a place they don't belong."  John O'Reilly Interview, Sept. 20, 2015.

Transgender students (like Drew here) have not sought to eliminate gender- specific facilities—they merely want to use the facilities that correspond with their gender identity.  "Far from being disruptive, our experience has been that those students just want to blend in."  Bourgeois Interview.  "Transgender-affirming policies solve problems, not create them.  Even if the law allowed it, forcing a transgender boy to use the female facilities would be extremely uncomfortable for all parties involved."  Chiasson Interview.

## CONCLUSION

Defendant and its administrators have barred Drew Adams from using the restroom corresponding to his gender identity, citing possible problems that have not occurred in this case and have not occurred in the experiences of *amici*.  Instead, *amici* demonstrate that school district can, and should, respect each student—including by respecting each student's gender identity—without disadvantaging other students.  Further, the experiences of *amici* make clear

that inclusive policies have a beneficial effect on the entire school community, and improve

conditions for all students.

Dated:  December 6, 2017

Respectfully submitted,

BOIES SCHILLER FLEXNER LLP

/s/ *Rosanne C. Baxter*
Rosanne C. Baxter
333 Main Street
Armonk, NY 10504
Phone: (914) 749-8200
Fax: (914) 749-8300
rbaxter@bsfllp.com
*Pro hac vice* motion pending

/s/ *Karen Dyer*
Karen Dyer
Florida Bar No. 716324
121 South Orange Avenue
Suite 840
Orlando, FL 32801
Phone: (407) 425-7118
Fax: (407) 425-7047
kdyer@bsfllp.com

*Attorneys for Proposed Amici*
*School Administrators*