**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

|  |  |
|---|---|
| DREW ADAMS, a minor, by and through his next friend and mother, ERICA ADAMS KASPER,<br><br>        Plaintiff,<br><br>v.<br><br>THE SCHOOL BOARD OF ST. JOHNS COUNTY, FLORIDA,<br><br>        Defendant. | **Case No. 3:17-cv-00739-TJC-JBT** |

---

**PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY OF**
**DR. PAUL W. HRUZ AND SUPPORTING MEMORANDUM OF LAW**

---

Pursuant to Federal Rules of Civil Procedure 26 and 37, and Federal Rules of Evidence 104, 403, and 702, Plaintiff Drew Adams ("Drew"), a minor, by and through his next friend and mother, Erica Adams Kasper (collectively, "Plaintiff"), respectfully moves this Court to exclude the expert testimony of Defendant's proposed expert, Dr. Paul W. Hruz.  *First*, pursuant to Federal Rule of Civil Procedure 37, Dr. Hruz's opinions and testimony should be excluded because he is a belatedly disclosed affirmative expert in violation of the Scheduling and Case Management Order (Dkt. 59) and Federal Rule of Civil Procedure 26(a)(2)(B). *Second*, Dr. Hruz's is not a qualified expert and his opinions and testimony are neither relevant nor reliable pursuant to the standards set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny.  His opinions and testimony are likewise inadmissible because any probative value is substantially outweighed by the danger of unfair prejudice,

1

confusion of the issues, waste of time, undue delay, and needless presentation of cumulative evidence.  *See* Fed. R. Evid. 403.

## ARGUMENT

**I.**    **DR. HRUZ'S AFFIRMATIVE EXPERT TESTIMONY SHOULD BE EXCLUDED BECAUSE IT WAS UNTIMELY IN VIOLATION OF FEDERAL RULE OF CIVIL PROCEDURE 26 AND THIS COURT'S CASE MANAGEMENT ORDER.**

In a thinly-veiled attempt to circumvent this Court's Case Management Order and in violation of the Federal Rules of Civil Procedure, Defendant untimely and improperly disclosed Dr. Hruz as a rebuttal expert witness on November 3, 2017, but, by his own admission, Dr. Hruz's opinions and testimony are that of an affirmative export.  This late-filed disclosure is neither justified nor harmless and, accordingly, Dr. Hruz should be excluded as an expert witness.

**A.  Legal Standard For Rebuttal Expert Testimony.**

Federal Rule of Civil Procedure 26(a) requires an expert witness to produce a report which contains, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2).  Moreover, Rule 26(e) states a party must supplement its expert report "if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e).  Eleventh Circuit has explained that "the expert disclosure rule is intended to provide opposing parties reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." *Reese v. Herbert*, 527 F.3d 1253, 1265 (11th Cir. 2008) (quotation omitted).

After the parties' initial disclosures of proposed expert testimony, opposing parties have thirty days to disclose any expert witness who will offer evidence "intended *solely* to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii) (emphasis added). A rebuttal expert's proper role is to "explain, repel, counteract or disprove evidence of the adverse party." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006); *see also Faigin v. Kelley*, 184 F.3d 67, 85 (1st Cir. 1999) ("The principal objective of rebuttal is to counter new, unforeseen facts brought out in the other side's case."). Therefore, "[a] rebuttal expert report is not the proper place for presenting new arguments, unless presenting those arguments is substantially justified and causes no prejudice." *STS Software Sys., Ltd. v. Witness Sys., Inc.*, No. 04-CV-2111, 2008 WL 660325, at *2 (N.D. Ga. Mar. 6, 2008) (cleaned up).

A rebuttal expert cannot be used to introduce evidence and opinions essential to the establishment of the proffering party's case-in-chief. *See*, *e.g.*, *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008) ("The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of evidence offered by an adverse party."); *Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1515 (10th Cir. 1990) (trial court properly excluded plaintiffs' expert's rebuttal testimony where the "proffered rebuttal testimony was really an attempt by Sil-Flo, Inc. to introduce or interpret exhibits more properly part of its case in chief."); *Larson v. Wis. Ctr. Ltd.*, No. 10–C–446, 2012 WL 368379, at *4 (E.D. Wis. Feb.3, 2012) ("It cannot be used to advance new arguments or new evidence to support plaintiff's expert's initial opinions."). The case law supports a strict reading of the rule. As one court put it:

A party presents its arguments as to the issues for which it has the burden of proof in its initial expert report. And in its rebuttal expert report, it presents expert opinions refuting the arguments made by the opposing party in its initial expert report. The rebuttal expert report is no place for presenting new arguments, unless presenting those arguments is substantially justified and causes no prejudice.

*Baldwin Graphics Sys., Inc. v. Siebert, Inc.*, No. 03-CV-7713, 2005 WL 1300763, at *2 (N.D. Ill. Feb. 22, 2005).

Put simply, a party cannot "offer testimony under the guise of 'rebuttal' only to provide additional support for his case in chief." *Cage v. City of Chi.*, No. 09–C–3078, 2012 WL 5557410, at *2 (N.D. Ill. Nov. 14, 2012).

