# EXHIBIT E

UNITED STATES DISTRICT COURT
EASTERN FOR THE MIDDLE DISTRICT OF WISCONSINFLORIDA
JACKSONVILLE DIVISION

ASHTON WHITAKERDREW ADAMS, a minor, by and through his mother and next friend, MELISSA WHITAKER and mother, ERICA ADAMS KASPER,

*Plaintiff,*

v.

KENOSHA UNIFIED SCHOOL DISTRICT NO. 1 BOARD OF EDUCATION and SUE SAVAGLIO-JARVIS, in her official capacity as Superintendent of the Kenosha Unified School District No. 1THE SCHOOL BOARD OF ST. JOHNS COUNTY, FLORIDA,

*Defendants.*

Civil Action No. 3:17-cv-00739-TJCJBT

Civ. Action No. 2:16-cv-00943

**EXPERT DECLARATION of Paul W Hruz, M.D., Ph.D**

1. I have been retained by counsel for Defendants as an expert in connection with the above-captioned litigation. I have actual knowledge of the matters stated in this declaration. My professional background, experience, and publications are detailed in my curriculum vitae, a true and accurate copy which is attached as Exhibit A to this declaration.

2. I received my doctor of philosophy degree from the Medical College of Wisconsin in 1993. I received my medical degree from the Medical College of Wisconsin in 1994. I am an Associate Professor of Pediatrics in the Division of Pediatric Endocrinology and Diabetes at Washington University School of Medicine. I also have a secondary appointment as Associate Professor of Cellular Biology and Physiology in the Division of Biology and Biological Sciences at Washington University School of Medicine. I served as chief of the Division of Pediatric

Endocrinology and Diabetes at Washington University from 2012-2017. I served as the Director of the Pediatric Endocrinology Fellowship Program at Washington University from 2008-2016.

3. I am board certified in Pediatrics and Pediatric Endocrinology. I have been licensed to practice medicine in Missouri since 2000.

4. My professional memberships include the American Academy of Pediatrics, the Pediatric Endocrine Society, the Endocrine Society, and the American Association for Biochemistry and Molecular Biology.

5. I have extensive experience in treating infants and children with disorders of sexual development and am an active member of the multidisciplinary Disorders of Sexual Development (DSD) program at Washington University. The DSD Team at Washington University is part of the DSD-Translational Research Network, a national multi-institutional research network that investigates the genetic causes and the psychologic consequences of DSD.

6. In the nearly 20 years that I have been in clinical practice I have participated in the care of hundreds of children with disorders of sexual development. In the care of these patients, I have acquired expertise in the understanding and management of associated difficulties in gender identification.

7. In my role as the director of the Division of Pediatric Endocrinology at Washington University, I have extensively studied the existing literature related to the incidence, potential etiology and treatment of gender dysphoria as efforts were made to develop a Transgender clinic at Saint Louis Children's Hospital. I have participated in local and national meetings where the endocrine care of children with gender dysphoria has been discussed and debated. I have met individually with several pediatric endocrinologists, including Dr. Norman Spack, who have developed and led transgender programs in the United States. I have also met with parents of children with gender dysphoria to understand the unique difficulties experienced by this patient

population.

8. Pediatric patients referred to our practice for the evaluation and treatment of gender dysphoria are cared for by an interdisciplinary team of providers that includes a psychologist and pediatric endocrinologist who have been specifically chosen for this role based upon a special interest in this rare patient population. Due to serious concerns regarding the safety, efficacy, and ethics of the current treatment paradigm, I have not directly engaged in hormonal treatment of patients with gender dysphoria.

9. My opinions as detailed in this declaration are based upon my knowledge and direct professional experience in the subject matters discussed. The materials that I have relied upon are the same types of materials that other experts in my field of clinical practice rely upon when forming opinions on the subject. The documents that I have reviewed specifically related to this case are 1.) The ~~medical records for Savanah "Ash" Whitaker (AW0124-AW0223), 2.) the transcript of the deposition of medical expert witness Danial Shumer, MD, MPH, and 3.) the defendants' answer to plaintiffs~~ first amended complaint ~~filed on October 18, 2016.~~for declaratory, injunctive, and other relief for Drew Adams, 2.) The plaintiffs first amended rule 26(a) disclosure and 3.) Drew Adams' medical records. A list of the published literature I have relied on is attached as Exhibit B to this declaration.

