## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

DREW ADAMS, a minor, by and
through his next friend and mother,
ERICA ADAMS KASPER,

        Plaintiff,

v.

THE SCHOOL BOARD OF ST.
JOHNS COUNTY, FLORIDA,

        Defendant.

Case No. 3:17-cv-00739-TJC-JBT

**PLAINTIFF'S PROPOSED
FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

## I.   PLAINTIFF'S PROPOSED FINDINGS OF FACT

### A.   Parties.

Plaintiff Drew Adams ("Drew"), a minor, by and through his mother, Erica

Adams Kasper, sued Defendant The School Board of St. Johns County, Florida (the

"School Board" or "Defendant"). Drew is 17 years old, and a junior at Allen D. Nease

High School ("Nease"), in the St. Johns County School District (the "District").[1] TTI

78:9-10; *id.* 78:23-79:3. Drew is a boy (TTI 82:17-24; TTII 87:7-8; Ct.'s Ex. 2, 49:14-

17), as recognized by the State of Florida on his driver's license and birth certificate.

TTI 109:9-20; *id.* 110:4-9; *id.* 283:6-11; Pl.'s Exs. 3-4. Drew also is transgender. Ct.'s

Ex. 2, 13:10-25; TTI 216:23-217:19. Although Drew has undergone masculinizing

---

[1] Plaintiff abbreviates the three trial transcript volumes as "TTI," "TTII," and "TTIII."

medical treatment, and is treated by peers and school officials as a boy, he is denied access to the boys' restrooms at Nease because he is transgender. TTIII 97:4-13.

The School Board operates, supervises, and controls all public schools within the District, including Nease. Pl.'s Ex. 138, RFA 5-7. Defendant is authorized to establish policies for the effective operation of the public schools in the district. *Id.* RFA 8. Defendant is a "person" acting under color of state law within the meaning of 42 U.S.C. § 1983 (Pl.'s Ex. 138, RFA 1), and is subject to civil suits. *Id.* RFA 2. Defendant receives federal financial assistance from the U.S. Department of Education ("ED"), and certain of its education programs and activities benefit from that assistance, making it subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX"). Pl.'s Ex. 138, RFA 3-4; Dkt. 116 at 22 ¶ 2.

**B. Drew's Gender Identity and Transition.**

Like all boys, Drew has a male gender identity. TTI 83:18-21; Ct.'s Ex. 2, 14:18-15:3. From early childhood, he eschewed more feminine clothes and toys, and identified with typically masculine clothing and activities. TTI 84:16-88:18. When Drew reached puberty he began to strongly dislike the aspects of his body that were becoming more feminized. *Id.* 89:4-20. He experienced depression and anxiety, and began treatment with a therapist in 2015. *Id.* 90:9-11; *id.* 90:22-91:6; *id.* 215:24-216:22. Drew's therapist and endocrinologist both confirmed that Drew is transgender (*id.* 93:12-94:1; *id.* 97:8-12; *id.* 193:15-194:5; Ct.'s Ex. 2, 13:10-25; Def.'s Ex. 22),

which Defendant does not dispute. TTIII 15:11-12; TTI 246:3-5; *id.* 255:14-23.

The standard of care for treatment of a transgender person includes living consistently with one's gender identity in all aspects of one's life. Ct.'s Ex. 2, 22:25-23:12; *id.* 27:12-20; Ct.'s Ex. 3 ¶ 41. To accomplish that transgender people undertake a process that includes social, legal, and medical transition. Ct.'s Ex. 2, 22:25-24:5; Ct.'s Ex. 3 ¶¶ 33-37. With support from his mental health and medical providers, Drew began transitioning to align his body and life with his male gender identity. TTI 92:17-93:10; *id.* 109:4-8. Drew's social transition included cutting his hair short, wearing clothing typically associated with males, using male pronouns, and using male restrooms. TTI 95:7-12; *id.* 96:1-21; *id.* 228:20-25; *and see generally* Ct.'s Ex. 2, 27:12-20. Until he later received surgery, Drew also wore a garment called a "binder" which reduced the appearance of his breasts; he recalls the day he received his binder in the mail as one of the "happier moments of [his] life." TTI 101:5-24.

The goal of medical transition is for the body to "completely appear [as] the gender that matches their gender identity." Ct.'s Ex. 2, 27:21-28:9; *see also* Ct.'s Ex. 3 ¶¶ 36-37, 39. Drew's medical transition began with hormone therapy in the summer of 2016 to masculinize his body. TTI 99:12-19; *id.* 237:22-238:1. He also underwent a mastectomy in 2017 to create a masculine chest, and to eliminate the need to wear his binder. TTI 100:25-101:4; *id.* 105:7-11; *id.* 238:2-6. Drew's hormone therapy will continue deepening his voice, and cause him to grow facial hair. Ct.'s Ex. 2, 30:7-21.

Drew's legal transition included correcting his driver's license and birth certificate to reflect his gender as male (TTI 109:9-20; *id.* 110:4-9; Pl.'s Exs. 3-4), pursuant to procedures established by Florida state agencies. *See* Req. for Judicial Notice, ECF No. 147; *see id.* Ex. A at 2 (Florida Department of Highway Safety and Motor Vehicles' gender change policy, which follows "standards established by the World Professional Association for Transgender Health (WPATH), recognized as the authority in this field by the American Medical Association"). Drew testified that updating his birth certificate "corrected a mistake that has been impacting my life since I was born," and means that the State "recognizes me as who I am, a boy, and that means everything to me." TTI 109:15-20; *id.* 110:21-25.

Drew knows "with every fiber of [his] being that every step [he has] taken so far has been the right one," and that the milestones in his transition have been "the happiest moments of [his] life." TTI 106:4-11; *id.* 106:24-107:9; *id.* 237:18-21 (Ms. Kasper's testimony that Drew was "ecstatic" about beginning hormone therapy, and that he "said it was one of the happiest days of his life").

Drew is widely known and accepted as a boy in all aspects of his life. TTI 109:21-23. This includes at Nease, where he has experienced support and respect from other students as a boy. Pl.'s Ex. 138, RFA 52; TTI 111:23-112:8; *id.* 127:11-14. Nease staff refer to Drew with male pronouns, and treat him as male in every respect except access to restrooms. TTI 170:16-25; *see also* Pl.'s Ex. 138, RFA 55.

When Drew first came out to his parents, both Mr. Adams and Ms. Kasper had already suspected that he might be transgender. TTI 219:5-15; TTII 87:13-24. As they learned more about what it means to be transgender, a number of cues from Drew's childhood started to make more sense, *e.g.*, Drew's strong aversion to clothing and activities stereotypically associated with girls. TTI 217:5-218:20; *id.* 217:7-9 (Ms. Kasper's testimony that "in retrospect, there were a million tiny things that we probably should have picked up on"); TTII 87:13-24 (Mr. Adams' testimony that "over the years from the earliest memories, really, of Drew," he simply "wasn't acting like a girl"; he would "pitch a fit" about wearing dresses, and Mr. Adams is not aware of a single family photo of Drew wearing one).

Ms. Kasper and Mr. Adams secured evaluation and assessment by numerous mental health and medical professionals, who prescribed treatment for Drew's social and medical transition. Pl.'s Ex. 134; TTI 89:25-90:7; *id.* 91:7-23; *id.* 93:12-94:8; *id.* 98:25-100:18; *id.* 105:7-106:3; *id.* 220:21-222:4; *id.* 227:25-228:16; *id.* 230:9-233:5; *id.* 238:7-18; TTII 88:6-12. Ms. Kasper testified that an "important" part of the recommended treatment was that Drew "be allowed to live as a boy" because "living as the gender that you identify as ameliorates a lot of the negativity" and "the depression, anxiety" that one can experience without treatment. TTI 228:6-11.

Once Drew began treatment, his mood and quality of life improved dramatically. TTI 216:23-217:4; *id.* 220:3-11 (Ms. Kasper's testimony that, "it was

5

absolutely remarkable the change in him. He went from this quiet, withdrawn, depressed kid to this very outgoing, positive, bright, confident kid. It was a complete 180."); TTII 91:2-92:2 (Mr. Adams' testimony that Drew was "super excited" to begin school as the boy that he is, and about getting involved with the school's academic and extra-curricular programs).

### C. Defendant's Policies, Customs, and Practices Relating to Restrooms and Other Sex-Designated Facilities and Activities.

All individuals, regardless of whether they are transgender, need access to restrooms that match their gender identity. Drew began using the boys' restrooms at Nease at the beginning of his freshman year in August 2015, and continued to use them for approximately six weeks. TTI 112:22-113:3; *id.* 113:16-18. Drew uses the boys' restroom in every setting outside Nease, always using a stall, without any problems. TTI 118:10-13; *id.* 202:18-22; *id.* 229:11-15. In every material way, Drew's restroom use is just like that of other boys; he enters the restroom, relieves himself, washes his hands, and leaves. *Id.* Drew is not aware of any problems with his restroom use during his first six weeks at Nease and no student complained. *Id.* 113:19-24. No one was unclothed, and no evidence was introduced at trial of any misconduct by Drew while he was using the boy's restroom. *Id.* 113:25-114:9.

On or around September 23, 2015, the school received a report from two female students that they had seen Drew entering the boys' restroom. TTIII16:19. The students—who again, are female—did not report that they feared for their safety or

privacy, nor report any misconduct. TTIII 16:22-17:1. The school does not have any documentary evidence of this alleged report, nor did Defendant's corporate representative know the girls' grade level or names. TTIII 100:25-101:9. Before Drew filed suit, not a single boy, or boy's parent, complained about Drew's restroom use. TTIII 95:2-12; *id.* 102:7-24. Apart from Drew's mere presence in the boys' restroom, no one, male or female, ever complained that Drew had engaged in any misconduct while in the restroom. Pl.'s Ex. 138, RFA 25-26, 31-32; TTI 113:19-114:9.

On or around September 23, 2015, Drew was pulled out of class to meet with three school staff after the report about his restroom use. TTI 114:10-115:9; *id.* 253:6-25; TTII 36:10-17. Drew was instructed during that meeting that he was banned from the boys' restroom, and was limited to use of the gender neutral restrooms or girls' restrooms. TTI 115:10-15; *id.* 117:22-25; *id.* 253:6-25. School staff informed him he had done nothing wrong. *Id.* 115:21-116:10.