## B. Dr. Hruz's "Rebuttal" Expert Report Is An Affirmative Expert Report.

On November 3, 2017, less than three weeks before the close of fact discovery in this case, Defendant disclosed Dr. Hruz as an expert witness. *See* Exhibit A – Defendant's Rule 26(a)(2) Disclosures. Although Defendant disclosed Dr. Hruz as a rebuttal expert to the testimony of Plaintiff's expert witnesses, Dr. Deanna Adkins and Dr. Diane Ehrensaft, that disclosure elevates form over substance.[1]

By his own admission, Dr. Hruz's testimony is that of an affirmative expert, and not a rebuttal expert, however. At his deposition on November 20, 2017, just 17 days after his initial disclosure, Dr. Hruz testified as follows:

Q. Just to clarify, did you submit an expert report or a rebuttal report?

---

[1] Defendant supplemented its belated disclosure with an affirmative expert report. *See* Exhibit B – Redacted Copy of Dr. Paul W. Hruz's Expert Report. Pursuant to Section IV of the Stipulated Protected Order in this case (Docket No. 72), Plaintiff has filed redacted copies of Exhibits B, D and E in order to protect "protected health information." Unredacted copies of these exhibits will be filed with the Court under seal.

4

A. An -- an expert opinion report. And I also submitted -- you requested information from prior litigation, and that included a rebuttal report.

Q. Okay. So you know the difference between a rebuttal report and an expert report?

A. Yes, I do.

Q. Okay. And the -- it is your understanding that the report that you submitted in this case is an expert report, not a rebuttal report?

A. That's my understanding. Again, I would rely on the legal counsel to -- to clarify if I'm in error there.

Hruz Depo. Tr. 90:1-90-14 (Excerpts of the deposition of Dr. Paul W. Hruz are attached hereto as Exhibit C). In so doing, Dr. Hruz candidly admitted that he submitted an *affirmative* expert report and ***not*** a rebuttal report. If his admission were not enough, the Court simply needs to compare his purported "rebuttal" expert report in this case to his nearly *identical* affirmative expert reports and declarations in other cases. *Compare* Ex. B – Hruz's Expert Report, *with* Expert Declaration of Paul W. Hruz, M.D., Ph.D., *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, No. 16-CV-943-PP (E.D. Wis. Apr. 26, 2017 (A redacted copy of which is attached as Exhibit D); *and* Expert Decl. of Paul W. Hruz, M.D., Ph.D., *Carcaño v. McCrory*, No. 1:16-cv-00236-TDS-JEP (M.D. N.C. Oct. 18, 2016) (Docket No. 173-6). *See also* Exhibit E – Redacted Copy of Redline Comparison of Dr. Hruz's Expert Rebuttal Report in *Adams* and Affirmative Expert Report in *Whitaker*. Dr. Hruz knows how to prepare a rebuttal report, as he has done so in other cases and knows the difference between the two.

Important here, Dr. Hruz's report provides no specific opinions as to Plaintiff Drew Adams and addresses the expert report of Dr. Adkins only once.[2]  Dr. Hruz has been emphatic that his purported expert testimony and opinion is general in nature, and provides generalized opinions rather than any specific rebuttal to the opinions offered by Plaintiff's experts.  *See* Hruz Depo. Tr. 47:20-47:22 ("Q. Would you agree that those opinions are general in nature and not specific to Drew Adams?  A. Yes.").  For these reasons, Dr. Hruz should have been disclosed as an affirmative expert, but was not.

## C.  Dr. Hruz's Untimely And Improperly Disclosed Testimony And Report Must Be Excluded.

Under Rule 37(c)(1), if a party fails to comply with these disclosure requirements, "the party is not allowed to use that . . . witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  "Rule 37(c)(1) is a self-executing sanction, and the motive or reason for the failure is irrelevant."  *Norden v. Samper*, 544 F. Supp. 2d 43, 49–50 (D.D.C. 2008).  "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party."  *Mitchell v. Ford Motor Co.*, 318 Fed. Appx. 821, 824 (11th Cir. 2009).  "The overwhelming weight of authority is that preclusion is *required* and *mandatory* absent some unusual or extenuating circumstances—that is, a substantial justification."  *Blake v.*

---

[2] *See* Hruz Depo. Tr. 46:23-47:6 ("Q. Is there any opinion specific as to Drew Adams in Paragraph 12?  A. No.  Q. Is there any opinion specific as to Drew Adams anywhere else in the report?  A. No.  My opinions are based on -- near the end of my declaration, I specifically state the concerns in a -- in a general sense of all patients that are -- are faced with this particular condition."); Hruz Report at para. 33.

*Securitas Sec. Servs., Inc.*, 292 F.R.D. 15, 19 (D.D.C. 2013) (quoting *Elion v. Jackson*, No. 05–992, 2006 WL 2583694, at *1 (D.D.C. Sep. 8, 2006)) (cleaned up).

*First*, the untimely and improper disclosure of Dr. Hruz's purported expert testimony and report in this case is not justified.  In its Scheduling and Case Management Order, this Court set a date of October 2, 2017 for the disclosure of expert witness testimony and a deadline of November 3, 2017 for the disclosure of rebuttal witness testimony.  *See* Dkt. 59 at para. 4. Defendant has not offered—and it cannot—any excuse for its untimely disclosure of Dr. Hruz's admitted affirmative testimony.[3]  There is simply no reason for why Defendant could not have disclosed Dr. Hruz as an expert witness on September 22, 2017, like it was supposed to do.