10. Over my career, I have provided expert medical record review and testified at deposition in less than a dozen cases. ~~I have not given a deposition as an expert witness since 2012 and~~Related to the litigation of issues of sex and gender, I have been designated as an expert witness in *Joaquin Carcano et al vs. Patrick Mccrory*, *Jane Doe vs Board of Education of the Highland School District*, and *Ashton Whitaker vs. Kenosha Unified School District.* I have been deposed in the last of these cases. In the past 4 years I have also served as an expert witness in *Dakota Humphrey vs. Stanley Block* and *Liston Ward et al. vs. Janssen Pharmaceuticals.* I have never testified at trial.

11. I am being compensated at an hourly rate for actual time devoted, at the rate of $~~300~~350

per hour. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

**Case Details**



**Basic Terminology**

13. Biological sex is a term that specifically refers to a member of a species in relation to the member's capacity to either donate (male) or receive (female) genetic material for the purpose of reproduction. This remains the standard definition that has been accepted and used by scientists, medical personnel, and society in general.

14. Gender, a term that had traditionally been reserved for grammatical purposes, is currently used to describe the psychologic and cultural characteristics of a person in relation to biological sex. Gender therefore exists in reference to *societal* perceptions, not biology.

15. Gender identity refers to a person's individual perception of being male or female.

16. Sexual orientation refers to a person's arousal and desire for sexual intimacy with members of the male or female sex.

**Human sexuality in relation to fundamental biology and observed variations**

17. Sex is genetically encoded at the moment of conception due to the presence of specific DNA sequences (i.e. genes) that direct the production of signals that influence the formation of ~~the~~bipotential gonad to develop into either ~~into~~ a testis or ovary. This genetic information is normally present on X and Y chromosomes. Chromosomal sex refers to the normal complement of X and Y chromosomes (i.e. normal human males have one X and one Y chromosome whereas normal human females have two X chromosomes). Genetic signals are mediated through the activation or deactivation of other genes and through programmed

signaling of hormones and cellular transcription factors. The default pattern of development in the absence of external signaling is female. The development of the male appearance (phenotype) depends upon active signaling

processes.

18. For members of the human species, sex is normatively aligned in a binary fashion (i.e., either male or female) in relation to biologic purpose. Medical recognition of an individual as male or female is typically made at birth according to external phenotypic expression of primary sexual traits (i.e., presence of a penis for males and presence of labia and vagina for females).

19. Due to genetic and hormonal variation in the developing fetus, normative development of the external genitalia in any individual differs with respect to size and appearance while maintaining an ability to function with respect to biologic purpose (i.e. reproduction). Internal structures (e.g. gonad, uterus, vas deferens) normatively align with external genitalia.

20. Reliance upon external phenotypic expression of primary sexual traits is a highly accurate means to assign biologic sex. In over 99.9% of cases, this designation will correlate with internal sexual traits and capacity for normal biologic sexual function. Sex is therefore not "assigned at birth" but is rather recognized at birth.

21. Due the complexity of signals that are involved in normal sexual development, it is not surprising that a small number of individuals are born with defects in this process. Defects can occur either through inherited or *de nova* mutations in genes that are involved in sexual determination or through environmental insults during critical states of sexual development. Persons who are born with such abnormalities are considered to have a disorder of sexual development (DSD). Most often, this is first detected as ambiguity in the appearance of the external genitalia.

22. Normal variation in external genital appearance (e.g. phallic size) does not alter the basic biologic nature of sex as a binary trait. "Intersex" conditions represent disorders of normal

development, not a third sex.

23. Medical care of persons with DSDs is primarily directed toward identification of the etiology of the defect and treatment of any associated complications. Similar to other diseases, tools such as the Prader scale are used to stage the severity of the deviation from normal. In children with DSDs, characterization based upon phenotype alone does not reliably predict chromosomal sex nor does it necessarily correlate with potential for biological sexual function. Decisions on initial sex assignment in these rare cases require detailed assessment by a team of expert medical providers.