Drew later learned that this instruction was pursuant to an unwritten policy (TTIII 11:8-13), and guidelines entitled "St. Johns County School District Guidelines for LGBT Students—Follow Best Practices" (the "guidelines"). Def.'s Ex. 33.

***Defendant's policy.***[2] The District's policy requires students to use restrooms that match their "biological sex" (TTII 149:8-12; *id.* 166:21-23; *id.* 185:8-18; TTIII

---

[2] "Defendant's policy" as used herein refers to its policy, custom, or usage, as these terms are used in 42 U.S.C. § 1983, barring transgender students from the restrooms consistent with their gender identity.

45:16-18), which according to the District and School Board refers to one's sex "biologically identified at birth." TTIII 34:24-35:1; *see also id.* 45:6-15. Drew, however, is a boy, and testified that using the girls' restroom would be demeaning and intolerable for him. TTI 118:1-5. It would also violate his privacy by indiscriminately disclosing his transgender status to the girls in the restroom or by forcing him to use a gender neutral restroom when all other boys use the boys' restroom. While Defendant claims that its policy treats all students equally based on "biological sex," its witnesses conceded that Drew is treated differently (i) from other boys, who can use restrooms that match their male gender identity; and (ii) from non-transgender students, since the policy in effect relegates him to a gender neutral restroom. TTIII 32:6-11 (Ms. Mittelstadt's testimony that any student can use a gender neutral restroom but, as a transgender boy, Drew cannot use the boys' restroom); *id.* 33:21-24 (Ms. Mittelstadt's admission that as compared to other boys in the school community, Drew is given an "accommodation" that is "different"); *id.* 118:10-13; *id.* 136:17-137:2 (Principal Kunze's testimony that all non-transgender students can use restrooms matching their gender identity *and* gender neutral restrooms, but transgender students cannot use the restroom corresponding to their gender identity); *cf.* TTII 140:21-22; *id.* 208:19-209:12 (Ms. Smith's concession that the gender neutral restroom is "safer" for Drew than the girls' restroom).

     ***Defendant's guidelines.*** Defendant's guidelines, which were approved by the

District's executive cabinet and Superintendent (TTII 168:22-169:3; *id.* 246:7-20), offer transgender students the option of using gender neutral restrooms, in addition to restrooms matching birth-assigned sex. Def.'s Ex. 33; TTII 171:22-172:5; *id.* 247:21-248:1.[3] Although Defendant's guidelines do not respect transgender students' gender identity for restroom use, the guidelines recognize gender identity in a variety of other ways, providing that schools will use the pronouns matching a student's consistently-asserted gender identity upon request of a student or parent (Pl.'s Ex. 138, RFA 51; Def.'s Ex. 33 at 1); update student records to reflect a transgender student's name and gender upon receipt of a court order (Def.'s Ex. 33 at 1); use a student's chosen name on unofficial school records even without a court order or birth certificate (*id.* at 1); allow transgender students to wear clothing in accordance with their consistently-asserted gender identity (*id.* at 2); not unnecessarily disclose a student's transgender status to others (*id.* at 1); and allow students to publicly express their gender identity (*id.*). The guidelines also cite the Florida High School Athletic Association ("FHSAA") policy requiring that students be allowed to participate in athletics

---

[3] Lest there be any question about whether the guidelines target transgender students specifically, Defendant introduced two exhibits showing that Mr. Upchurch had redlined the section about restrooms to refer to "transgender students." Def.'s Exs. 71, 120 (both exhibits change "gender identity" to "transgender identity," and "students" to "transgender students"); TTIII 56:12-60:23; *id.* 108:16-109:6. When asked whether the guidelines apply to "all students," Mr. Upchurch responded that they applied to "questions or situations that were covered by the best practices" (TTIII 61:1-5)—which, of course, he had redlined to refer specifically to transgender students.

consistent with their gender identity. *Id.* at 2.[4]

**Designation of sex at enrollment.** As a practical matter, Defendant accepts as a student's "biological sex" the gender designated in their enrollment paperwork, on the student's birth certificate, and in other school records. TTII 205:11-206:8; *id.* 233:12-234:23; TTIII 50:3-22. This information is accepted "at face value." TTIII 50:24-51:1. The District's enrollment form allows an enrolling student to check "M" or "F" for their "gender," and does not include any other information identifying a student's sex. Def.'s Ex. 142; TTIII 12:3-23. There is no reference to whether the student is transgender or that would require a student to self-identify as transgender, or to "biological sex." Def.'s Ex. 142; TTIII 12:19-21. The school entry health exam form similarly includes one blank box for the student's "sex," and makes no other reference to one's sex or transgender status (Def.'s Ex. 144), as is true for the other enrollment documents (Def.'s Ex. 143).[5] The District does not track students' chromosomes, external sex organs, internal sex organs, or whether students are

---

[4] The FHSAA policy requires that transgender students be permitted to participate in athletic teams in accordance with their gender identity (TTII 103:6-19; *id.* 105:12-23; Pl.'s Ex. 68 at 48), and constitutes another way in which the State recognizes gender identity—in addition to the State's protocols for correcting gender markers on birth certificates and driver's licenses (Req. for Judicial Notice, ECF No. 147). The FHSAA is the "governing nonprofit organization of athletics in Florida public schools," such as the schools in the District. *See* Fla. Stat. Ann. § 1006.20(1).

[5] Mr. Upchurch speculated that if there were incongruence between a child's gender identity and their sex assigned at birth, it might show up in the physical. TTIII 51:10. But the health exam form speaks for itself, and contains no indicator of a child's transgender status; it simply includes a blank box for the child's sex. Def.'s Ex. 144.

intersex. Pl.'s Ex. 138, RFA 62-68. Nor does the District inspect students' anatomy before they use school restrooms. Pl.'s Ex. 138, RFA 69. Indeed, the District does not learn about the presence of transgender students in its schools unless it is reported, such as by self-disclosure (TTII 235:15-18; TTIII 53:18-21), and no policy requires transgender students to identify themselves to school officials. TTIII 91:12-16.

Once a transgender student indicates their birth-assigned sex on their enrollment forms, that gender is "set in stone," and that student cannot access restrooms matching their gender identity under any circumstances. TTII 235:10-14; TTIII 12:24-13:12. But if a transgender student enrolls with paperwork already corrected to match their gender identity, "they would have access to that restroom that corresponded with how [the District] coded it in the system at the time of enrollment." TTIII 35:5-36:1; *id.* 89:19-25 (Mr. Upchurch's agreement that in such a situation, the District would have no reason to question that student's use of the restroom); *see also* TTII 204:8-15; TTIII 52:4-8; *id.* 53:17-18. When asked whether this raises any concern from the District's perspective, Mr. Upchurch answered, "As a practical matter, I would say no. The district does not play bathroom cop." TTIII 53:5-14.

According to School Board witnesses, if transgender students use restrooms that match their gender identity that would be considered misconduct, with a range of potential consequences as punishment. TTII 228:5-16; TTIII 17:20-18:1.

Defendant is aware of at least 16 transgender students in its schools. TTIII

106:20-24. At least seven of them have asked to use restrooms matching their gender identity. *Id.* 106:20-107:3. Principal Kunze is aware of five transgender students at Nease, including Drew. *Id.* 136:2-4. Of the other four, the general school population does not know that they are transgender. *Id.*141:24-142:3.

Ms. Kasper, contacted Nease and District officials to try to resolve this issue informally, through written communications and meetings. TTI 254:7-257:20; *id.* 265:16-266:24; *id.* 273:19-276:21; Def.'s Ex. 14; Def.'s Ex. 36; Pl.'s Ex. 12. When her efforts were unsuccessful, she filed a complaint with ED's Office for Civil Rights ("OCR") in November 2015. TTI 259:16-260:1. After the OCR complaint languished, Drew filed the instant suit in June of 2017. *Id.* 260:20-261:11; *id.* 277:8-13.

### D.  The Harms Visited on Drew by Defendant's Restroom Policy.

Drew testified that being able to use the boys' restroom at Nease was profoundly important for him because, "It's a statement to everyone around me that I am a boy. It's confirming my identity and confirming who I am, that I'm a boy. And it means a lot to me to be able to express who I am with such a simple action because I'm just—I'm just like every other boy . . ." TTI 107:18-25. In other words, having equal access to the boys' restroom made him feel like he "belonged." *Id.* 113:4-7.

In contrast, being barred from the boys' restroom felt "humiliating" and "like a slap in the face." TTI 116:14; *id.* 117:4; *id.* 277:25-278:4. Drew testified that being prohibited from the boys' restroom causes him anxiety and depression, including

12

when he has to walk past the boys' restroom to access the gender neutral restroom. *Id.* 117:4-7; *id.* 204:10-12 (it feels "like a walk of shame," because "I know that the school sees me as less of a person, less of a boy, certainly, than my peers"). Mr. Adams testified that Drew was "devastated" after the school barred him from the boys' restroom, and he returned to the depression and anxiety he had experienced before he transitioned. TTII 92:13-22; *id.* 92:20-22 ("every day after that, it's like he's being called out and being treated differently and it hurts him"); *see also* Ct.'s Ex. 2, 38:17-25 (Drew reported the restroom ban during his first appointment with Dr. Adkins, and appeared very distressed about it).

When Drew is misgendered (*i.e.*, referred to or treated as a girl rather than a boy), it is harmful to him, and can cause him to feel anxious and depressed. TTI 118:1-5 (Drew's testimony that just thinking about using the girls' restroom at school caused him anxiety, and feels like an insult to his identity and to him as a person); TTII 93:8-21 (Mr. Adams' testimony about how deeply upsetting it was for Drew when he was misgendered during a jiu-jitsu class).

The expert testimony established that failing to recognize and support a transgender student's gender identity sends a message—both to the transgender student and to others—that the transgender student is different from his or her peers and needs to be segregated, causing the transgender student to experience shame, and potentially other harms as well. Ct.'s Ex. 3 ¶¶ 41-48; TTI 116:21-24 (Drew's

13

testimony that the restroom exclusion "made a statement to the rest of the student body that the school did not accept who I was"); *id.* 117:17-21; *id.* 204:5-206:6; *id.* 204:19-20 ("it feels like the school doesn't think I'm even worthy of occupying the same space as my classmates"); *id.* 205:2-4 ("because I'm using a special bathroom and I'm oftentimes passing a men's bathroom, everybody knows I'm different, and I just want to fit in"); *see also id.* 56:8-14.