*Second*, Defendant's untimely and improper disclosure of Dr. Hruz is not harmless. The disclosure here was only 19 days before the close of fact discovery and 38 days before the start of trial in this case.  This belated disclosure was prejudicial towards Plaintiff in several ways.  For one, the belated disclosure of Dr. Hruz—an admitted, affirmative expert— prevented Plaintiff from providing expert rebuttal reports to his testimony.  For another, this belated disclosure prevented Plaintiff from conducting the proper and exhaustive investigation

---

[3] Indeed, Dr. Hruz has a served as an expert witness in some of the same cases in which Dr. Josephson, Defendant's other purported expert witness, has also served.  *See*, *e.g.*, *Carcaño v. McCrory*, No. 1:16-cv-00236-TDS-JEP (M.D. N.C. 2016).  What is more, Dr. Hruz and Dr. Josephson first met and became experts for school districts that discriminate against transgender children at a conference sponsored by the Alliance Defending Freedom.  *See* Hruz Depo. Tr. 92:21-93:24.  The Alliance Defending Freedom has been designated a "hate group" by the Southern Poverty Law Center for its anti-LGBT agenda and advocacy, including advocating for state-sanctioned sterilization of transgender people. *See* Southern Poverty Law Ctr., *Extremist Groups: Alliance Defending Freedom* (2017), *available at*, https://www.splcenter.org/fighting-hate/extremist-files/groups (last accessed Dec. 4, 2017).

of Dr. Hruz's background, expertise, and opinions that Plaintiff would have conducted had he been timely disclosed on September 22, 2017.  *See Brown v. NCL (Bahamas) Ltd.*, 190 F. Supp. 3d 1136, 1143 (S.D. Fla. 2016) ("Rule 26 . . . is intended to provide opposing parties reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.") (cleaned up).  For example, Plaintiff has been able to identify a couple of individuals with whom Dr. Hruz claims to have spoken about the treatment of transgender patients.  However, Plaintiff was able to speak with some of these individuals, but only *after* Dr. Hruz's deposition.  At this point, it is impossible to tell what other information Plaintiff would have discovered had he been afforded the additional 42 days to investigate Dr. Hruz's background, claims, and opinions.

Because Dr. Hruz's testimony and report were not timely disclosed, the Court should join the multiple courts across the country that have disallowed the introduction of such untimely testimony and opinions.  *See Bowman v. Int'l Bus. Mach. Corp.*, No. 1:11-CV-0593-RLY-TAB, 2012 WL 6596933, at *7 (S.D. Ind. Dec. 18, 2012), *objections overruled*, No. 1:11-CV-0593-RLY-TAB, 2013 WL 1857192 (S.D. Ind. May 2, 2013); *ProBatter Sports v. Joyner Tech., Inc.*, No. 05-CV-2045-LRR, 2007 WL 2752080, at *4 (N.D. Iowa Sept. 18, 2007) (striking large portions of an expert's affidavit that did not constitute true rebuttal after reaching the "inescapable conclusion []that [plaintiff was] attempting to circumvent the Scheduling Order by unilaterally redesignating [expert] from a rebuttal expert witness to a case in chief expert witness"); *In re Air Crash Disaster Near Kirksville, Mo.*, No. 05MD1702JCH, 2007 WL 2363505, at *4 (E.D. Mo. Aug. 16, 2007) (granting motion to strike where plaintiff attempted to use an expert who had been designated as a rebuttal witness to present evidence

8

to support its case-in-chief.); *GSI Group, Inc. v. Sukup Mfg. Co.*, No. 05-CV-3011, 2007 WL 757818 (C.D. Ill. Mar. 8, 2007) (striking expert opinions raised only in rebuttal reports); *Continental Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, No. 04-CV-1866-D, 2006 WL 2506957 (N.D. Tex. Aug. 15, 2006) (expert opinions supporting affirmative defense should have been included in initial expert report); *STS Software Sys., Ltd.*, 2008 WL 660325, at *2 (granting motion to strike rebuttal expert report containing new opinions not discussed in initial expert reports); *Dickerson v. UPS*, No. 95-CV-2143-D, 1999 WL 222389 (N.D. Tex. Apr. 8, 1999) (prohibiting rebuttal opinions as to claim or defense for which the party bears the burden of proof); *Int'l Bus. Machs. Corp. v. Fasco Indus., Inc.*, No. C-93-20326 RPA, 1995 WL 115421, at *3 (N.D. Cal. Mar. 15, 1995).

Put simply, the Federal Rules "do not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report." *Allgood v. Gen. Motors Corp.*, 2007 WL 647496, at *6 (S.D. Ind. Feb. 2, 2007) (cleaned up). As such, Dr. Hruz's testimony, opinions, and expert report should be completely disregarded based on Defendant's thinly-veiled attempt to circumvent the Court's Case Management Order and Rule 26's requirements.

## II.   DR. HRUZ'S PURPORTED EXPERT TESTIMONY SHOULD BE EXCLUDED BECAUSE IT DOES NOT MEET ANY OF THE INDICIA FOR ADMISSIBILITY UNDER *DAUBERT* AND THE FEDERAL RULES OF EVIDENCE.

In this case, Dr. Hruz's opinions and testimony lack any indicia of admissibility under *Daubert* and the Federal Rules of Evidence. Indeed, if this Court performs its traditional and rigorous gatekeeping role, Dr. Hruz should be excluded because he is not qualified to serve an

expert witness in this case, and his opinions and testimony are neither reliable nor probative of any of the issues in this case.

## A. Legal Standard.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Pursuant to *Daubert* and Rule 702, district courts must perform a "gatekeeping" role with respect to expert scientific testimony and must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc), *cert. denied,* 544 U.S. 1063 (2005); *see also City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998), *cert. denied*, 528 U.S. 812 (1999).  This is "rigorous inquiry" that district courts "must" perform.  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005).

When evaluating whether an expert's methodology is reliable, the Court considers, among other things:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Frazier*, 387 F.3d at 1262.  *See also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149–150 (1999); *Daubert*, 509 U.S. at 591, 593–594.