24. Standard medical practice in the treatment of persons with DSDs has evolved with growing understanding of the physical and psychologic needs and outcomes for affected individuals. Previously, it was felt that a definitive sex assignment was necessary shortly after birth with the belief that this would allow patients with DSDs to best conform to the assigned sex. Current practice is to defer sex assignment until the etiology of the disorder is determined and, if possible, a prediction can be made on likely biologic and psychologic outcomes. When this cannot be done with confidence, a presumptive sex assignment is made. Factors used in making such decisions include chromosomal sex, phenotypic appearance of the external genitalia, and parental desires. The availability of new information can in rare circumstances lead to sex reassignment. Decisions on whether to surgically alter the external genitalia to align with sex are generally deferred until the patient is able to provide consent.[1]

**Gender Dysphoria in relation to Biological Sex**

~~21.~~25. Although gender usually aligns with biological sex, some individuals experience discordance in these distinct traits. Specifically, biologic females may identify as males and biologic males may identify as females. As gender by definition is distinct from biological sex, one's gender identity does not change a person's biological sex.

~~22.~~26. Individuals who experience significant distress due to discordance between gender identity and sex are considered to have "gender dysphoria".[2] Although the prevalence of gender dysphoria has not been established by rigorous scientific analysis, estimates reported in in the DSM-V are between 0.005% to 0.014% for adult males and 0.002% to 0.003% for adult females. Thus, gender dysphoria is a rare condition. It is currently unknown whether these estimates are falsely low due to under-reporting, or if changing societal acceptance of transgenderism and the growing number of medical centers providing medical intervention for gender dysphoria affects the number of persons who identify as transgender. Recent data ~~suggests~~indicates that the number of people seeking care for gender dysphoria is increasing with some estimates as high as ~~4~~20-fold.[3,4]

~~23.~~27. There is strong evidence against the theory that gender identity is determined at or before birth and is unchangeable. This comes from identical twin studies where siblings share genetic complements and prenatal environmental exposure but have differing gender identities.[5]

~~24.~~28. Further evidence that gender identity is not fixed comes from established peer reviewed literature demonstrating that the vast majority (80-95%) of children who express gender dysphoria revert to a gender identity concordant with their biological sex by late adolescence.[6,7] It is not known whether individuals with gender dysphoria persistence have differing etiologies or severity of precipitating factors compared to desisting individuals.



~~25.~~30. The etiology of gender dysphoria in ~~these persons~~individuals with gender dysphoria remains to be identified. Theories include prenatal hormone exposure, genetic variation, and postnatal environmental influences. Based upon the currently available but incomplete dataset,

it is likely that gender dysphoria is multifactorial with differing qualitative and quantitative influences in any given individual.

~~26.~~31. The recently coined concept of "neurological sex" as a distinct entity or a basis for classifying individuals as male or female has no scientific justification. Limited emerging data has suggested structural and functional differences between brains from normal and transgender individuals. These data do not establish whether these differences are innate and fixed or acquired and malleable. The remarkable neuronal plasticity of the brain is known and has been studied extensively in gender-independent contexts related to health and disease, learning and behavior.

**Gender Ideology**

~~27.~~32. The modern attempt to equate gender identity with sex is not based upon sound scientific principles but rather is based upon ideology fueled by advocacy. Although worldviews among scientists and physicians, similar to society at large, differ, science is firmly grounded in physical reality not perception. The inherent link between human sexual biology and teleology is self-evident and fixed.

~~28.~~33. The claims of proponents of transgenderism, which include opinions such as "Gender ~~defines who one~~identity is ~~at his/her core~~the primary factor determining a person's sex" and "Gender is the only true determinant of sex" must be viewed in their proper philosophical context. There is no scientific basis for redefining sex on the basis of a person's psychological sense of 'gender'.

~~29.~~34. The prevailing, constant and accurate designation of sex as a biological trait grounded in the inherent purpose of male and female anatomy and as manifested in the appearance of external genitalia at birth remains the proper scientific and medical standard. Redefinition of the classification and meaning of sex based upon pathologic variation is not established medical fact.