Additionally, the expert testimony established that refusing to allow a transgender person to fully transition—or deciding that he or she cannot be affirmed in a particular area, such as restroom use—is detrimental and interferes with social transition. Ct.'s Ex. 2, 33:3-15; Ct.'s Ex. 3 ¶ 41; TTI 116:11-16 (Drew felt shocked, confused, and angry after being barred from the boys' restroom because, "I was living in every aspect of my life as a boy and now they're taking that away from me."); *id.* 278:14-17 (Ms. Kasper's testimony that the restroom exclusion "brings that social transition to sort of a screeching halt"; "everywhere else and every other aspect in his life he can be a normal boy. At school, he can't."). As Drew's endocrinologist, Dr. Adkins prescribed that Drew complete his social transition by living consistent with his gender identity in all aspects of life, including restroom use. Ct.'s Ex. 2, 28:10-17; *id.* 33:8-11. Denying Drew access to the boys' restroom thus interferes with that prescribed medical treatment. *Id.* 33:12-15; *id.* 38:17-39:21. Being relegated to a gender neutral restroom does not reduce the harm or stigma of being banned from the

restroom matching one's gender identity. Ct.'s Ex. 2, 33:22-34:13; Ct.'s Ex. 3 ¶ 47.

Drew thinks about his access to restrooms every day from the moment he wakes up, planning his liquid consumption so that he can limit his need to use the restroom and avoid the stigmatization of a gender neutral restroom or missing class time. TTI 119:6-10; *id.* 277:20-22. At various points during his time at Nease, Drew would hold his bladder to avoid having to use the gender neutral restroom, making it harder for him to concentrate in class. TTI 173:16-174:5; *id.* 277:16-18.

Nease does not have a gender neutral restroom adjacent to each boys' restroom. Pl.'s Ex. 138, RFA 77-78. At least a couple of the gender neutral restrooms —including those nearest Drew's second and fourth period classes—are considerably farther away and more inconvenient than the boys' restrooms, and Drew must sometimes walk past boys' restrooms from which he has been banned to reach the gender neutral restrooms. TTI 117:8-16; *id.* 124:7-11; *id.* 171:1-10; Pl.'s Ex. 69. This sometimes requires him to miss class time, and to divert his attention to figuring out which class is the best one to miss. TTI 118:20-119:2; *id.* 214:21-215:12. Additionally, Drew is deprived of ready access to gender neutral restrooms three days a week during the lunch hour, when the school restricts students to a specific, limited area of the campus, with no gender neutral restroom. *Id.* 279:15-19. The area is bounded either by closed doors or administrators standing guard, so Drew cannot leave the area without asking permission. *Id.* 279:20-280:3.

**E.  Defendant's Purported Governmental Interests.**

Defendant failed to introduce evidence supporting the purported governmental interests in its policy, consisting of an umbrella interest in student welfare and, in particular, privacy and safety. TTIII 110:22-111:10; TTII 172:13-15; *id.* 173:1-22.[6]

*1.  Privacy:* Despite Defendant's claim that privacy interests support its policy, Defendant offered no evidence of any concrete concerns beyond an objection to the mere presence of a transgender student in the restroom. *See, e.g.*, TTII 251:7-15. All boys' and girls' restrooms at Nease contain stalls with locking doors. TTIII 31:22-25; *id.* 114:1-8; Pl.'s Ex. 138, RFA 57. Where Defendant has not yet installed partitions between the urinals in all boys' restrooms, Ms. Mittelstadt conceded that Defendant could do so. TTIII 32:12-15. All students who use a girls' restroom at Nease do so by using a stall. Pl.'s Ex. 138, RFA 58. Any student wanting additional privacy in the boys' restroom can use a stall, and all students can use gender neutral restrooms. TTIII 31:22-32:8; *id.* 114:18-115:4; Pl.'s Ex. 138, RFA 59.

Ms. Smith, who oversaw the task force's development of recommendations for the guidelines (TTII 200:6-9), characterized the task force's research, and her own personal research, as extensive. *Id.* 147:6-7 ("We tried to gather every bit of information we could"). Nonetheless, both she and Ms. Mittelstadt conceded that they had learned of no incident involving a violation of privacy in schools with respect to

---

[6] Defendant disclaimed any interest in cost. TTII 67:25-68:5.

students' gender identity. *Id.* 219:18-220:10; TTIII 15:13-16:8 (in Ms. Mittelstadt's 15 years with the District, she was not aware of a single negative incident involving a transgender student using a restroom conforming to their gender identity); *id.* 31:1-5 (as a general matter, no negative incidents involving transgender students using restrooms that match their gender identity were known to the District). When pressed by the Court as to how Drew's restroom use, which always includes the use of a stall, could implicate privacy concerns, Ms. Smith conceded "that would work," pivoting immediately to an argument that Drew needed to be excluded because other students might bully, assault, or make fun of him. TTII 217:7-22. As explained below, this purported hypothetical concern is unsupported by the evidence.

       **2.**      ***Safety:*** Defendant's purported interest in safety is two-fold. First, Defendant recognizes that transgender children are vulnerable to bullying and believes that separating them from other students in restrooms will keep them safe. TTIII 120:3-19. Second, Defendant suggests that under a rule treating transgender students equally, a student with bad intentions could access a restroom to engage in misconduct. *Id.* 112:20-25. But Defendant conceded that the second concern is not the "primary point" of its argument and certainly did not identify any incident where this had occurred. *Id.* 112:25-113:1. Rather, Defendant's concern is "[p]rimarily" for the safety of transgender individuals. *Id.* 112:13-19. Notably, the record reflects that lesbian and gay students also are at disproportionate risk for bullying (Pl.'s Ex. 66 at

8-9), but Defendant does not segregate lesbian and gay students from the restrooms their peers use. TTII 214:22-215:10; TTIII 55:6-12.

Defendant also suggests that the policy and guidelines are intended to prevent "a safety concern that's ***unrelated*** to transgender students": the risk of "allowing . . . males and females to mingle in group bathrooms," which might result in "illicit consensual activity," a "freshman female student to be in the bathroom alone with an 18-year-old male student," or "harassment or even assault." TTIII 69:6-21. Drew's claims are unrelated to those concerns indeed, since his claims have nothing to do with males and females mingling in the same restroom. Additionally, the District has a code of conduct which prohibits any kind of misconduct or crime (*id.* 96:1-8; Def.'s Ex. 65 at 27-28, 31-38 (District's Student Code of Conduct); Pl.'s Ex. 138, RFA 28), and Florida's criminal laws apply to criminal conduct on campus and provide an additional layer of protection. TTIII 96:9-14; *see, e.g.*, Def.'s Ex. 65 at 27-28; Pl.'s Ex. 138, RFA 30. Thus, there are policies in place to address this concern. TII 214:10-14; *see also* TTIII 31:6-21.

Notably, Defendant is not aware of any instances of sexual assault in the District involving a transgender student, and acknowledged that transgender people are not more prone to committing assault than any other person. TTIII 95:13-23.[7]

---

[7] Ms. Smith offered a vague concern about students who identify as "gender fluid," suggesting this might allow a "football quarterback" to "come in and say I feel like a girl today and so I want to be able to use the girls' room." TTII 213:10-18; *id.* 214:1-

The school has a duty to protect the safety of all students, including transgender students. *Cf. Nabozny v. Podlesny*, 92 F.3d 446, 456 (7th Cir. 1996). After a student transitions, and is living consistent with their gender identity, it can be dangerous for them to continue to use restrooms that match their sex assigned at birth, as they would be at risk of bullying and injury. Ct.'s Ex. 2, 32:2-33:2. This notwithstanding, one of the only two options for a transgender student is to use the restroom associated with their sex assigned at birth. TTII 207:22-208:4. Ms. Smith conceded that a gender neutral restroom is "safer" (TTII 140:21-22; *id.* 208:19-209:12), and that using the restroom of one's birth-assigned sex does raise "safety or security or privacy issues," such that Defendant's real "solution" is for transgender students to use only gender neutral restrooms. *Id.* 218:16-219:4.

---

4; *id.* 216:15-17; TTIII 70:6-14. But Ms. Smith conceded twice that—despite her purportedly robust research—neither she nor the task force were aware of any such situations. TTII 213:19-23; *id.* 216:18-20. She also conceded that any student who misbehaved "certainly would" be subject to discipline. *Id.* 214:10-14; *see also* TTIII 31:6-21. As the Court noted, it was given no actual evidence on this point (TTIII 155:18-156:16); nonetheless, a simple response can be found throughout the record. This case is about transgender students, who medical experts recognize as being "*insistent, persistent, and consistent* over time in their cross-gender identification," Ct.'s Ex. 3 ¶ 27, a definition that appears throughout the model policies that the task force examined. Pl.'s Exs. 113 at 4 ("consistently asserted" gender identity); 66 at 4 (same); 114 at 4 ("consistent and uniform assertion" of gender identity); 115 at 4 ("exclusively and consistently asserted" gender identity). Perhaps most importantly, this definition appears in *Defendant's own guidelines*. Def.'s Ex. 33 ("consistently asserted transgender identity"). Thus, even under Defendant's own guidelines, its far-fetched "football quarterback" scenario is a non-issue. *See also Doe v. Boyertown Area Sch. Dist.*, No. 17-cv-1249, 2017 WL 3675418, at *55 (E.D. Pa. Aug. 25, 2017) (rejecting arguments about gender fluidity as a basis for discrimination).

      ***3.***     ***Discomfort/community values:*** Ms. Smith testified that the task force was concerned about the fact that girls may use the restroom to change clothes, "refresh [] makeup," and "talk to other girls," and that they may feel "uncomfortable" doing so in the presence of a transgender girl. TTII 213:1-9. No explanation was offered as to why a female student could not change clothes in a stall, or why girls might feel uncomfortable socializing in the same space as a female transgender student—indeed, such socializing is indicative of the opportunities for a normal adolescence denied transgender students by Defendant's policy. The evidence suggests that these are illusory, theoretical concerns as Defendant offered no evidence that these concerns have actually been expressed by any student at the school.