"The burden of laying a proper foundation for the admissibility of an expert's testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of

the evidence." *Hall v. United Ins. Co. of America,* 367 F.3d 1255, 1261 (11th Cir.2004) (citation omitted). "The admission of expert testimony is a matter within the discretion of the district court." *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 282 F.R.D. 655, 665–66 (M.D. Fla. 2012), *aff'd*, 725 F.3d 1377 (Fed. Cir. 2013). However, because "expert evidence can be both powerful and misleading because of the difficulty in evaluating it," "the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises *more* control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (cleaned up).

### A. Dr. Hruz Is Not Qualified To Offer An Expert Opinion On Any Issue In This Case.

It is axiomatic that "[A] witness may be qualified as an expert by virtue of his 'knowledge, skill, experience, training, or education." *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1342 (11th Cir. 2003). However, credentials are not dispositive when determining qualification. "Expertise in one field does not qualify a witness to testify about others." *Lebron v. Secretary of Florida Dept. of Children and Families*, 772 F.3d 1352, 1368 (11th Cir. 2014) (holding that a psychiatrist was properly prevented from opining on rates of drug use in an economically vulnerable population because he had never conducted research on the subject, and instead relied on studies to form his opinion). "A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty." *Id.* (quoting *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002)). If a proposed expert witness does not "propose to testify about matters growing naturally and directly out of research he had conducted

independent of the litigation," such expert should be disqualified.  *Lebron*, 772 F.3d at 1369 (quoting Fed. R. Evid. 702 (cleaned up)).

Dr. Hruz is an Associate Professor of Pediatrics in the Division of Pediatric Endocrinology and Diabetes at Washington University School of Medicine in St. Louis.  He is proffered as an expert witness based on his study of "existing literature related to the incidence, potential etiology and treatment of gender dysphoria."  Hruz Report, para. 7.  Translated, it appears to mean that he has read some things about it.  Dr. Hruz admits that he has not treated any transgender patients, patients with gender dysphoria, conducted peer-reviewed research about gender identity, transgender people, or gender dysphoria; and is not a psychiatrist, a psychologist, nor mental health care provider of any kind, who could speak knowledgeably about the effects of Defendant's discriminatory policy on transgender students, let alone Plaintiff.

 Dr. Hruz has ***never*** treated a patient with gender dysphoria or a transgender patient.  *See* Hruz Report para. 8; Hruz Depo. Tr. 24:11-24:14 ("I intentionally do not treat transgender patients.  Q. At all?  A. That is correct."); *id.* at 25:20-25:23 ("Q. Okay.  And based on your testimony, would you agree that you have not treated any transgender patients for gender dysphoria?  A. Yes, I would agree.").  Dr. Hruz has also not sat in on a meeting with a patient discussing the treatment options for gender dysphoria.  *See* Hruz Depo. Tr. At 40:6-40:11 ("Q. Just to be clear, though, you have never sat in a meeting between a provider and a patient discussing their treatment options for gender dysphoria?  A. That is correct, I've never been in the room with a patient while that care is being discussed.").  It appears that rather than do, Dr. Hruz reads.  But that does not qualify him as an expert in gender dysphoria or anything else

frankly.  *See* Exhibit F – Declaration of Dr. Norman P. Spack, M.D. at ¶ 14 ("In my experience, someone who acts out of science would go and see how gender management clinics work in order to form their opinions.").[4]

Similarly, Dr. Hruz has not conducted any independent research about transgender youth or gender dysphoria, nor has he published peer-reviewed literature on this subjects.  Hruz Depo. Tr. 61:17-64:7;  *id.* at 295:19-295:23 ("Q. Have you published any peer-reviewed literature regarding gender dysphoria or transgender youth?  A. These are questions that I've already answered, and the answer is no.").  Instead, Dr. Hruz relies *solely* on his review of studies for purposes of his expert opinion.  As with the disqualified expert in *Lebron* who "reached his opinion instead by relying on studies," this is not a sufficient qualification to serve as an expert witness.  *Lebron*, 772 F.3d at 1369.

And, Dr. Hruz is neither a psychiatrist, a psychologist, nor mental health care provider of any kind, who would be able to diagnose mental health conditions, such as gender dysphoria.  Hruz Depo. Tr. 41:21-42:2 ("Q. Are you a licensed mental healthcare provider of any kind?  A. I am not.");  *id.* at 42:11-42:18 ("Q. As an endocrinologist, do you routinely diagnose conditions in the DSM-5?  A. I -- I do not . . . I do not consider myself as a psychiatrist to making those diagnoses, no.").  Thus, Dr. Hruz cannot provide any opinion on the diagnosis

---

[4] Dr. Spack is an Associate Physician in Medicine at Boston Children's Hospital, the Co-Founder and Co-Director Emeritus of the Gender Management Service (GeMS) Program at Boston Children's Hospital, and an Associate Clinical Professor of Pediatrics at Harvard Medical School in Massachusetts.  Spack Decl. ¶ 4.  The first-of-its-kind program in the United States, GeMS provides comprehensive care to the unique group of gender nonconforming and transgender children and adolescents.  *Id.* at ¶ 5.  Since its founding, the GeMS Program has been replicated by over 60 similar programs at pediatric academic centers in North America, including the now Transgender Center at St. Louis Children's Hospital.  *Id.* at ¶ 6.

and mental health care of gender dysphoria and has not and cannot offer any opinions on whether Drew has gender dysphoria or the validity of such a diagnosis.