**Potential Harm Related to Gender Dysphoria Treatments**

~~30.~~35. The fundamental purpose of the practice of medicine is to treat disease and alleviate suffering. An essential tenet of medical practice is to avoid doing harm in the process. Due to the frequent lack of clear and definitive evidence on how to best accomplish this goal, treatment approaches can and do frequently differ among highly knowledgeable, competent, and caring physicians.

~~31.~~36. Persons with gender dysphoria as delineated in the DSM-V experience significant psychological distress related to their condition with elevated risk of depression, suicide, and other morbidities. Thus, attempts to provide effective medical care to affected persons are clearly warranted.

~~32.~~37. Efforts to effectively treat persons with gender dysphoria require respect for the inherent dignity of those affected, sensitivity to their suffering, and maintenance of objectivity in assessing etiologies and long-term outcomes. Desistance (i.e. reversion to gender identity concordant with sex) provides the greatest lifelong benefit and is the outcome in the majority of patients and should be maintained as a desired goal. Any forced societal intervention that could interfere with the likelihood of gender dysphoria resolution is unwarranted and potentially harmful.

~~33.~~38. There is an urgent need for high quality controlled clinical research trials to determine ways to develop supportive dignity affirming social environments that maintain affirmation of biological reality. To date, three approaches have been proposed for managing children with gender dysphoria.[8] The first approach, often referred to as "conversion" or "reparative therapy", is directed toward actively supporting and encouraging children to identify with their biological sex. The second "neutral" approach, motivated by understanding of the natural history of transgender identification in children, is to neither encourage nor discourage transgender identification, recognizing that the majority of affected children if left alone will eventually realign their gender with their sex. The third "affirming" approach is to actively encourage

children to embrace transgender identity with social transitioning followed by hormonal therapy.

~~34.~~39. The gender affirming approach, which includes use of a child's preferred pronouns, use of sex-segregated bathrooms, other intimate facilities and sleeping accommodations corresponding to a child's gender identity, has limited scientific support for short-term alleviation of dysphoria and no long-term outcomes data demonstrating superiority over the other approaches. Claims that the other approaches have been scientifically disproven are false. Decades of research, most notably the pioneering work of Dr. Kenneth Zucker, have supported the efficacy of a more conservative approach for the majority of patients experiencing gender dysphoria.[8,9]

~~35.~~40. Feelings of anxiety, depression, isolation, frustration, and embarrassment are not unique to children with gender dysphoria, but rather are common to children who differ physically or psychologically from their peers. Difficulties are accentuated as children progress through the normal stages of neurocognitive and social development. In the clinical practice of pediatric endocrinology, this is most commonly seen in children with diabetes. Attempts to deny or conceal the presence of disease rather than openly acknowledge and address specific needs can have devastating consequences including death. With proper acknowledgment of the similarity and differences between children with gender dysphoria and other developmental challenges, prior experience can guide the development of effective approaches to both alleviate suffering and minimize harm to school aged children experiencing gender dysphoria.

~~36.~~41. The Endocrine Society published in 2009 clinical guidelines for the treatment of patients with persistent gender dysphoria.[10] The recommendations include temporary suppression of pubertal development of children with GnRH agonists (hormone blockers normally used for children experiencing precocious puberty) followed by hormonal treatments to induce the development of secondary sexual traits consistent with one's gender identity. This guideline was developed using the GRADE (Recommendations, Assessment, Development, and Evaluation) system for rating clinical guidelines. As directly stated in the Endocrine Society

publication, "the strength of recommendations and the quality of evidence was low or very low." According to the GRADE system, low recommendations indicate "Further research is very likely to have an important impact on our confidence in the estimate of effect and is likely to change the estimate". Very low recommendations mean that "any estimate of effect is very uncertain". An updated set of guidelines was published in September of 2017.[11] The low quality of evidence presented in this document persist.

37.42. Clinical Practice Guidelines published by the World Professional Association for Transgender Health (WPATH), which is currently in its 7th iteration, similarly, though less explicitly, acknowledge the limitation of existing scientific data supporting their recommendations given and "the value of harm-reduction approaches".