      Defendant also conceded that local "community values," which "trend[] conservative," influenced the task force's development of the guidelines. TTIII 32:16-20; *id.* 33:2-16; *id.* 67:13-20; *id.* 86:10. In other words, the task force's work was shaped by private views in the community about transgender students. Although the task force uncovered no incidents of harm with inclusive policies, it nonetheless chose to deny transgender students use of restrooms matching their gender identity.

      Plaintiff introduced the testimony of three school administrators with experience implementing inclusive policies for transgender students. Dr. Thomas Aberli served as Principal at Atherton High School in Louisville, Kentucky, for approximately 1,500 students, when the school adopted a policy in 2014 that respects

students' gender identity. TTI 20:4-15, *id.* 21:1-4, *id.* 22:11-21; Pl.'s Exs. 146-47.

Michaelle Valbrun Pope is the Executive Director for Student Support Initiatives for

Broward County Public Schools ("BCPS") in Florida, which adopted an inclusive

policy several years ago. TTII 51:12-20; Pl.'s Exs. 65, 66. BCPS is the sixth largest

district in the nation, with more than 271,000 students, or 340,000 students if one

includes off-campus learning centers. TTII 53:2-21. Michelle Kefford is the Principal

of the Charles W. Flanagan High School, within BCPS. *Id.* 97:11-13. Ms. Pope and

Ms. Kefford helped develop BCPS's non-discrimination policy and guidelines

regarding transgender students (*id.* 54:5-6; *id.* 99:5-16), and Principal Kefford helps

train educators within BCPS on the policy and serves as a point person for

administrators and staff with questions about the policy (*id.* 100:14-20). All three of

the witnesses' policies extend to restrooms and locker rooms, and Broward's detailed

guidelines also explain how to apply its requirement of equal treatment to overnight

trips and other gender-separated activities and facilities. Pl.'s Ex. 147 at 2; Pl.'s Ex.

66 at 40-44.

     Dr. Aberli, Ms. Pope, and Principal Kefford (collectively, the "School

Administrators") each testified that their policies treat all students equally based on

their gender identity, and were neither difficult nor costly to implement. TTI: 48:20-

49:2; *id.* 53:6-11; TTII 67:8-16; *id.* 101:14-22; *id.* 102:18-103:5. None has

experienced problems under their policies with privacy or safety. TTI 26:2-4; *id.* 45:6-

14; *id.* 46:22-47:15; *id.* 51:8-52:8; *id.* 54:8-23; *id.* 73:18-74:14; TTII 64:4-65:20; *id.*

69:11-70:3; *id.* 105:24-107:5; *id.* 119:13-120:16. *See also Amicus Curiae* Br. of Sch.

Administrators From 29 States and the District Of Columbia, ECF No. 124-1.

## F.  Expert Testimony about Drew and Transgender Adolescents.

Plaintiff offered testimony from two experts, Dr. Deanna Adkins and Dr. Diane

Ehrensaft. Dr. Adkins is a Pediatric Endocrinologist at Duke University School of

Medicine ("Duke"), where she is also a clinician educator and Assistant Professor of

Pediatrics. Ct.'s Ex. 2, 6:1-8. Dr. Adkins is Drew's treating endocrinologist and has

been licensed to practice medicine in North Carolina since 2001. Ct.'s Ex. 2, 9:8-13;

*id.* 11:19-24. Dr. Adkins is Director of the Duke Center for Child and Adolescent

Gender Care (the "Clinic"), which she founded in 2015. *Id.* 6:9-22. The Clinic

engages a multidisciplinary team to treat patients with disorders of sex development

(also known as intersex patients), and transgender patients. Since 2015, Dr. Adkins

has treated more than 220 transgender patients at the Clinic, in addition to her prior

experience with both transgender and intersex populations. *Id.* 7:14-8:4. Dr. Adkins

has been called upon to assist with sex assignments in infants whose sex-related

characteristics are not completely aligned as male or female. *Id.* 8:2-4; *id.* 8:17-22. In

addition to her time in Clinic each week, Dr. Adkins is the Fellowship Program

Director for pediatric endocrinology at Duke and mentors fellows on treatment of

intersex and transgender patients; she also lectures on these issues throughout the

medical school. *Id.* 9:17-11:10. Dr. Adkins has the qualifications and experience to testify on these topics and the Court found her testimony reliable and relevant.

Dr. Ehrensaft is a practicing developmental and clinical psychologist with 35 years of experience; she specializes in working with children and adolescents experiencing gender dysphoria and their families. Ct.'s Ex. 3 ¶¶ 3-4. Dr. Ehrensaft has provided consultation, therapy, and evaluations to more than 500 transgender and gender nonconforming children, and has consulted with more than 200 mental health and related providers across the United States to assist them in treating this patient population. *Id.* ¶¶ 4-5. Dr. Ehrensaft helped found the Child and Adolescent Gender Center ("CAGC") at the University of California, San Francisco Benioff Children's Hospital, where she has served as the Director of Mental Health since CAGC's inception. *Id.* ¶ 6. Dr. Ehrensaft facilitates a group of approximately 175 local mental health providers who work with transgender youth, which meets monthly to discuss emerging practice issues, and which has developed training and assessment materials. *Id.* ¶ 7. Dr. Ehrensaft is co-investigator on a five-year study funded by a National Institute of Health grant to study the health outcomes of gender nonconforming youth receiving puberty blockers and/or cross-sex hormones. *Id*. ¶ 11. Dr. Ehrensaft also sits on the subcommittee of WPATH tasked with drafting the new version of the Standards of Care. *Id*. ¶ 13. She has published numerous books and articles, including peer-reviewed articles, on issues relevant to this case and participated directly in

studies relating to medical and mental health outcomes of gender nonconforming youth. *Id*. ¶ 12. Dr. Ehrensaft has the qualifications and experience to testify on these topics and the Court found her testimony reliable and relevant.

Everyone has a gender identity, which is a person's inner sense of belonging to a particular gender, such as male or female. Ct.'s Ex. 2, 14:1-9; Ct.'s Ex. 3 ¶ 21-22. Gender identity is a deeply felt and core component of a person's identity. Ct.'s Ex. 2, 14:1-4; Ct.'s Ex. 3 ¶ 21. Gender identity is not a choice and cannot be voluntarily altered; it is widely considered unethical to attempt to change the gender identity of others. Ct.'s Ex. 2, 14:10-13; Ct.'s Ex. 3 ¶¶ 21-22, 26.

At birth, infants are generally classified as male or female based solely on observation of their external genitalia. Ct.'s Ex. 2, 39:22-40:23; Ct.'s Ex. 3 ¶ 19. But for some individuals, such as those who are intersex or transgender, an examination of external genitalia will not accurately determine their sex, and current medical understanding recognizes that external genitalia are not an accurate proxy for a person's sex, which is composed of a number of components.[8] Ct.'s Ex. 2, 39:22-40:23; *id.* 12:15-22; Ct.'s Ex. 3 ¶¶ 19-20. Where there is divergence between these components, gender identity is the determinative factor of a person's sex. Ct.'s Ex. 3

---

[8] The components include, for example, chromosomal sex, gonadal sex, fetal hormonal sex (prenatal hormones produced by the gonads), internal morphologic sex (internal genitalia, *i.e.*, ovaries, uterus, testes), external morphological sex (external genitalia, *i.e.*, penis, clitoris, vulva), sexual differentiations in brain development and structure, and pubertal hormonal sex. Ct.'s Ex. 3 ¶ 20.

¶ 20; Ct.'s Ex. 2, 43:12-44:14.

Intersex individuals have helped medical experts better understand the significance and role of gender identity. Ct.'s Ex. 2, 41:2-20. Dr. Adkins explained that perhaps the clearest example of the importance of gender identity is a condition called cloacal exstrophy. *Id.* 41:22-42:18. Individuals with this condition have little or no development of abdominal structures relating to sex, genitals, and sometimes hormones. *Id.* Where the birth-assigned sex does not match one's gender identity, these individuals often experience depression and may become suicidal. *Id.* 42:22-43:11. This has helped medical professionals understand that, for both patients who are intersex or transgender, physical characteristics cannot override one's gender identity, which is the key component in determining one's sex. *Id.* 43:12-44:14.

For transgender individuals, the lack of alignment between their gender identity and their sex assigned at birth can cause significant distress. Ct.'s Ex. 2, 15:8-12; *id.* 15:24-16:5; *id.* 19:21-21:15 (Dr. Adkins' testimony about Drew's distress regarding the aspects of his body that did not match his male gender identity); Ct.'s Ex. 3 ¶¶ 27-28.[9] Authoritative standards provide treatment protocols to help relieve this distress and care for individuals who are transgender. Ct.'s Ex. 2, 24:6-25:5.

---

[9] The clinical diagnosis for this distress is gender dysphoria. Ct.'s Ex. 2, 15:8-12; Ct.'s Ex. 3 ¶ 28. Drew testified about his diagnosis of gender dysphoria. TTI 93:12-94:1; *id.* 97:8-12; *id.* 193:15-194:5. Ms. Kasper also testified Drew was diagnosed with gender dysphoria by multiple providers, which guided his treatment. TTI 222:1-4; *id.* 227:11-24; *id.* 236:2-20; Pl.'s Ex. 134; Def.'s Ex. 22.

These standards have been published by multiple medical organizations and include, for example, the Standards of Care Version 7 by WPATH (Ct.'s Ex. 3 ¶ 13), and Endocrine Treatment of Gender Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline (hereinafter the "ES Guidelines") (Ct.'s Ex. 2, 17:17-24; Pl.'s Ex. 30).[10]

The goal of treatment is to alleviate the distress by aligning the adolescent's lived experience and body with his or gender identity. Ct.'s Ex. 2, 22:12-15; Ct.'s Ex. 3 ¶ 39. Like all children, when loved, supported, and affirmed by their caretakers, and by their social environment, transgender children can thrive, grow into healthy adults and have the same capacity for happiness, achievement, and contribution to society as others. Ct.'s Ex. 3 ¶ 32; TTII 60:12-19. An important part of that affirming treatment is restroom access in accordance with one's gender identity. Ct.'s Ex. 3 ¶¶ 34, 46.