Finally, Dr. Hruz's involvement as an "expert witness" in these cases dates back and originates to a conference by the Alliance Defending Freedom organized specifically to cultivate professional "experts" who would testify against the gender-affirmation of transgender people. *See* Hruz Depo. Tr. 92:21-93:24. As such, like the disqualified expert in *Lebron*, Dr. Hruz "developed his opinions expressly for purposes of testifying" in an area that he did not otherwise specialize in. *Lebron*, 772 F.3d at 1369.

Put simply, Dr. Hruz has no foundation of knowledge, skill, or experience necessary to serve as an expert on gender identity, the diagnosis of gender dysphoria, or the treatment paradigms for gender dysphoria, particularly mental health treatment. In other words, Dr. Hruz is "not qualified by background, training, or expertise to opine" about the effects of a policy prohibiting transgender people from using the sex-designated facilities consistent with their identity, such as Defendant's discriminatory policy. *Lebron*, 772 F.3d at 1369. Accordingly, Dr. Hruz is not qualified to serve as an expert witness in this case or opine on any of the factual issues presented by this case.

**B. Dr. Hruz's Report, Opinions, And Testimony Have No Relevance To This Case.**

Even though this case revolves around whether Defendant's bathroom policy unlawfully discriminates against transgender people, like Plaintiff, Dr. Hruz's Report fails to direct his report to the actual Plaintiff or issues relevant to this litigation. *See* Hruz Depo. Tr. 46:23-47:22. Specifically, Dr. Hruz has testified that he has no opinion on the ultimate issues in this case,

Q. (By Mr. Gonzalez-Pagan) So you do not have any opinion as to whether

the current policy should or should not be implemented at St. John's County

School District?

A. That would require me to have experience as a school administrator or

making school policies, which I do not have that experience.

Hruz Depo. Tr. 254:13-254:19.  Indeed, Dr. Hruz admits that Drew Adams is a post-pubertal

transgender boy, that Drew Adams has been diagnosed with gender dysphoria, and that he has

no basis to dispute whether Defendant's discriminatory restroom policy has caused distress,

anxiety, or otherwise harmed Drew Adams.  *See* Hruz Depo. Tr. 22:20-23:8; *id.* at 25:24-26:5;

*id.* at 45:3-46:3.

Instead, Dr. Hruz focuses on his generalized opinions, *see* Hruz Depo. Tr. 47:20-47:22,

regarding: "Desistance (i.e. reversion to gender identity concordant with sex) . . . as a desired

goal"; the medical "[t]reatment of gender dysphoric children who experience persistence

symptoms"; activities that "encourage[] or perpetuate[] transgender persistence"; Dr. Hruz's

questioning the efficacy of standard treatments for gender dysphoria, generally such puberty

blockers, hormone therapy, and surgery; purported desistence or persistence rates among

children who suffer from gender dysphoria; and any discussion about "making informed

consent" to medical treatments for gender dysphoria.  Hruz Report at para. 28, 37, 39, 43, 46.[5]

---

[5] Plaintiff submitted a motion in limine on these issues because they have no relationship to the case at bar.  There is no dispute that Drew is transgender or that he was diagnosed with gender dysphoria.  To dispute the latter point, Defendant is required to submit medical testimony and evidence, but both of its experts acknowledge that they do not dispute the

None of these "opinions" have a relationship to the actual case being tried, meaning whether Defendant's policy excluding Plaintiff, a transgender boy, from using the restroom associated with his gender identity is discriminatory and whether that policy has harmed Plaintiff. Dr. Hruz candidly admits he is neither a school administrator nor a mental health provider of any kind (Hruz Depo. Tr. 87:3-87:25), and his generalized views on transitioning and the medical treatments for gender dysphoria simply have no application here.

*In the first instance*, Dr. Hruz's testimony about desistance is entirely irrelevant to this case.  Hruz Report, para. 28, 39.  The persistence or desistence rates of gender dysphoria in children in general has no bearing on Plaintiff's specific gender dysphoria diagnosis, or whether Plaintiff is transgender.  Even assuming *arguendo* that some children with gender dysphoria ultimately identify with a gender that matches their birth sex at the end of adolescence, that is not the case here.  That is not Drew's situation and has no bearing on his diagnosis of gender dysphoria or his transgender status.  Dr. Hruz admits as much.  Hruz Depo. Tr. 189:25-190:4 ("A. Drew Adams was also a late onset gender dysphoric individual, and that is a population that was not covered in these studies, and there is no evidence as to what the outcome is in those individuals.").  Nor does it make the School Board's policy less discriminatory. It is undisputed that there are transgender children and adolescents, so what is the relevance of this testimony?   This testimony will not aid the trier of fact in deciding the ultimate issue: whether the School Board has engaged in unconstitutional and unlawful

---

diagnosis.  Although Plaintiff nonetheless argues these points in this motion, he believes that, for the reasons stated in the motion in limine, that evidence regarding these issues should be excluded from the case.  *See* Docket No. 107.

discrimination against Plaintiff based on his sex and transgender status, a status that is not in question. The only plausible explanation is that Defendant wishes to cast doubt generally on the validity of a diagnosis of gender dysphoria, an issue not before this Court.