38.43. Treatment of gender dysphoric children who experience persistence of symptoms with hormones (pubertal suppression and cross-hormone therapy) carries significant risk. It is generally accepted, even by advocates of transgender hormone therapy, that hormonal treatment results in sterility which in many cases is irreversible.[12] Emerging data also show that treated patients have lower bone density which may lead to increased fracture risk later in life.[13] Other potential adverse effects include disfiguring acne, high blood pressure, weight gain, abnormal glucose tolerance, breast cancer, liver disease, thrombosis, and cardiovascular disease.[14]

39.44. Since strategies for the treatment of transgendered children as summarized by the Endocrine Society guidelines are relatively new, long-term outcomes are unknown. Evidence presented as support for short term reductions in psychological distress following social transition in a "gender affirming" environment remains inconclusive. When considered apart from advocacy based agendas, multiple potential confounders are evident. The most notable deficiencies of existing research are the absence of proper control subjects and lack of randomization in study design. Although appropriate caution is warranted in extrapolating the outcomes observed from prior studies with current treatments, adults who have undergone social transition with or without surgical modification of external genitalia continue to have rates of

depression, anxiety, substance abuse and suicide far above the background population.[15,16]

~~40.~~45. Evidence cited to support societal measures that promote or encourage gender transition, including the plaintiffs demand for use of ~~preferred pronouns by teachers and the use of public~~multi-user sex-segregated restrooms~~, other intimate facilities and sleeping accommodations~~ corresponding with the plaintiff's gender identity, as a medically necessary treatment for gender dysphoria is limited. Recent studies reporting reductions in dysphoria following social transition of adolescent patients are small, poorly controlled and of insufficient duration to draw definitive conclusions regarding long-term efficacy. Long-term follow up of patients with gender dysphoria who have undergone social and hormonal transition with or without surgical intervention has shown persistent psychological morbidity far above non-transgendered individuals with suicide attempts 7-fold and completed suicides19-fold above the general population.[15,16]

~~41.~~46. Of particular concern is the likelihood that forced societal affirmation including a requirement that the ~~Kenosha Unified~~St. John's County School District allow students to use sex-segregated bathrooms corresponding to gender identity rather than access to single unit facilities~~ or provision of sleeping accommodations based upon gender identity rather than sex~~, will interfere with known rates of gender resolution. Any activity that encourages or perpetuates transgender persistence for those who would otherwise desist can cause significant harm, particularly in light of the current treatment paradigm for persisting individuals. As noted, permanent sterility can be expected with hormonal or surgical disruption of normal gonadal function. This is particularly concerning given that children are likely incapable of making informed consent to castrating treatments.[17]

~~42.~~47. Dignity affirming support for adolescents with gender dysphoria does not necessitate facilitation of a false understanding of human sexuality in schools. Rather, policy requirements that can increase persistence of transgender identification have significant potential for inducing long-term harm to affected children.

~~43.~~48. There remains a significant and unmet need to better understand the biological,

psychological, and environmental basis for the manifestation of discordance of gender identity and biological sex in affected individuals.[18] In particular, there is a concerning lack of randomized controlled trials comparing outcomes of youth with gender dysphoria who are provided mandated access to sex-segregated bathroom facilities corresponding with gender identity to youth provided single user facilities. This includes understanding of how forced public encouragement of social gender transition affects the usual progression to resolution of gender dysphoria in affected children. Such studies can be ethically designed and executed with provision of other dignity affirming measures to both treatment groups. Without this scientific evidence, it is impossible to assert that the approach using sex-segregated bathrooms is an essential component of treatment.

49. Limitations on this report: My opinions and hypotheses in this matter are subject to the limitations of all documentary and related evidence, the impossibility of absolute prediction, as well as the limitations of social and medical science. I have not met with, nor interviewed, plaintiff Drew Adams. As always, I have no expert opinions regarding the veracity of witnesses in this case. I have not yet reviewed all of the evidence in this case and my opinions are subject to change at any time as new information becomes available to me. Only the trier of fact can determine the credibility of witnesses and how scientific research may or may not be related to the specific facts of any particular case. A key role of an expert witness is to help the court, lawyers, parties, and the public understand and apply reliable scientific, technical, and investigative principles, hypotheses, methods, and information. I have transmitted this confidential expert report directly to attorney Michael Spellman, for distribution as consistent with the relevant laws.

Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.