Dr. Adkins offered testimony that "biological sex"—the term Defendant's policy relies upon to assign restroom use—is not a medically precise or accurate term (Ct.'s Ex. 2, 48:9-49:12), since each individual has multiple sex-related characteristics, which may or may not all be aligned. Pl.'s Ex. 30 at 7 (ES Guidelines

---

[10] The ES Guidelines were co-sponsored by the American Association of Clinical Endocrinologists, the American Society of Andrology, European Society for Pediatric Endocrinology, European Society of Endocrinology, Pediatric Endocrine Society, and WPATH. Ct.'s Ex. 2, 26:12-23; Pl.'s Ex. 30 at 1. *See also* Br. of *Amici Curiae* Medical, Nursing, Mental Health and Other Health Care Organizations, ECF No. 119-1, and Req. for Judicial Notice, ECF No. 115 (clinical guidelines, standards of care, and statements supporting gender-affirming care for transgender people from major medical and mental health organizations).

explaining that "biological sex" is "imprecise and should be avoided"). When those characteristics are not all aligned, the most important determinant of sex is gender identity. Ct.'s Ex. 2, 43:12-44:14; Ct.'s Ex. 3 ¶ 20.

### G. The Level of Scrutiny for Transgender Status Discrimination.

Transgender people have suffered a long history of discrimination that continues today. Dkt. 114-6 at 71 (finding that transgender Americans have faced a "long, serious, and pervasive history of official and unofficial . . . discrimination by both federal, state, and local governments and private [entities]"); *id.* at 86 (noting "transphobia ha[s] long permeated the American worldview"). This history of discrimination includes recent state legislation targeting them for discrimination in public restrooms, Ct.'s Ex. 2, 32:2-33:2; Dkt. 114-2, and a ban imposed by this administration on their military service. Dkt. 114-1. Being transgender does not impair one's ability to be a fully productive and contributing member of society. Ct.'s Ex. 3 ¶ 32; TTII 60:12-19. Additionally, gender identity is innate, generally fixed, and not subject to voluntary change. Ct.'s Ex. 2, 14:10-13; Ct.'s Ex. 3 ¶¶ 21-22, 26. Transgender people also are relatively politically powerless. Dkt. 114-6 at 85 ("For members of the . . . transgender community, the struggle to receive recognition, to be given the same rights and treatment as other Americans, has been difficult.").

## II.     PLAINTIFF'S PROPOSED CONCLUSIONS OF LAW

### A.     <u>Equal Protection</u>

The Equal Protection Clause of the Fourteenth Amendment provides that no State may "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "Where a governmental entity, like Defendant, by its conduct intentionally treats . . . one group of people differently from another group, when they are similarly-situated in all other material respects, the governmental classification must be justified by a standard related to its nature." *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 285 (W.D. Pa. 2017). Here, Defendant's policy facially discriminates against transgender students in violation of the equal protection guarantee of the Fourteenth Amendment. While all individuals need to use restrooms that match their gender identity, only transgender students are prohibited from doing so. *Evancho*, 237 F.Supp.3d at 285 (holding policy, like Defendant's, discriminates based on "transgender status" because "Plaintiffs are the only students who are not allowed to use the common restrooms consistent with their gender identities"). In a "typical discrimination case, the comparator and the subject must be aligned in all *material* respects." *Church of Our Savior v. City of Jacksonville Beach*, 108 F. Supp. 3d 1259, 1266 (M.D. Fla. 2015) (emphasis added). Plaintiff introduced testimony that he is similarly situated for purposes of restroom use in every *relevant* respect (TTI 118:10-13; *id.* 202:18-22; *id.* 229:11-15), which Defendant did not rebut.

28

*Defendant concedes that heightened scrutiny applies to its differential treatment of Drew.* ECF No. 138-1 at 26. Indeed, it is difficult to see how Defendant could do otherwise given that in the last three months alone, four additional district courts weighed the issue, and uniformly imposed heightened scrutiny on the administration's recently-announced ban on military service by transgender people.[11] Defendant thus admits that it bears the heavy burden of demonstrating—at a minimum—an exceedingly persuasive justification that is substantially related to its classification. Plaintiff nonetheless explains the multiple reasons that Defendant's policy must be viewed as sex discrimination, and why discrimination based on transgender status requires strict or at least heightened scrutiny.

## 1.   Discrimination on the Basis of Sex.

Defendant's exclusion of Drew from the boys' restroom constitutes sex discrimination for at least three reasons. ***First, discrimination against transgender people inherently relies on sex stereotypes.*** It is settled law in the Eleventh Circuit that discrimination against transgender people necessarily relies upon sex stereotypes, because "[t]he very acts that define transgender people as transgender are those that contradict stereotypes of gender appropriate appearance and behavior." *Glenn v.*

---

[11] *See Doe 1 v. Trump*, No. 17-1597, 2017 WL 4873042, at *27-28 (D. D.C. Oct. 30, 2017); *Stone v. Trump*, No. MJG-17-2459, 2017 WL 5589122, at *15 (D. Md. Nov. 21, 2017); *Karnoski v. Trump*, No. C17-1297-MJP, 2017 WL 6311305, at *7 (W.D. Wash., Dec. 11, 2017); *Stockman v. Trump*, No. 5:17-cv-01799, ECF No. 79 at 19 (C.D. Cal. Dec. 22, 2017) (*available at* https://perma.cc/MX8R-ZFHY).

*Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011); *id.* ("A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes."); *see also Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1048 (7th Cir. 2017) ("By definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth."); *Chavez v. Credit Nation Auto Sales, LLC*, 641 F. App'x 883, 884 (11th Cir. 2016) (per curiam) (affirming *Glenn*'s holding); *Doe 1*, 2017 WL 4873042, at *28 ("The defining characteristic of a transgender individual is that their inward identity, behavior, and possibly their physical characteristics, do not conform to stereotypes of how an individual of their assigned sex should feel, act and look."); *Evancho*, 237 F. Supp. 3d at 285-86; *Valentine Ge v. Dun & Bradstreet, Inc.*, No. 6:15-cv-1029-ORL-41GJK, 2017 WL 347582, at *4 (M.D. Fla. Jan. 24, 2017).

Eleventh Circuit courts have uniformly applied this instruction. Seven opinions in this Circuit have discussed *Glenn* in the context of transgender plaintiffs' claims, and *all* have recognized without exception that *Glenn* protects transgender plaintiffs from sex-stereotyping discrimination.[12]

---

[12] *Chavez v. Credit Nation Auto Sales, Inc.*, 966 F. Supp. 2d 1335, 1348 (N.D. Ga. 2013); *Chavez v. Credit Nation Auto Sales*, 49 F. Supp. 3d 1163, 1173-74 (N.D. Ga. 2014), *aff'd in part, rev'd in part sub nom.*, 641 F. App'x 883 (11th Cir. 2016); *Williamson v. Trump*, No. 7:17-cv-01490-LSC, 2017 WL 4536419, at *2 (N.D. Ala. Oct. 11, 2017); *Parris v. Keystone Foods, LLC*, 959 F. Supp. 2d 1291, 1303 (N.D. Ala. 2013); *Taschner v. Freeman Decorating Servs.*, No. 614-cv-1622-ORL-22DA, 2014 WL 5472536, at *3 n.4 (M.D. Fla. Oct. 23, 2014); *Diamond v. Allen*, No. 7:14-

Despite admitting that heightened scrutiny applies, ECF No. 138-1 at 26,

Defendant attempts to distinguish *Glenn* by arguing that Defendant is making a

distinction based on the "fact" or "reality" of Plaintiff's anatomy, and *Glenn* only

prohibits stereotypes based on "demeanor." *Id.* at 26-28. This is incorrect.

Impermissible gender stereotyping is not immunized because a policy purports to

regulate genital characteristics rather than sex. *See Lusardi v. McHugh*, Appeal No.

0120133395, 2015 WL 1607756, at *9 (E.E.O.C. Apr. 1, 2015) (finding it unlawful to

bar a transgender woman from the restroom based on the belief that she was not "truly

female" without genital surgery); *Roberts v. Clark Cty, Sch. Dist.*, 215 F. Supp. 3d

1001, 1015 (D. Nev. 2016) ("Although CCSD contends that it discriminated against

Roberts based on his genitalia, not his status as a transgender person, this is a

distinction without a difference here.").[13] *Glenn* itself answers Defendant's argument:

the employer found it "unsettling to think of someone dressed in women's clothing

with male sexual organs inside that clothing"—and far from excusing the

discrimination, *Glenn* found that to be *direct evidence* of gender stereotyping. Ms.

---

cv-124 HL, 2014 WL 6461730, at *3 n.2 (M.D. Ga. Nov. 17, 2014). *See also
Valentine Ge*, 2017 WL 347582, at *4.

[13] *See also Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1065-66 (9th Cir. 2002)
(explaining that any focus on sex-related anatomy, such as genitalia or breasts, "is
inescapably 'because of . . . sex'") (citation omitted). For example, non-transgender
individuals who have lost external genitalia in an accident have not somehow had
their sex changed, or eliminated. *Cf.* Ct.'s Ex. 2, 41:22-44:14. Instead, gender identity
continues to be the primary determinant of their sex; so too for transgender people. *Cf.
Schroer v. Billington*, 424 F. Supp. 2d 203, 211 (D.D.C. 2006) (noting that sex "is not
a cut-and-dried matter of chromosomes").

Glenn's anatomy had no relevance to her ability to perform her job; here too, Plaintiff's anatomy has no relevance to his ability to use the boys' restroom.

**Second, Defendant's policy classifies on its face on the basis of sex.** The central inquiry is whether "the discrimination is related to [] sex." *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000); *accord Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 525-26 (D. Conn. 2016) (the dispositive inquiry is whether discrimination is "related to sex"). Whether one describes this case as about which gender-specific restroom Drew can use, or about how Defendant views Drew's sex for purposes of restroom use (so-called "biological" or otherwise), it is inescapably about sex. Nothing more is required to invoke the heightened scrutiny Defendant concedes applies. ECF No. 138-1 at 26; *see also Whitaker*, 858 F.3d at 1051 (the district's "policy cannot be stated without referencing sex," and thus is inherently "based upon a sex-classification" such that "heightened review applies.").[14]

**Third, discrimination based on gender transition is impermissible sex discrimination.** Discrimination based on gender transition is necessarily based on sex, just as discrimination based on religious conversion is necessarily based on religion.