Second, Dr. Hruz's opinions about conversion/reparative therapy are irrelevant to this case and represent fringe views completely contrary the mainstream medical and scientific community in the United States. Dr. Hruz asserts that "[d]esistence . . . provides the greatest lifelong benefit and is the outcome in the majority of cases and should be maintained as a desired goal." Hruz Report, para. 68. These views are not supported by any major national or international medical association that speaks with authority on gender dysphoria treatment. *See King v. Governor of the State of New Jersey*, 767 F.3d 216, 221–22 (3d Cir. 2014) (noting the "reports, articles, resolutions, and position statements from reputable mental health organizations opposing" conversion/reparative therapy and that "[m]any of these sources emphasized that such efforts are ineffective and/or carry a significant risk of harm"); *Pickup v. Brown*, 740 F.3d 1208, 1223–24 (9th Cir. 2014) (noting "the well-documented, prevailing opinion of the medical and psychological community that [conversion/reparative therapy] has not been shown to be effective and that it creates a potential risk of serious harm to those who experience it" and noting the legislature reliance's on position statements, articles, and reports published by the following organizations: the American Psychological Association, the American Psychiatric Association, the American School Counselor Association, the American Academy of Pediatrics, the American Medical Association, the National Association of Social Workers, the American Counseling Association, the American Psychoanalytic Association, the American Academy of Child and Adolescent Psychiatry, and the Pan American Health

Organization."). Dr. Hruz admits that conversion/reparative therapy has been rejected as harmful by major medical organizations. Hruz Depo. Tr. 237:1-237:23.

What is more, Dr. Hruz's opinions on conversion/reparative therapy have no bearing on the question of whether the School Board has discriminated against Plaintiff on the basis of *his* sex or transgender status. By presenting gender dysphoria and transgender identity as something that is generally "abnormal" and must be "fixed," Dr. Hruz's testimony will only serve to prejudice the Court against Plaintiff by casting doubt on his diagnosis and identity, two things that are not and cannot be disputed. Again, Dr. Hruz has conceded that he is not offering opinions on either Drew's transgender status or his diagnosis with gender dysphoria. Hruz Depo. Tr. 25:24-26:5; *id.* at 23:4-23:8. The underlying causes or most effective treatments for gender dysphoria are not before this Court. It is not the role of the School Board to question their students' medical diagnoses or argue that the prescribed treatment – including social transition and access to restrooms corresponding to one's gender identity; indeed, even its own experts acknowledge they have no basis to do so.

*Third*, Dr. Hruz's opinion that puberty blockers and hormonal treatments pose risks to patients is highly irrelevant to this case, even though he openly concedes that his opinions regarding treatment for gender dysphoria are contrary to the applicable standards of care, clinical guidelines, and general medical consensus. Hruz Report, para. 37, 39, 41-44. Moreover, Dr. Hruz's provision of this care for other conditions, such as precocious puberty, notwithstanding his "concerns" completely undermine this line of testimony. Hruz Depo. Tr. 232:20-233:19. And notwithstanding, Dr. Hruz's assertions regarding medical treatment for gender dysphoria, even if true (which they are not), have no bearing on the present case as

Plaintiff has already been through years of psychological evaluation and treatment by multiple doctors in multiple states.  The list of medical professionals treating Plaintiff does not include Dr. Hruz; and he has ever, by his own admission, treated or consulted with Plaintiff.  *See* Hruz Depo. Tr. 17:9-18:2; *id.* at 46:23-47:22.

Put simply, Dr. Hruz's opinions are based on nothing more than the "subjective belief or unsupported speculation" found insufficient in *Daubert*.  *Daubert*, 509 U.S. at 589-590.  In other words, Dr. Hruz lacks knowledge "of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Jones v. Otis Elevator Co*., 861 F.2d 655, 662 (11th Cir. 1988).  Therefore, Dr. Hruz's opinions regarding the medical treatment for gender dysphoria generally, let alone for Plaintiff, are irrelevant to this case as he have no basis on which to question Plaintiff's diagnosis or any treatments he has received, and this is not a case about the propriety of Plaintiff's medical treatment.

**C.  Dr. Hruz's Report, Opinions, And Testimony Are Unreliable.**

As a general rule, an expert's testimony should only be admitted if it is sufficiently reliable.  An expert's reliability "concerns whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 988 (11th Cir. 2016) (quoting *Daubert*, 509 U.S. at 592-93).  In making this determination the court can consider a variety of factors, including whether the purported expert's theory has been tested, whether it has been subjected to peer review and publication, and whether the theory has been generally accepted in the scientific community.  *See Daubert*, 509 U.S. at 593-94; *Rink*, 400 F.3d at 1292.  As such, courts must assess "whether the evidence is genuinely

scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Chapman v. Procter & Gamble Distributing, LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014). "In evaluating the reliability of an expert's method . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293, n.7.

Here, Dr. Hruz's testimony is based on nothing more than rank speculation, "untested" theories, uncorroborated anecdotes, assumptions that are obsolete, flawed, unethical, and expressed opinions based upon "unsettled science"; his opinions lack the markers of reliability necessary for them to be admitted as expert testimony. Dr. Hruz has conducted no studies or research or employed any methodology or scientific basis to reach any of his opinions. Hruz Depo. Tr. 61:17-64:7; *id.* at 295:19-295:23. His opinions regarding transgender people, as he admits, are contrary and squarely at odds with the generally accepted opinions, guidelines, and standards of care of the medical and scientific community. Hruz Depo. Tr. 58:21-61:9. His opinions on major topics, such as treatment protocols, have been rejected by every legitimate authority in the areas of gender dysphoria and transgender healthcare including the American Medical Association, WPATH, the American Academy of Pediatrics, the American Psychological Association, the American Psychiatric Association, the Endocrine Society, and the Pediatric Endocrine Society.

Put simply, Dr. Hruz's opinions in this case are decidedly not scientific and represent a fringe viewpoint – this Court should exclude his testimony.