_____

[14] Any argument that Defendants' policy can evade review because it classifies *both* boys and girls based on a sex-based characteristic (such as one's so-called "biological sex") ignores the key question of whether one's sex has been taken into account, as is clearly the case here. *See Whitaker*, 858 F.3d at 1051 (rejecting school district's claim that its exclusion treated boys and girls equally). *Cf. Loving v. Virginia*, 388 U.S. 1, 8 (1967) (rejecting "the notion that the mere 'equal application' of a statute containing racial classifications" removes it from scrutiny under the Fourteenth Amendment).

32

Firing an employee because she converts from Christianity to Judaism "would be a clear case of discrimination 'because of religion,'" even if the employer "harbors no bias toward either Christians or Jews but only 'converts.'" *Schroer v. Billington*, 577 F. Supp. 2d 293, 306 (D.D.C. 2008); *accord Fabian*, 172 F. Supp. 3d at 527; *Macy v. Holder*, Appeal No. 0120120821, 2012 WL 1435995, at *11 (E.E.O.C. Apr. 20, 2012). Similarly, Defendant may treat boys and girls equally as a general matter but nonetheless discriminate against those who undertake gender transition. By burdening transgender students based on expectations about how "real" boys or girls behave, Defendants' policy discriminates based on sex. *Schroer*, 577 F. Supp. 2d at 306.

Accordingly, there are multiple ways to view Defendant's policy, but all lead to the conclusion that excluding Drew from the boys' restroom constitutes differential treatment "on the basis of sex." *Whitaker*, 858 F.3d at 1051; *Evancho*, 237 F. Supp. 3d at 285-86; *Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 870 (S.D. Ohio 2016).

The small handful of outlier decisions holding otherwise—issued by courts not bound by *Glenn*—should not persuade this Court. *Johnston v. Univ. of Pittsburgh*, 97 F. Supp. 3d 657 (W.D. Pa. 2015), *appeal dismissed* (Mar. 30, 2016), is unpersuasive for multiple reasons—including that it inappropriately relied on pre-*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), case law that has since been abrogated, leaving it with "little persuasive value." *Highland*, 208 F. Supp. 3d at 875. Indeed, *Johnston*'s

narrow analysis and contrived view about the scope of sex discrimination prohibitions

under federal law have been rejected by two different courts within the *same* district,

*Evancho*, 237 F. Supp. 3d at 288-89; *E.E.O.C. v. Scott Med. Health Ctr., P.C.*, 217 F.

Supp. 3d 834, 841-42 (W.D. Pa. 2016) (holding that Title VII's sex discrimination

prohibition extends broadly to sexual orientation), as well as others.[15]

At least two reasons counsel against following *Texas v. United States*, 201 F.

Supp. 3d 810, 832-33 (N.D. Tex. 2016), *order clarified*, No. 7:16-cv-00054-O, 2016

WL 7852331 (N.D. Tex. Oct. 18, 2016). First, other courts grappling with claims like

the ones in this case have found that the *Texas* analysis "can charitably be described

as cursory." *Highland*, 208 F. Supp. 3d at 863; *Students and Parents for Privacy*,

2016 WL 6134121, at *18, n.19 (the decision's "relatively conclusory analysis"

renders it "unpersuasive").[16] More important, however, is that *Texas* did not even

purport to decide any of the issues in this case, looking instead at jurisdiction over

claims by schools who disagreed with the prior administration's guidance under Title

IX. *Texas* baldly asserted, without support, that the Constitution assigns the questions

---

[15] *See also A.H. v. Minersville Area Sch. Dist.*, No. 3:17-cv-391, 2017 WL 5632662, at *5 (M.D. Pa. Nov. 22, 2017) (compared to *Johnston*, "the Court finds the analysis in the more recent decisions of *Evancho* and *Whitaker* persuasive"); *Students and Parents for Privacy v. United States Dep't of Educ.*, No. 16-cv-4945, 2016 WL 6134121, at *18, n.19 (N.D. Ill. Dec. 29, 2017) (*Johnston* "is of limited persuasive value in this case").

[16] Similarly, this Court should not be persuaded by Defendant's reference to older decisions already rejected by *Glenn* as outliers. *Compare* ECF No. 138-1 at 27 (citing *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215 (10th Cir. 2007)), *with Glenn*, 663 F.3d at 1318 n.5 (*Etsitty* is out-of-step with the vast majority of decisions in this area).

in a case like this one to elected officials. *Texas*, 201 F.Supp.3d at 815. Not so—the Constitution sets a floor beneath which no government action may fall.

Finally, while *Carcaño v. McCrory*'s decision to grant transgender individuals preliminary injunctive relief under Title IX supports Drew's claim here, its denial of preliminary relief on equal protection grounds falls short. 203 F. Supp. 3d 615 (M.D.N.C. 2016). *Carcaño*'s equal protection holding flowed from the Court's "assum[ption] that the sexes are primarily defined by their differing physiologies," *id.* at 642—which is not compatible with *Glenn*. Of the only three cases to cite *Carcaño*—*i.e.*, *Evancho*, *Highland*, and *Students*—none follow that analysis.

## 2.   Discrimination Based On Transgender Status.

Defendant's restroom policy separately requires strict, or at least heightened, scrutiny because it discriminates on the basis of transgender status. The Supreme Court consistently has applied some form of heightened scrutiny where the classified group has suffered a history of discrimination, and the classification has no bearing on a person's ability to perform in society. *See, e.g.*, *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976). The Supreme Court has also sometimes considered whether the group is a minority or relatively politically powerless, and whether the characteristic is defining, or "immutable" in the sense of being beyond one's control or not one the government has a right to insist that an individual try to change. *See, e.g.*, *Lyng v. Castillo*, 477 U.S. 635, 638 (1986). While not all considerations need be

35

present, *see Plyler v. Doe*, 457 U.S. 202, 216 n.14 (1982); *Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 983 (N.D. Cal. 2012), all four point in favor of at least heightened scrutiny for transgender status discrimination.

Transgender people "satisf[y] these criteria." *Doe 1*, 2017 WL 4873042, at *27; *see also Evancho*, 237 F. Supp. 3d at 288; *Highland*, 208 F. Supp. 3d at 874; *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139-40 (S.D.N.Y. 2015); *Stone*, 2017 WL 5589122, at *15; *Stockman*, *supra*, at 19. Transgender people have experienced a long history of discrimination. *See Whitaker*, 858 F.3d at 1051; *Doe 1*, 2017 WL 4873042, at *27; *Evancho*, 237 F. Supp. 3d at 288; *Highland*, 208 F. Supp. 3d at 874; *Adkins*, 143 F. Supp. 3d at 139; *Brocksmith v. United States*, 99 A.3d 690, 698 n.8 (D.C. 2014). There is also "obviously no relationship between transgender status and the ability to contribute to society." *Highland*, 208 F. Supp. 3d at 874; *see also Doe 1*, 2017 WL 4873042, at *27; *Evancho*, 237 F. Supp. 3d at 288; *Adkins*, 143 F. Supp. 3d at 139. A person's gender identity is an innate, effectively immutable characteristic that cannot be voluntarily altered or be expected to change as a condition of equal treatment. *See Doe 1*, 2017 WL 4873042, at *28; *Evancho*, 237 F. Supp. 3d at 288; *Highland*, 208 F. Supp. 3d at 874; *Adkins*, 143 F. Supp. 3d at 139-40; *see also Hernandez-Montiel, v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000); Ct.'s Ex. 2, 12:23-13:1; Ct.'s Ex. 3 ¶ 26. Finally, there can be little dispute that transgender people are relatively powerless politically. *Doe 1*, 2017 WL 4873042, at *2; *Evancho*, 237 F.

Supp. 3d at 288.[17]

### 3.      Defendant Fails to Carry its Heavy Burden.

Although Defendant's policy cannot survive any level of scrutiny, Defendant has failed to carry the heavy burden required here. Under the heightened scrutiny applicable to all sex-based classifications, the government "must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996). Under strict scrutiny, a law must be narrowly tailored to advance compelling state interests. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). Under both, "[t]he burden of justification is demanding and it rests entirely on the State. . . . [It] must be genuine, not hypothesized or invented post hoc in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Virginia*, 518 U.S. at 533.  Moreover, constitutionality is judged based on the "actual state purposes, not rationalizations for actions in fact differently grounded." *Id.* at 535-36. Defendant fails to carry its burden under either standard.

---

[17] Defendant claims incorrectly, ECF No. 138-1 at 25, that this argument is foreclosed by *Kirkpatrick v. Seligman & Latz, Inc.*, 475 F. Supp. 145, 147 (M.D. Fla. 1979), *aff'd*, 636 F.2d 1047 (5th Cir. 1981). But *Kirkpatrick* upheld the firing of an employee because she was transgender—a result that could not stand under *Glenn*—and, far from endorsing the district court's level-of-scrutiny holding, the Fifth Circuit held on review that it "need not reach this issue." 636 F.2d at 1049-50. The level of scrutiny remains an open question in this Circuit.

    *a.*    ***Privacy:*** Numerous courts have rejected the argument that allowing transgender students to share multi-user restrooms affects the privacy of other students. *See, e.g.*, *Whitaker*, 858 F.3d at 1052 ("This policy does nothing to protect the privacy rights of each individual student vis-à-vis students who share similar anatomy and it ignores the practical reality of how [plaintiff], as a transgender boy, uses the bathroom: by entering a stall and closing the door."). As in other similar cases, there is no evidence that Drew ever did "anything to actually invade the physical or visual privacy of anyone else." *Evancho*, 237 F. Supp. 3d at 280; *see also Highland*, 208 F. Supp. 3d at 874 ("There is no evidence that Jane herself . . . would infringe upon the privacy rights of any other students"). The boys who shared a restroom with Drew for six weeks would seem to agree, since Drew's restroom use was reported by two *female* students and no one else. TTIII 16:9-15.