**D.  Dr. Hruz's Report, Opinions, And Testimony Are Tainted By His Personal Bias.**

While Plaintiff is cognizant that bias in an expert witness's testimony is usually an issue for the jury, *Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1332 (11th Cir. 2014), this case is a bench trial and the Court has indicated that it will decide *Daubert* motions after trial.  Here, there is ample evidence that Dr. Hruz's testimony is permeated and tainted by his unscientific views and personal bias.  *See Sanchez v. Esso Standard Oil de Puerto Rico, Inc.*, No. CIV 08-2151, 2010 WL 3809990, at *4 (D.P.R. Sept. 29, 2010).

More specifically, Dr. Hruz appears to have lied about the nature of his conversations with the parent of transgender child in 2013 as well as his conversation with Dr. Norman Spack, a noted pediatric endocrinologist and the co-founder of Boston Children's Hospital Gender Management Service (GeMS) Program.  Specifically, Dr. Hruz testified that he discussed about Dr. Spack the level of scientific evidence for the use of puberty blockers.  Hruz Depo. Tr. 277:8-280:17.  But Dr. Spack directly contradicts Dr. Hruz's description of this conversation. Contrary to Dr. Hruz's assertions, Dr. Spack avers that "Dr. Hruz did not discuss or mention that his issues or concerns were based on science."  Spack Decl. ¶ 13.  To the contrary, Dr. Hruz expressed to Dr. Spack that he had "a significant problem with the entire issue" and "whole idea of transgender," and that for him, it was "a matter of [his] faith."  *Id.* at ¶¶ 11-12.

Similarly, Dr. Hruz misrepresented the nature of his conversation with Kim Hutton, the mother of a transgender child, in 2013.  *See* Hruz Depo. Tr. 102:24-103:9; *id.* at 126:12-129:25. For example, Dr. Hruz has testified that when he met with the parent of transgender child who was affiliated with an organization called TransParent, he was in a "very early investigative phase" of his so-called study of gender dysphoria.  Hruz Depo. Tr. 103:25-104-7; *id.* at 102:24-

103:9 ("A. Again, this was at the very early time frame when I was trying to investigate the claims for the treatment and care, and I wanted to get as comprehensive of a viewpoint as I could.").  However, the nature of Dr. Hruz's conversation with Ms. Hutton revealed that his opposition to gender-affirming care and treatment of transgender children, as well as his opposition to a having a Transgender Center at St. Louis Children's Hospital, was already firmly established and is rooted in his personal moral and religious views.[6]  Here, Dr. Hruz told Ms. Hutton, "there will never be a pediatric gender center at St. Louis Children's Hospital. I won't allow it," Hutton Depo Tr. 30:8-30:11, at a time when he claims he was "very early" in his investigation of gender dysphoria, Hruz Depo. Tr. 103:25-104:7; *id.* at 102:24-103:9 (Excerpts of the deposition of Kim Hutton are attached hereto as Exhibit G).  Similarly, during his investigatory conversation with Ms. Hutton, Dr. Hruz told Ms. Hutton multiple times that her "child was not normal and would never be normal," Hutton Depo. Tr. 28:20-28:23; that "the idea of doing surgeries on transgender people is -- is wrong," *id.* at 21:21-27:24; and told Ms. Hutton "to read Pope John Paul IIs writings on gender," *id.* at 29:17-29:20.   And in response to Ms. Hutton's statement that transgender children, including hers, "are at a 41 percent risk of suicide if they don't have acceptance and -- and care from their parents and -- and if they don't get their medical needs met," Dr. Hruz responded that, "Some children are born in this world to suffer and die."  Hutton Depo. Tr. 29:21-30:4.  As a result, Ms. Hutton left her conversation with Dr. Hruz—a conversation Dr. Hruz testifies he "was approaching

---

[6] Plaintiff does not seek to impugn or malign whatever moral or religious views Dr. Hruz may hold.  However, to the extent that Dr. Hruz's moral and religious views have influenced his purported expert testimony and opinions—indeed, they seem to be a motivating factor for his testimony—that is something the Court must be aware of and should consider.

this in a purely investigative manner" to learn about the "lived experience" of transgender children and their families, Hruz Depo. Tr. 126:16-127:3—"perplexed" due to "the religious tone of the conversation," which she "figured [] would at least be based on science." Hutton Depo. Tr. 37:11-37:19.

The bias illuminated by Dr. Spack's declaration and Ms. Hutton's testimony is further confirmed by the nature of Dr. Hruz's publications and presentations on this issue. Hruz Depo. Tr. 85:11-85:20. For one, Dr. Hruz's *one and only* publication on this issue was published in *The New Atlantis*, a publication of the Ethics and Public Policy Center—an "institute dedicated to applying the Judeo-Christian moral tradition to critical issues of public policy." Ethics and Public Policy Ctr., *About EPPC*, *available at* https://eppc.org/about/ (last accessed Dec. 5, 2017). And Dr. Hruz's presentation on this topic, as recently as November 17, 2017, was at the Saint John Paul II Bioethics Center at the Holy Apostles College & Seminary. Hruz Depo. Tr. 83:5-85:20. In that presentation, Dr. Hruz referred to being transgender as something that "probably goes back to some of the early heresies in the church." *Id.* at 84:6-84:16. Dr. Hruz also referred to pictures of transgender people as "disturbing." *Id.* at 85:4-85:10. When confronted with these statements, Dr. Hruz did not disavow or deny making them. *Id.*

The foregoing, coupled with Dr. Hruz's departure with generally accepted medical and scientific standards, demonstrates that Dr. Hruz's purported expert testimony lacks any indicia of reliability. To be sure, the Federal Rules of Evidence state that "[e]vidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility." Fed. R. Evid. 610. But the Advisory Committee Notes to Federal Rule of Evidence 610 make absolutely clear that "an inquiry for the purpose of showing interest or bias because of them is

not within the prohibition."   Advisory Committee Notes to Fed. R. Evid. 610.   Indeed, "[w]ithout this critical information," the Court would be "deprived of the necessary facts from which it could appropriately draw inferences about [Dr. Hruz's] reliability." *State v. Heinz*, 3 Conn. App. 80, 93, 485 A.2d 1321, 1328 (Conn. App. 1984).   Here, it is clear that Dr. Hruz has not been candid regarding his experiences or the bases for his "opinions."   The record evidence demonstrates a clear bias by Dr. Hruz against transgender people generally, which infects his reliability as a purported expert witness in this case.