    The evidence shows that Defendant's purported concern about privacy is unfounded, including Defendant's admissions about the private nature of restrooms (TTIII 31:22-25; TTIII 114:1-8; Pl.'s Ex. 138, RFA 57-58), and Plaintiff's unrebutted expert and fact witness testimony refuting the notion that transgender children might expose themselves to others—as the witnesses explained, doing so would conflict directly with the goal of transition, which is to help others see a transgender boy, for example, as the boy that he is. Ct.'s Ex. 3 ¶ 49; TTII 65:8-20; *id.* 108:3-9.

    Defendant's own research uncovered no instances of privacy violations

through the extensive investigation of its task force. TTII 219:18-220:10; TTIII 15:13-16:8; *id.* 31:1-5. To the extent that Defendant's privacy interest is based on an objection to the "mere presence" of a transgender student in the restrooms, that argument fails where "the record demonstrates" that it "is based upon sheer conjecture and abstraction." *Whitaker*, 858 F.3d at 1053; *Boyertown*, 2017 WL 3675418, at *55 (rejecting privacy violation claims based on sharing sex-separated facilities with transgender students); *Students and Parents for Privacy*, 2017 WL 6629520, at *6 (same); *Karnoski*, 2017 WL 6311305, at *8 (defendant fails to meet its burden by relying on concerns that are hypothetical and overbroad).[18]

Defendant also failed to show any relationship between excluding transgender students from restrooms and protecting the privacy of others, let alone the "exceedingly persuasive" fit "between the means and the important end" required to carry its burden. *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 70 (2001) (quotation omitted). Defendant's policy punishes transgender students to avoid purported privacy violations that have not, and do not occur in the enclosed setting of school restrooms. This, coupled with the fact that Defendant does not monitor any non-transgender student's sex-related characteristics, and metes out discriminatory treatment to

---

[18] Ms. Mittelstadt's testimony that a student might need to disrobe in the restroom to wash stained clothing is similarly unpersuasive. TTII 248:8-12. Given Defendant's position that gender neutral restrooms should suffice for *all* restroom-related needs for transgender students, it is unclear why such restrooms should not also suffice on the hypothetical occasion that a student might need to disrobe to wash a stain from their clothing.

transgender students who disclose their status—but not those who quietly enroll with documents matching their gender identity—underscores the lack of any meaningful tailoring between the governmental interest and the challenged classification.

Indeed, Defendant's policy not only fails to *further* any interest in privacy, but actually *undermines* it instead. Defendant's own guidelines acknowledge transgender students' right to privacy (Def.'s Ex. 33 at 1), but Defendant's policy nonetheless risks disclosure of students' transgender status to others—as would occur if Drew used the girls' restroom—by separating transgender students from their peers in noticeable ways. *Compare* TTI 279:15-208:3 (three days a week students are corralled in an area for lunch with no gender neutral restrooms; a transgender student would have to get permission to leave the area for restroom access, while all their peers must stay behind), *with* TTIII 141:24-142:3 (some transgender students, like the four others at Nease besides Drew, are not widely known in school as transgender).

Defendant cited various cases in its proposed conclusions of law, ECF No. 138-1, to suggest that physiological differences justify the differential treatment of Drew in the name of privacy, but those cases all share a different theme: Where the government can provide equal access, it must, regardless of whether physiological differences might warrant accommodation. As here, the defendants in *Virginia* argued that privacy justified excluding women from the Virginia Military Institute ("VMI"). 518 U.S. at 522, 524-25. They claimed that admitting women to VMI would destroy

40

any sense of decency between men and women. *Id.* at 528. Rather than accept privacy as a reason to discriminate, the Supreme Court instead ended VMI's exclusion of women and required that privacy be addressed through any necessary alterations. *Id.* at 550 n.19. "[P]hysiological differences," *id.*, could not trump the obligation to provide "genuinely equal protection," *id.* at 557. The same result followed in *Faulkner v. Jones*, a challenge to the male-only policy at South Carolina's military college. 10 F.3d 226, 228-29 (4th Cir. 1993). *Bauer v. Lynch*, 812 F.3d 340, 342 (4th Cir.) involved a male FBI Academy trainee's challenge to the Academy's requirement of fewer pushups for female trainees than male trainees. *Id.* at 342. Bauer recognized, however, that the Academy had adopted those standards so that more women, of equivalent fitness to men, could qualify, and thus upheld the gender-normed fitness requirements because they *furthered* rather than *hindered* equal access by women.

*Nguyen v. INS* is not to the contrary. *Nguyen* examined differing requirements for men and women to prove parentage of children born abroad, finding them permissible because women can demonstrate parentage through giving birth. 533 U.S. at 64. *Nguyen* held that the ability of women to prove parentage through birth is not a stereotype, *id.* at 68, but Defendant's notion here that Drew cannot use the boys' restroom because of his sex assigned at birth clearly *is* based on stereotype, rather than the reality of his restroom use.

Defendant attempts to distinguish *Whitaker*, *G.G.*, *Highland*, *Evancho*, and

*Boyertown* by arguing that its privacy obligations under the Florida Constitution are higher, but even if there were "an unavoidable conflict between the Federal and a State Constitution, the Supremacy Clause of course controls." *Reynolds v. Sims*, 377 U.S. 533, 584 (1964). Notably, Defendant has not even explained why it believes that Florida's general privacy protections conflict with Drew's claims, and Defendant's corporate representative conceded that Florida schools who respect students' gender identity are not violating any law. TTIII 122:11-123:13.

      ***b.***      ***Safety:*** Courts also have repeatedly rejected the notion that treating transgender students equally raises any safety concerns for others. *See, e.g.*, *Evancho*, 237 F. Supp. 3d at 291 (noting the lack of any evidence that an inclusive policy would encourage improper behavior in restrooms); *Highland*, 208 F. Supp. 3d at 877 n.15 (rejecting the argument that equal access to facilities by transgender students will "lead to disruption or safety incidents"). Notably, there has been no suggestion that Drew poses any safety concerns (Pl.'s Ex. 138, RFA 25-26, 31-32), and as Defendant acknowledges, transgender students tend to be the vulnerable ones. TTIII 120:3-19. Drew experienced no safety issues while he used the boys' restroom, but regardless, nothing in the law suggests that Defendant can segregate a group of students from their peers purportedly for their own protection.

      Defendant's other concerns for safety, including the possibility of assault, are wholly untethered to its discrimination against transgender students, who Defendant

admits are not more prone to misconduct. TTIII 95:13-23; *see also* TTII 119:13-16. In fact, Defendant uncovered no safety concerns in its research of other school districts who treat their transgender students equally, and characterized the lack of foundation for its interest as a desire to be "proactive" for tomorrow. TTII 214:5-21. But a "classification must substantially serve an . . . interest *today,* for in interpreting the equal protection guarantee, we have recognized that new insights and societal understandings can reveal unjustified inequality . . . that once passed unnoticed and unchallenged." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1684 (2017).

      ***c.    Discomfort/community values:*** Shunting transgender students out of communal spaces simply to accommodate their non-transgender peers' discomfort is illegitimate as a matter of law. Such unfounded concerns amount to nothing more than "mere negative attitudes [and] fear," which are not "permissible bases for" differential treatment, even under rational basis review. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985); *see also Glenn v. Brumby*, 724 F. Supp. 2d 1284, 1305 (N.D. Ga. 2010), *aff'd*, 663 F.3d 1312 ("avoiding the anticipated negative reactions of others cannot serve as a sufficient basis for discrimination and does not constitute an important government interest"); *Lusardi*, 2015 WL 1607756, at *9 ("Some co-workers may be . . . embarrassed or even afraid [to share restrooms with a transgender colleague], [but] . . . co-worker confusion or anxiety cannot justify discriminatory terms and conditions of employment.").

Defendant's admission that community values—*i.e.*, the "conservative" views of local residents—shaped the task force's recommendations underscores that the policy is motivated by impermissible private bias or misunderstanding, rather than a valid governmental interest. "The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984); *see also Open Homes Fellowship, Inc. v. Orange Cty., Fla.*, 325 F. Supp. 2d 1349, 1358 (M.D. Fla. 2004) ("'the City may not avoid the strictures of [the Equal Protection] Clause by deferring to the wishes or objections of some fraction of the body politic'") (quoting *Cleburne*, 473 U.S. at 448).

## B.   Title IX

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Access to the bathroom is [] an education program or activity under Title IX." *Highland*, 208 F. Supp. 3d 850, 865. To prove a Title IX violation, Plaintiff must show that (1) he experienced discrimination in an education program or activity on the basis of sex, (2) the institution received federal financial assistance at the time the discrimination occurred, and (3) the discrimination caused Plaintiff harm. *See Highland*, 208 F. Supp. 3d at 865. As a federal financial recipient,

44

Defendant is governed by Title IX. Pl.'s Ex. 138, RFA 3-4; Dkt. 116 at 22 ¶ 2.

Defendant's intentional exclusion of Drew from boys' restrooms discriminates based on his sex under Title IX for all the reasons explained above. Courts rely upon a common body of law in analyzing discrimination claims, regardless of whether a claim arises under the Equal Protection Clause or a particular anti-discrimination statute. *Glenn* decided an Equal Protection claim, but relied interchangeably on Title VII authorities to find that "the very acts that define transgender people as transgender are those that contradict stereotypes of gender-appropriate appearance and behavior." 663 F.3d at 1316 (quotation omitted). The courts have looked both to Title VII, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 617 (1999), and Equal Protection, *Johnson v. Bd. of Regents of Univ. Sys. of Ga.*, 106 F. Supp. 2d 1362, 1367 (S.D. Ga. 2000), *aff'd sub nom. Johnson v. Bd. of Regents of Univ. of Georgia*, 263 F.3d 1234 (11th Cir. 2001), to interpret Title IX's prohibition on sex discrimination. *See also Bigge v. Dist. Sch. Bd. of Citrus Cty., Fla.*, No. 5:13-cv-49-OC-10PRL, 2015 WL 1138472, at *10 (M.D. Fla. Mar. 13, 2015). Accordingly, the instruction in *Glenn* and its progeny about the ways in which discrimination against transgender people must be understood as sex discrimination governs here as well.

"Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). Defendant suggests that the plain meaning of

"sex" in Title IX, and in dictionaries at the time of enactment, comport with its reliance solely on genitalia. ECF No. 138-1 at 16. But Title IX does not define sex, and certainly does not reduce its protections to the sum of students' reproductive organs. The dictionary definitions Defendant points to arise from the *G.G. v. Gloucester Cty. Sch. Bd. dissent*, while the *majority* was persuaded that some definitions at the time did indeed recognize variance in sex-related characteristics, and certainly should not foreclose claims by transgender students. 822 F.3d 709, 721-722 (4th Cir. 2016). Courts that have carefully evaluated and considered definitions of the word "sex," including at the time of Title IX's enactment, have correctly concluded that a reasonable interpretation includes a host of sex-related characteristics, including gender identity. *See*, *e.g.*, *Students and Parents for Privacy*, 2016 WL 6134121, at *17-18; *Highland*, 208 F. Supp. 3d at 866, n.4; *Fabian*, 172 F. Supp. 3d at 526. Thus, by enforcing its policy, Defendant discriminates on the basis of sex.

Defendant makes much of a regulatory exception under Title IX permitting the provision of "separate toilet, locker rooms, and shower facilities on the basis of sex," 34 C.F.R. § 106.33, and some comments from the Title IX Congressional debate—stating that both of these things make clear that a school is not required to allow girls to go into the boys' restroom and vice versa. ECF No. 138-1 at 17. But Drew seeks no such thing; to the contrary, *he is a boy*, and he is simply asking that, as all other boys, he be permitted to use the boys' restroom.

46

The fact that the current administration recently withdrew the prior interpretation of Title IX by ED is entitled to no weight. While some courts accorded *Auer* deference to the previous administration's non-binding guidelines interpreting Title IX to protect transgender students, *see, e.g.*, *G.G.*, 822 F.3d at 723, the rescission did not propound any new rule. *Minersville*, 2017 WL 5632662, at *4. Regardless, the one constant has been the ongoing obligation to follow Title IX, and a statutory claim is not foreclosed by the current lack of an agency position on the issue. "Contrary to Defendant's argument, a specific practice need not be identified as unlawful by the government before a plaintiff may bring a claim under Title IX." *Id.* at *6. Since the rescission, courts have found that policies like the Defendant's violate Title IX or, at the motion to dismiss stage, have found that such claims should be allowed to proceed. *Id.* at *6; *Whitaker*, 858 F.3d at 1046-50 (7th Cir. 2017); *Evancho*, 237 F. Supp. 3d at 283 n.23.

"A policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX." *Whitaker*, 858 F.3d at 1049. As such, Defendant's policy subjects Drew, "as a transgender student, to different rules, sanctions, and treatment than non-transgender students, in violation of Title IX." *Whitaker*, 858 F.3d at 1049-50. This treats Drew differently from other male students based on his gender identity, the fact that he is transgender, and his nonconformity

with sex stereotypes, denying Drew full and equal participation in educational
opportunities in violation of Title IX.

### C.    Declaratory and Injunctive Relief, and Damages.

Plaintiff satisfies the requirements for declaratory relief, because his ongoing
expulsion from the boys' restroom creates an "actual controversy," making it ripe for
this Court to "declare the rights" of the "interested party seeking such declaration." 28
U.S.C. § 2201(a). Additionally, Drew will undoubtedly suffer several forms of serious
and irremediable harm if a permanent injunction is not granted. He is subjected to
unequal treatment with each passing day, and accompanying humiliation, anxiety,
depression. "Courts have long recognized that disparate treatment itself stigmatizes
members of a disfavored group as innately inferior . . . ."  *Evancho*, 237 F. Supp. 3d at
294; *Stockman*, *supra*, at 20 ("A few strokes of the legal quill may easily alter the law,
but the stigma of being seen as less-than is not so easily erased."); *cf. J.S., III v.
Houston Cty. Bd. of Educ.*, 877 F.3d 979, 987 (11th Cir. 2017) (describing the
"intangible consequences" that may result from isolation, including stigmatization).

Second, Defendant's policy also interferes on a daily basis with Drew's
medically prescribed social transition, a serious harm that Defendant has utterly failed
to justify. Ct.'s Ex. 2, 28:10-17; *id.* 33:8-11 Third, Drew has had to miss class to use
the gender neutral restroom, and has struggled to concentrate while holding his
bladder and worrying about when he can use the restroom. TTI 173:16-174:5; *id.*

48

277:16-18. Courts have long recognized that interference with a student's education constitutes irreparable harm meriting injunctive relief. *See Ray v. Sch. Dist. of DeSoto Cty.*, 666 F. Supp. 1524, 1535 (M.D. Fla. 1987); *Alejandro v. Palm Beach State Coll.*, 843 F. Supp. 2d 1263, 1270-71 (S.D. Fla. 2011); *Daniels v. Sch. Bd. of Brevard Cty.*, 985 F. Supp. 1458, 1461-62 (M.D. Fla. 1997) (holding that various unequal facilities for girls' softball team versus boys' baseball team warranted preliminary injunctive relief; "[e]qual access to restroom facilities is such a clearly established right as to merit no further discussion"); *Whitaker*, 858 F.3d at 1045.

The balance of the equities also tips sharply in Drew's favor because Defendant introduced no evidence that any student is harmed when Drew uses the boys' restroom, but the harms inflicted on Drew from the exclusion are profound. Additionally, the "public has no interest in enforcing an unconstitutional" policy, like the one here. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). Similarly, "the overriding public interest lay[s] in the firm enforcement of Title IX." *Cohen v. Brown Univ.*, 991 F.2d 888, 906 (1st Cir.1993).

Plaintiff is also entitled to emotional distress damages under Title IX and the Equal Protection Clause. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255, (2009); *K.M. v. Sch. Bd. of Lee Cty. Fla.*, 150 F. App'x 953, 957 (11th Cir. 2005). "As a matter of both common sense and case law, emotional distress is a predictable, and thus foreseeable, consequence of discrimination." *Sheely v. MRI Radiology Network,*

*P.A.*, 505 F.3d 1173, 1199 (11th Cir. 2007). As such, the Eleventh Circuit has "long found that violations of . . . antidiscrimination statutes frequently and palpably result in emotional distress to the victims." *Id.*; *see also*, *e.g.*, *Bogle v. McClure*, 332 F.3d 1347, 1354, 1359 (11th Cir. 2003); *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir. 1999); *Stallworth v. Shuler*, 777 F.2d 1431, 1435 (11th Cir. 1985). Plaintiff seeks garden variety emotional distress damages, and is entitled to them for the humiliation, pain, and loss of dignity caused by Defendant's intentional conduct barring him from the boys' restroom.

In conclusion, this Court (i) denies Defendant's motion to dismiss Plaintiff's Title IX claim; (ii) declares that Defendant's blanket exclusion of transgender students from sex-separated facilities matching their gender identity violates the Equal Protection Clause of the Fourteenth Amendment and violates Title IX; (iii) permanently enjoins Defendant, its officers, employees, and agents, and all persons acting in active concert or participation with Defendant, or under Defendant's supervision, direction, or control, from enforcing any policy, practice, or custom of the St. Johns County School District that denies transgender students access to and use of restrooms that match a student's gender identity; (iv) and awards Drew $25,000 in damages, or whatever amount the Court deems appropriate based on the evidence presented at trial.

Dated:  February 2, 2018

*s/ Tara L. Borelli*
Tara L. Borelli (*pro hac vice*)
Lambda Legal Defense and Education
    Fund, Inc.
730 Peachtree St. NE, Ste. 640
Atlanta, GA 30308-1210
T. 404-897-1880 | F. 404-897-1884
tborelli@lambdalegal.org

Omar Gonzalez-Pagan (*pro hac vice*)
Lambda Legal Defense and Education
    Fund, Inc.
120 Wall Street, 19th Floor
New York, New York 10005-3919
T. 212-809-8585 | F. 212-809-0055
ogonzalez-pagan@lambdalegal.org

Paul D. Castillo (*pro hac vice*)
Lambda Legal Defense and Education
    Fund, Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas, Texas 75219
T. 214-219-8585 | F. 214-219-4455
pcastillo@lambdalegal.org

Natalie Nardecchia (*pro hac vice*)
Lambda Legal Defense and Education
    Fund, Inc.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010-3512
T. 213-382-7600 | F.: 213-351-6050
nnardecchia@lambdalegal.org

Respectfully submitted,

Kirsten Doolittle, Trial Counsel,
FBN: 942391
Law Office of Kirsten Doolittle, P.A.
207 North Laura St., Ste. 240
Jacksonville, FL 32202
T. 904-551-7775 | F. 904-513-9254
kd@kdlawoffice.com

Jennifer Altman, FBN: 881384
Markenzy Lapointe, FBN: 172601
Shani Rivaux, FBN: 42095
Aryeh Kaplan, FBN: 60558
Pillsbury, Winthrop, Shaw, Pittman, LLP
600 Brickell Avenue, Suite 3100
Miami, FL 33131
T. 786-913-4900 | F. 786-913-4901
jennifer.altman@pillsbury.com
markenzy.lapointe@pillsburylaw.com
shani.rivaux@pillsbury.com
aryeh.kaplan@pillsbury.com

Richard M. Segal (*pro hac vice*)
Nathaniel R. Smith (*pro hac vice*)
Pillsbury, Winthrop, Shaw, Pittman, LLP
501 W. Broadway, Suite 1100
San Diego, CA 92101
T. 619-234-5000 | F. 619-236-1995
richard.segal@pillsburylaw.com
nathaniel.smith@pillsburylaw.com

William C. Miller (*pro hac vice*)
Pillsbury, Winthrop, Shaw, Pittman, LLP
1200 17th St. NW
Washington, DC 20036-3006
T. 202-663-9455 | F. 202-663-8007
william.c.miller@pillsburylaw.com

*Counsel for Plaintiff*

51

# **CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2018, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system, causing a copy of the

foregoing and all attachments to be served on all counsel of record.

/s/ Tara L. Borelli
Tara L. Borelli (*pro hac vice*)
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30308-1210
Tel.: 404-897-1880 | Fax: 404-897-1884
tborelli@lambdalegal.org