### E.   Dr. Hruz's Report, Opinions, And Testimony Lack Probative Value And Are Thus Inadmissible Under Federal Rule Of Evidence 403.

Finally, the Court should exclude evidence if its introduction will result in unfair prejudice, confusion of the issues, or result in misleading testimony.   Fed. R. Evid. 403.   As noted above, Dr. Hruz offers no opinions on any factual dispute in this case, and, in any event, the opinions he offers are irrelevant and wildly unreliable. Thus, consideration of Dr. Hruz's testimony would waste time and create confusion.   The testimony would also result in prejudice, as the testimony seeks to sow confusion about Plaintiff's gender identity when he has performed no examination of Plaintiff and cannot render any opinions about Drew. Accordingly, Dr. Hruz's testimony also fails to satisfy the requirements of Federal Rule of Evidence 403 and should be excluded.

### CONCLUSION

WHEREFORE, based on the foregoing, Plaintiff respectfully requests that the Court grant the instant motion and exclude Dr. Hruz's purported expert testimony because: (1) it was untimely and improperly disclosed, and (2) it does not meet any of the indicia for admissibility

under *Daubert* and the Federal Rules of Evidence.  Accordingly, the Court should exclude Dr. Hruz's report, opinions, and testimony in full.

## CERTIFICATE OF CONFERENCE PURSUANT TO LOCAL RULE 3.01(g)

Pursuant to 3.01(g) of the Local Rules of the Middle District of Florida, the undersigned certifies that he has conferred with the attorneys representing Defendant regarding the relief requested in the motion.  The parties were unable to reach a resolution and Defendant's counsel does not consent to the relief requested.

Dated this 6th of December, 2017.

Respectfully submitted,

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan
  (*admitted pro hac vice*)
LAMBDA LEGAL DEFENSE
    AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, New York 10005-3919
Telephone: 212-809-8585
Facsimile:  212-809-0055
ogonzalez-pagan@lambdalegal.org

Natalie Nardecchia
(*admitted pro hac vice*)
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010-3512
Tel. 213-382-7600 | Fax: 213-351-6050
nnardecchia@lambdalegal.org

Tara L. Borelli (*admitted pro hac vice*)
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30308-1210
Telephone:  404-897-1880

Kirsten Doolittle, Trial Counsel
Florida Bar No. 942391
THE LAW OFFICE OF KIRSTEN DOOLITTLE, P.A.
The Elks Building
207 North Laura Street, Ste. 240
Jacksonville, FL 32202
Telephone:  904-551-7775
Facsimile:  904-513-9254
kd@kdlawoffice.com

Jennifer Altman
Florida Bar No: 881384
Markenzy Lapointe
Florida Bar No: 172601
Shani Rivaux
Florida Bar No: 42095
Aryeh Kaplan
Florida Bar No: 60558
PILLSBURY WINTHROP SHAW PITTMAN, LLP
600 Brickell Avenue Suite 3100
Miami, FL 33131
Telephone:  786-913-4900
Facsimile:  786-913-4901
jennifer.altman@pillsbury.com
markenzy.lapointe@pillsburylaw.com

Facsimile:  404-897-1884
tborelli@lambdalegal.org

shani.rivaux@pillsbury.com
aryeh.kaplan@pillsbury.com

Paul D. Castillo (*admitted pro hac vice*)
LAMBDA LEGAL DEFENSE
    AND EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, Texas 75219
Telephone:  214-219-8585
Facsimile:  214-219-4455
pcastillo@lambdalegal.org

Richard M. Segal (*admitted pro hac vice*)
Nathaniel R. Smith (*admitted pro hac vice*)
PILLSBURY WINTHROP SHAW PITTMAN LLP
501 W. Broadway, Suite 1100
San Diego, CA 92101
Telephone:  619-234-5000
Facsimile:  619-236-1995
richard.segal@pillsburylaw.com
nathaniel.smith@pillsburylaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2017, the foregoing motion was filed electronically using the Court's ECF system, which will provide electronic notice to all counsel of record, including:

> Terry J. Harmon (tharmon@sniffenlaw.com)
> Robert J. Sniffen (rsniffen@sniffenlaw.com)
> Michael P. Spellman (mspellman@sniffenlaw.com)
> Lisa B. Fountain (lfountain@sniffenlaw.com)
> Kevin Kostelnik (kkostelnik@sniffenlaw.com)
> SNIFFEN & SPELLMAN, P.A.
> 123 North Monroe Street
> Tallahassee, Florida 32301
>
> Robert Christopher Barden (rcbarden@mac.com)
> RC Barden & Associates
> 5193 Black Oaks Court North
> Plymouth, MN 55446-2603
>
> *Attorneys for Defendant, The School Board of St. Johns County, Florida*

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan
(*admitted pro hac vice*)
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, New York 10005-3919
Tel.: 212-809-8585 | Fax: 212-809-0055
ogonzalez-pagan@lambdalegal.org