**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

DREW ADAMS, a minor, by and
through his next friend and mother,
Erica Adams Kasper,

               Plaintiff,

vs.                                  Case No. 3:17-cv-739-J-32JBT

THE SCHOOL BOARD OF ST. JOHNS
COUNTY, FLORIDA,

               Defendant.

_____

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The parents of St. Johns County, along with teachers and administrators of the St. Johns County School District, have a solemn obligation to guard the well-being of the children in their charge. As recent events from around the country have tragically demonstrated, this is a very challenging job. Recognizing the difficulty of this task and that local school boards, answerable to the citizens of their community, are best situated to set school policy, federal courts are reluctant to interfere. Nevertheless, the federal court also has a solemn obligation: to uphold the Constitution and laws of the United States. That is why federal courts around the country have recognized the right of transgender students to use the bathroom matching their gender identity.

Drew Adams is a rising senior at Allen D. Nease High School. He is transgender, meaning he "consistently, persistently, and insistently" identifies as a

boy, a gender that is different than the sex he was assigned at birth (female).[1] At trial, Adams testified: "I am a boy and I know that with every fiber of my being."[2] However, when the principal of Nease was asked whether she considered Adams to be a boy, she replied, "I do not."[3] That's what this case is about. Everyone agrees that boys should use the boys' restroom at Nease and that girls should use the girls' restroom. The parties disagree over whether Drew Adams is a boy.

I can only answer that question with the evidence given to me at trial. Drew Adams says he is a boy and has undergone extensive surgery to conform his body to his gender identity; medical science says he is a boy; the State of Florida says so (both Adams' Florida birth certificate and Florida driver's license say he is a male); and the Florida High School Athletic Association says so. Other than at his school, Adams uses the mens' bathroom wherever he goes, including in this federal courthouse during trial. Even the St. Johns County School Board regards Adams as a boy in every way, except for which bathroom he can use.

When confronted with something affecting our children that is new, outside of our experience, and contrary to gender norms we thought we understood, it is natural that parents want to protect their children. But the evidence is that Drew Adams

---

[1] Doc. 119, Ex. A at 7.

[2] Doc. 160-1 at transcript page ("Tr.") 83.

[3] Doc. 162 at Tr. 140.

poses no threat to the privacy or safety of any of his fellow students. Rather, Drew Adams is just like every other student at Nease High School, a teenager coming of age in a complicated, uncertain and changing world. When it comes to his use of the bathroom, the law requires that he be treated like any other boy.

The Court recognizes that some will disagree with this decision, for religious and other reasons. I respect their point of view. However, as a judge, my job is to determine what the law requires and apply it faithfully to the facts. I have done that to the best of my ability.

## I. Procedural History

Through his next friend and mother, plaintiff Drew Adams, a minor,[4] filed suit in June 2017 (when he was a rising junior at Nease) under 42 U.S.C. § 1983, alleging that the School District violated his rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, U.S. CONST. amend. XIV, § 2, and Title IX, 20 U.S.C. § 1681, by refusing to let him use the boys' bathroom at school. See Doc. 1 (and as amended, Doc. 60). Soon thereafter, he filed a motion for preliminary injunction seeking to enjoin the School Board (the School District's governing body) from continuing its policy during the pendency of the case. Although the Court denied his motion, it set an expedited schedule so the matter could quickly

_____

[4]Ordinarily, minors' names are redacted from court files, but Adams elected to waive those privacy protections. See Doc. 1 at 1, n.1; Doc. 60 at 1, n.1.

be brought to trial.[5]  See Docs. 50, 57 (Order and hearing transcript).  The Court held

a three day non-jury trial on December 11, 12, and 13, 2017, hearing testimony from

ten witnesses[6] and admitting numerous exhibits.[7]  Two witnesses were unable to

appear live and the Court agreed to accept their videotaped deposition testimony and

a declaration from one.[8]  The parties also stipulated to certain facts that are deemed

admitted.[9]  A month after the trial (and while school was out of session), the

---

[5]Along the way, plaintiff dismissed two school officials he had sued in their official capacities, leaving the School Board of St. Johns County, Florida, as the only defendant.  See Docs. 45, 49, 60.

[6]One of those witnesses was Frank D. Upchurch, III, the long-time School Board Attorney who advised the School Board on its Best Practices Guidelines (discussed below) and who is well familiar with School Board policies and the facts described herein.  References to testimony by "the School Board Attorney" are references to Mr. Upchurch's testimony and should not be confused with statements or argument by the School Board's outside counsel who have represented it throughout this litigation and at trial.

[7]The minutes of the bench trial are of record (Docs. 148, 149, and 150), as are the parties' exhibits (Docs. 151 & 152), and Court exhibits (Doc. 166).  Additional exhibits containing sensitive medical or personal identifying information were filed under seal (Docs. 167, 168, 169, 170, 171).  References to exhibits admitted at trial are denoted herein as Pl. Ex. ___ (for plaintiff's exhibit), Def. Ex. ___ (for defendant's exhibit), or Ct. Ex. ___ (for Court exhibits).  The public record includes redacted versions of the trial transcripts (Docs. 160-1, 161, 162) which the Court cites throughout this opinion.  The unredacted transcripts are under seal at Docs. 143, 144, 145.  The Court has had no need to cite to the unredacted transcripts in this decision.

[8]See Doc. 166, Ct. Ex. 1, 2, 3, 4, 5.  In accepting the video depositions, the Court agreed to rule on the numerous objections contained therein.  See Doc. 160-1 at Tr. 147.  To the extent the Court relies on testimony to which an objection was lodged, the objection is overruled.

[9] See Doc. 116 at § I (p. 22).

undersigned toured Nease High School with the school principal and counsel for both sides, visiting every restroom on campus. Thereafter, the parties submitted proposed findings of fact and conclusions of law and supplemental briefs addressing the School Board's bathroom policy. <u>See</u> Docs. 172, 173-1,[10] 174, 175. The Court heard closing arguments on February 16, 2018. Doc. 184. While the Court has adopted portions of each party's submission, the Court's findings of fact and conclusions of law are its own. Several pending motions were carried with the case, and those rulings are incorporated herein.

## II.  Findings of Fact[11]

### A.  Defining Transgender/Gender Identity/Sex Assigned at Birth

As explained by Dr. Diane Ehrensaft, a developmental and clinical psychologist who studies and specializes in treating transgender children and adolescents, there are a number of components that determine a person's gender:  external genitalia, internal sex organs, chromosomal sex, gonadal sex, fetal hormonal sex, hypothalamic sex, pubertal hormonal sex, neurological sex, and gender identity and role. Doc. 166,

_____

[10]An unredacted version of defendant's brief is in the record at Doc. 180.

[11]Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes these findings upon evaluation of the evidence, including the stipulations in the parties' joint pretrial statement and the testimony and exhibits admitted at trial. Where the evidence to support a relevant finding was in dispute, the Court has weighed the evidence on both sides to determine what facts are "more likely true than not." Pattern Jury Instructions, Civil Cases, Eleventh Circuit (2013 revision, last revised Jan. 2018) 1.1 Gen. Prelim. Instr.

Ct. Ex. 3 at ¶ 20.[12]   Among these markers, external genitalia, the most physically obvious one, has historically been used to determine gender for purposes of recording a birth as male or female.  Id. at ¶ 19.  In most people, all the markers, including external genitalia, lead to a singular conclusion that an individual is either a male or a female.  Doc. 166, Ct. Ex. 3 at ¶ 19.  Sometimes, though, they are not congruent, with some indicators suggesting the individual is female, and others male.[13]  Id. at ¶ 20.  In this situation, neurological sex and related gender identity are the most important and determinative factors.  Id.

---

[12]Defendant filed a Daubert motion to exclude certain testimony of Deanna Adkins, M.D. and Diane Ehrensaft, Ph.D.  Doc. 129. To the extent the motion seeks to exclude portions of their testimony regarding matters of school policy creation and implementation, or links between the school bathroom policy and Adams' purported emotional distress and damages, the motion is moot because the Court has not relied on that testimony.  To the extent the motion seeks to exclude portions of their testimony related to understanding the nature of gender, the protocols for addressing gender transitioning, and the treatment of gender dysphoria, the motion is denied, the Court finding they are qualified to testify on those matters (and others not challenged by this motion), the methodologies upon which they rely for these limited matters are sufficiently reliable, and their testimony assists the Court in understanding the evidence.

[13]Because the "physical aspects of maleness and femaleness" may not be in alignment (for example, "a person with XY chromosomes [could also] have female-appearing genitalia), the Endocrine Society guidelines disfavor the term "biological sex."  Doc. 151, Pl. Ex. 30 at 7.

The Medical Amici[14] explain that "'[g]ender identity' refers to a person's internal sense of being male, female, or another gender." Doc. 119, Ex. A at 6. A transgender individual is someone who "'consistently, persistently, and insistently' identifies as a gender different than the sex they were assigned at birth." Id. at 7. A 2016 publication estimated that 1.4 million transgender adults are living in the United States, 0.6 percent of the adult population. Id. at 4. "Gender identity is distinct from and does not predict sexual orientation; transgender people, like cisgender [non-transgender] people, may identify as heterosexual, gay, lesbian, bisexual, or asexual." Id. at 4-5.

"[M]any transgender individuals are diagnosed with gender dysphoria, a condition that is characterized by debilitating distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex." Id. at 7. Gender dysphoria is recognized by the Diagnostic and Statistical Manual of Mental

---

[14]Upon review, and over defendant's objection (Doc. 118), the motion for leave to file an amicus brief by the American Academy of Nursing, the American Academy of Pediatrics, the American Association of Child & Adolescent Psychiatry, the American College of Physicians, the American Medical Association, the American Medical Women's Association, the Association of Medical School Pediatric Department Chairs, the American Nurses Association, the GLMA-Health Professionals Advancing LGBT Equality, the Endocrine Society and the Pediatric Endocrine Society, (hereinafter, "the Medical Amici") (Doc. 119), is granted to the extent that the Court will rely on its brief (Doc. 119, Ex. A) for helpful explanations of biological and medical terminology. Additionally, the position of these medical associations as to the appropriate standard of care for gender dysphoria is useful to understanding that diagnosis. Defendant's motion to strike their brief (Doc. 118) is denied.

Disorders.  Id. at 8.  According to the Medical Amici, the World Professional Association for Transgender Health ("WPATH") has established the accepted standard of care for transgender persons suffering from gender dysphoria, and it "includes assessment, counseling, and, as appropriate, social transition, puberty-blocking drug treatment, hormone therapy, and surgical interventions to bring the body into alignment with one's gender identity."  Id. at 10-11.

Social transition "typically includes publicly identifying oneself as that gender; adopting a new name; using different pronouns; grooming and dressing in a manner typically associated with one's gender identity" (Id. at 11); changing sports teams to be consistent with one's gender identity (Doc. 166, Ct. Ex. 2 at Tr. 23); "and using restrooms and other single-sex facilities consistent with that identity."  Doc. 119, Ex. A at 11.  Transgender students typically seek privacy and discreteness in restroom use and try to avoid exposing any parts of their genitalia that would reveal sex characteristics inconsistent with their gender identity.  Doc. 166, Ct. Ex. 3 at ¶ 49. The Pediatric Endocrine Society states that not allowing students to use the restroom matching their gender identity promotes further discrimination and segregation of a group that already faces discrimination and safety concerns.[15]  Doc. 151, Pl. Ex. 47.

_____

[15]Other evidence further supports the contention that there is a documented history of discrimination against transgender individuals.  See, e.g., Doc. 114 (Plaintiff's request for Judicial Notice as to governmental actions, policies and reports documenting discrimination against transgender people) (the objection to this filing is overruled); Doc. 151, Pl. Ex. 66 at iv, v, and 4 (Broward County Public Schools

The Endocrine Society Clinical Practice Guideline considers the standard of care for some adults and adolescents with gender dysphoria or who seek gender affirmance to include hormone treatment which, for a transgender male, will alter the appearance of the genitals, suppress menstruation, and produce secondary sex characteristics such as increased muscle mass, increased body hair on the face, chest, and abdomen, and a deepening of the voice.  Doc. 151, Pl. Ex. 30 at 18-19. Surgical interventions (including a double mastectomy and chest reconstruction for transgender men (sometimes referred to as "top surgery") and/or genital surgery) may be appropriate and medically necessary for some patients, but may be delayed until the age of legal majority because, unlike the other treatments, they are largely irreversible.  Id. at 26; Doc. 119, Ex. A at 13.  Before the medical profession gained its current understanding of gender identity, some practices involved attempts to force transgender people to live in accordance with the sex assigned to them at birth, but

_____

LGBTQ Critical Support Guide (citing Florida school survey data showing most LGBTQ students have been either verbally or physically harassed, discussing "pervasive safety concerns" of LGBTQ students, and stating that "[t]ransgender students are disproportionately targeted for harassment and violence" resulting in more than 50% of transgender students reporting a suicide attempt)).  The School Board Attorney also testified that in reviewing the literature compiled by the task force that studied the school policies and in conducting other research, transgender students "are a vulnerable student population" who "fear for their safety," and "are more prone to be victims of violence, bullying [and] physical [harm] than other students."  Doc. 162 at Tr. 120; see also Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ., 858 F.3d 1034, 1051  (7th Cir. 2017) (citing "alarming" statistics which document the "discrimination, harassment, and violence" faced by transgender individuals because of their gender identity).

those attempts failed and caused significant harm.  Doc. 119, Ex. A at 5.

**B.    Drew Adams**

When Adams was born in 2000, he had the external genitalia of a female, and indeed, his parents had been told they were expecting a girl.  Doc. 160-1 at Tr. 84; Doc. 161 at Tr. 31.  His Florida birth certificate recorded his sex as "female."  Doc. 160-1 at Tr. 83; Doc. 170, Def. Ex. 145 (under seal).  From a young age, Adams' parents noticed that Adams rejected what they describe as stereotypically feminine behaviors and attributes, such as playing with dolls, favoring the color pink, or wearing dresses; instead, Adams preferred playing with toy race cars and dinosaurs, and going to the science center.  Doc. 160-1 at Tr. 217-18; Doc. 161 at Tr. 87.  Nonetheless, Adams was a happy and smart child.  Doc. 160-1 at Tr. 81, 189.  In middle school, however, as Adams started going through puberty, he "hated" the developing feminine parts of his body.  Id. at Tr. 89-91.  Adams began to show signs of depression and anxiety and in early 2015, Adams' parents brought him to a mental health therapist as well as a psychiatrist.  Id. at Tr. 89-91, 215-16.

At the end of eighth grade, a few months after he began his therapy, Adams realized that he was transgender and came out to his parents, who already suspected as much.  Doc. 160-1 at Tr. 219; Doc. 161 at Tr. 87.  Adams and his parents met with Adams' therapist seeking guidance.  Doc. 160-1 at Tr. 220-21.  Adams' therapist confirmed that Adams was transgender, and Adams began implementing the social

transition to present as a male, which included cutting Adams' hair short, wearing a chest binder (a garment which flattens the breast tissue) and masculine clothing, asking people to switch to male pronouns when referring to him, and using the men's restrooms when in public.[16]  Id. at Tr. 95, 101.  When Adams uses the men's restroom, he walks in and enters a stall, closes and locks the door, relieves himself, exits the stall, washes his hands, and leaves.  Id. at Tr. 202.

Adams' psychologist determined he met the criteria for gender dysphoria, and in May 2016, she supported his request to begin treatment with an endocrinologist for his medical transition, which included taking birth control to halt menstruation and testosterone to make his body more masculine.  Id. at Tr. 98-100; Doc. 151, Pl. Ex. 134.  In May 2017, Adams had a double mastectomy.[17]  Doc. 160-1 at Tr. 105.

Adams has also worked on the legal transition.  The Florida Department of Highway Safety and Motor Vehicles follows the recommendations of the WPATH in establishing procedures for changing gender on Florida driver's licenses, requiring a statement from a medical provider that the applicant is undergoing clinical treatment for gender transition.  See Doc. 147, Ex. A (Florida Driver License Operations Manual) at LR07.2b.  Within certain guidelines, the Florida Department of Health,

---

[16]Adams' given first name (Drew) is commonly used for boys and for girls so he did not change his first name.

[17]Adams is not yet old enough for any additional surgeries that would medically further his transition.  Doc. 160-1 at Tr. 106; Doc. 166, Ct. Ex. 2 at Tr. 29.

Office of Vital Statistics accepts supporting authenticated medical documentation to amend the sex designation on birth certificates.[18] <u>See</u> Fla. Admin. Code Ann. R. 64V-1.003(2) (2004). Adams followed these procedures, and his Florida driver's license and Florida birth certificate both now record his gender as "Male" or "M." <u>See</u> Doc. 151, Pl. Ex. 3; Doc. 169, Pl. Ex. 4 (under seal).

According to Adams' mother, coming out brought on "an absolutely remarkable" change in Adams. Doc. 160-1 at Tr. 220. "He went from this quiet, withdrawn, depressed kid to this very outgoing, positive, bright, confident kid. It was a complete 180." <u>Id.</u> As Adams testified, with every step of the transition, he feels even better: "I don't hate myself anymore. And I don't hate the person I am. I don't hate my body anymore. There are some parts I don't like, of course, but I don't look at myself and think all those negative thoughts anymore." <u>Id.</u> at Tr. 106. Adams only sees his therapist now on an as-needed basis, less often than he previously did, and he is not taking any medications for anxiety or depression. <u>Id.</u> at Tr. 131, 188.

Adams is excelling academically in high school, is enrolled in the International Baccalaureate program, and is a member of the National Honor Society. <u>Id.</u> at Tr. 214-15; Doc. 162 at Tr. 129-130. He spends his summers volunteering at area hospitals and is involved in a number of organizations that serve the LGBT

---

[18]Plaintiff's request for Judicial Notice of these Florida law provisions (Doc. 147) is granted without objection, though defendant contends that the state failed to follow its own procedures when changing Adams' birth certificate. <u>See</u> Doc. 156 at 1, n.1.

community.[19]   Doc. 160-1 at Tr. 124-25.   Adams plans to attend college upon graduation and aspires to become a doctor.  Id. at Tr. 81.

## C.  The St. Johns County School District and Its Transgender and Bathroom Policies

The St. Johns County School Board is responsible for providing "proper attention to [the] health, safety, and other matters relating to the welfare of students." Fla. Stat. § 1001.42(8)(a).   The St. Johns County School District educates approximately 40,000 students in 36 different schools, serving grades K-12.  Doc. 161 at Tr. 254-55.  An enrollment packet is assembled for each new student.  Id. at Tr. 229.  Part of that packet is the School District's student information/entry form, which includes a box to check whether the student's gender is "male" or "female," as does the Home Language Survey form.  Doc. 170, Def. Ex. 142 & 143 (under seal).  The paperwork includes a state health form, which has a space to indicate a student's "sex."  Doc. 170, Def. Ex. 144 (under seal).  The enrollment packet also includes a copy of a student's birth certificate, which, for Florida, lists the student's "sex."  Doc.

_____

[19]"LGBT" is an abbreviation for lesbian, gay, bisexual, transgender.  See, e.g., Doc. 152, Def. Ex. 203 at 1 (U.S. Dep't of Health and Human Services website).  "LGBTQ" is an abbreviation for lesbian, gay, bisexual, transgender and questioning (and/or queer).  See, e.g., Doc. 115, Ex. 3 at 2 (American Academy of Pediatrics Policy Statement); Doc. 152, Def. Ex. 85 at 56 (District of Columbia Public Schools Policy Guidance).  To the limited extent that the Court has relied on the materials included in plaintiff's Request for Judicial Notice of Clinical Guidelines, Resolutions, Standards of Care, and Statements by Major Medical and Mental Health Organizations, that request (Doc. 115) is granted.

170, Def. Ex. 145 (under seal). The School District uses these documents to record a student's gender in its files. Doc. 161 at Tr. 205. If a student later presents a document, such as a birth certificate or driver's license, which lists a different gender, the original enrollment documents control. The School District will not change the official school records. Doc. 162 at Tr. 12-13. But, if a transgender student initially enrolls with documents listing the gender that matches the student's gender identity, the School District will accept the student as being of that gender. Id. at Tr. 35. The School Board is aware of approximately sixteen transgender students in its schools, some of whom would like to use restrooms which match their gender identity. Id. at Tr. 106-07. The principal at Nease is aware of five transgender students at Nease, including Adams. Id. at Tr. 136.

According to the School Board Attorney, and as affirmed by the School Board Chair, for as long as anyone can remember, the unwritten School District bathroom policy was that boys will use the boys' restrooms at school and girls will use the girls' restrooms at school, using those terms as traditionally defined based on biological traits. Id. at Tr. 45-46; Doc. 184 at Tr. 11-12. As a long-time school official explained, students of one "biological sex" have never been permitted to use the restroom of the opposite "biological sex." Doc. 161 at Tr. 149-50. The school bathroom policy has been enforced through the student code of conduct, and a student could be subject to discipline for failing to abide by the bathroom policy. Id. at Tr. 227-28; Doc. 162 at

Tr. 17-18; Doc. 152, Def. Ex. 65 (St. Johns County School District student codes of conduct, 2015-2018).[20]

Beginning in 2012, the (now retired) Director of Student Services worked with LGBTQ students, attended and sent staff to LGBTQ conferences, and researched school policies in other school districts in Florida and elsewhere to educate herself and the School District about emerging LGBTQ issues. Doc. 161 at Tr. 146-47. She formed a task force which consulted with district administrators, principals, attorneys, guidance counselors, mental health professionals, parents, students, members of the public, and LGBTQ groups in St. Johns County and elsewhere. Id. at Tr. 150-52, 158-59, 161-62, 174-80. The result was a set of Best Practices Guidelines adopted by the School Superintendent's Executive Cabinet and introduced to school administrators in September 2015. Id. at Tr. 242-45.

The Best Practices Guidelines were formed with the community's values in mind (described by the School Board Attorney as trending conservative), and they provide guidance to faculty and staff to address numerous issues related to LGBTQ students. Doc. 162 at Tr. 32-33, 86. Under the Best Practices Guidelines, upon request by a student or parent, students should be addressed with the name and gender pronouns corresponding with the student's consistently asserted gender

---

[20]Historically, the School District accommodated the occasional student who needed additional privacy because of a physical disability or for other reasons by making a gender-neutral single-stall bathroom available. Doc. 161 at Tr. 149.

identity; school records will be updated upon receipt of a court order to reflect a transgender student's name and gender; unofficial school records will use a transgender student's chosen name even without a court order; transgender students are allowed to dress in accordance with their gender identity; students are permitted to publicly express their gender identity; and the school will not unnecessarily disclose a student's transgender status to others. Doc. 152, Def. Ex. 33; Doc. 151, Pl. Ex. 138 at Request for Admission # 51.[21] The Best Practices Guidelines also provide that "[t]ransgender students will be given access to a gender-neutral restroom and will not be required to use the restroom corresponding to their biological sex."[22] Doc. 152,

---

[21]Defendant's motion to withdraw and amend two responses to plaintiff's request for admissions (Doc. 103) is granted. The Court will deem defendant's responses to request # 45 and request # 54 to be amended as stated in the motion.

[22]The Best Practices Guidelines also provide that "[t]ransgender students will not be forced to use the locker room corresponding to their biological sex" and will instead be provided with other accommodations. Doc. 152, Def. Ex. 33 at 2.

As to students participating in interscholastic sports, the Florida High School Athletic Association ("FHSAA") (of which Nease is a member) does not have any policies regarding restroom or locker room access, but it does provide that students shall be given the opportunity to participate in school sports in a manner consistent with their gender identity, regardless of the gender listed on a student's birth certificate or school records. Doc. 151, Pl. Ex. 68 (FHSAA Administrative Policies, 2017-18 edition) at § 4.3; Doc. 152, Def. Ex. 65 (St. Johns County School District Student Code of Conduct 2017-2018) at § 8 (referencing student athletes' mandatory compliance with FHSAA rules and by-laws). Schools which fail to abide by the FHSAA Policies are subject to monetary penalties. Doc. 151, Pl. Ex. 68 at 1. The Best Practices Guidelines acknowledge the FHSAA policy. Doc. 152, Def. Ex. 33 at 2.

Def. Ex. 33 at 1.  The document further states that "[t]here is no specific federal or Florida state law that requires schools to allow a transgender student access to the restroom corresponding to their consistently asserted transgender identity."  Id.

In formulating their recommendations for the Best Practices Guidelines, the LBGTQ task force was aware that some other school districts, including in Florida, have adopted policies permitting transgender students to use the restrooms consistent with their gender identity.  Doc. 161 at Tr. 215-16.  However, the task force did not recommend that alternative for the St. Johns County School District due at least in part to concerns about how to handle gender-fluid students (those whose gender changes between male and female) or those pretending to be gender-fluid, although the task force had not heard of any such incidents.[23]  Id. at Tr. 215-17.

_____

[23]There is not a scientific or medical definition of "gender-fluid" in the record.  The Broward County Public Schools support guide for LGBTQ issues references gender fluidity within its definition of "genderqueer," saying individuals who are genderqueer "typically reject notions of static categories of gender and embrace a fluidity of gender identity and often, though not always, sexual orientation."  Doc. 151, Pl. Ex. 66 at 10.  The District of Columbia Public Schools defines gender fluidity as conveying "a wider, more flexible range of gender expression, with interests and behaviors that may change, even from day to day.  Gender fluid children do not feel confined by restrictive boundaries of stereotypical expectations of girls or boys . . . . [A] child may feel they are a girl some days and a boy on others, or a combination, or possibly feel that neither term describes them accurately."  Doc. 151, Pl. Ex. 116, Pt. 2 at 25.  In Doe v. Boyertown Area School District (a transgender school bathroom case discussed further below), the court defined "gender fluid" as a person who "identifies as male in some situations and female in other situations."  276 F. Supp. 3d 324, 344 (E.D. Pa. 2017), aff'd, 890 F.3d 1124 (3d Cir. 2018) (affirming), 893 F.3d 179 (opinion).  That court also cited an expert (Ohio psychiatrist Dr. Scott Leibowitz) who explained that "'gender fluid' is not a clinical term, but it describes kind of feeling a

According to the School Board Attorney, the gender-neutral bathroom option was added to the Guidelines and is now part of the school policy as a reasonable alternative for transgender students so they would not be required to use the bathroom of their sex assigned at birth. Doc. 162 at Tr. 61-62. The School Board's position is that this approach reconciles the interests of transgender students without violating the School Board policy of having separate bathrooms for boys and girls. Id. at Tr. 62. The retired Director of Student Services also explained that the Best Practices Guidelines accommodate gender-fluid students while protecting against the possibility that students might claim to be gender-fluid to gain access to the bathroom of the opposite sex. Doc. 161 at Tr. 216.

Several months after the School District implemented the Best Practices Guidelines, the United States Departments of Education and Justice issued guidance ("the 2016 Guidance") that the term "sex" under Title IX included gender identity. Doc. 152, Def. Ex. 84. The 2016 Guidance directed that schools that provide sex-segregated restrooms, locker rooms and shower facilities must allow transgender students to use those facilities consistent with their gender identity. Id. at 3. In response, the School District issued a statement through its Superintendent that it

_____

certain gender at a certain moment in time, and . . . then switching, perhaps, back." Id. at 365.

Adams is not gender-fluid. Other than discussing defendant's contentions about gender-fluidity, the Court's opinion does not address how schools should handle this complicated issue.

18

disagreed with that guidance and intended to continue following its long-standing bathroom policy as supplemented by the Best Practices Guidelines, which it believed to be lawful and provided a reasonable accommodation. Doc. 162 at Tr. 75-78. In February 2017, the Departments of Education and Justice withdrew the 2016 Guidance, explaining that it had not undergone any formal public process and had been issued without extensive legal analysis or explanation as to how it was consistent with Title IX. Doc. 152, Def. Ex. 237.

Incorporating both the long-standing unwritten School Board bathroom policy and the Best Practices Guidelines, the current policy in St. Johns County public schools for grades four and up is that "biological boys" may only use boys' restrooms or gender-neutral single-stall bathrooms and "biological girls" may only use girls' restrooms or gender-neutral single-stall bathrooms, with the terms "biological boys" and "biological girls" being defined by the student's sex assigned at birth, as reflected on the student's enrollment documents.[24] Doc. 162 at Tr. 45-46, 62, 71; Doc. 161 at

---

[24]Although the Best Practices Guidelines supplement the earlier policy by providing a gender-neutral single-stall bathroom option, the policy that only "biological boys" may use the boys' restroom and that only "biological girls" may use the girls' restroom is not written anywhere. The Court had questions about whether it had been adopted as the official policy of the School Board, such that the challenge to it created a ripe controversy requiring decision by a federal court. At the Court's direction, the parties filed supplemental briefs on the issue after trial and the School Board Chair affirmed that the School Board policy prohibits Adams from using the boys' bathrooms at Nease High School. See Docs. 159, 172, 174, 178, 184 at Tr. 6-13. The Court is satisfied that this matter presents a real and substantial controversy that is ripe for juridical review. See Nat'l Adv. Co. v. City of Miami, 402 F.3d 1335, 1338-39 (11th

Tr. 248. The School Board Attorney explained that the bathroom policy comports with the Board's overall responsibility for student welfare, which, in the case of bathrooms, principally involves concerns for privacy and safety.[25] Doc. 162 at Tr. 110-11.

With regard to privacy, the School Board seeks to preserve the privacy of individuals using the restroom facilities, but admits that the bathroom stall doors provide privacy for anyone inside a stall. Id. at Tr. 114. The retired Director of Student Services who led the LGBTQ task force explained the privacy concerns:

> [W]hen a girl goes into a girls' restroom, she feels that she has the privacy to change clothes in there, to go to the bathroom, to refresh her makeup. They talk to other girls. It's kind of like a guy on the golf course; the women talk in the restrooms, you know. And to have someone else in there that may or may not make them feel uncomfortable, I think that's an issue we have to look at. It's not just for the transgender child, but it's for the other.

Doc. 161 at Tr. 213. The School District's Deputy Superintendent for Operations raised similar points, saying a student may want privacy to undress or clean up a stain on her clothing. Id. at Tr. 248. The School Board Attorney also explained that allowing a transgender student to use a restroom that conformed to his or her gender identity could create opportunities for students "with untoward intentions to do things they ought not to do," although the School Board has never received any complaints

---

Cir. 2005) (explaining the constitutional and prudential concerns that must be satisfied to invoke the federal court's limited jurisdiction).

[25]The School Board did not argue that cost was a factor in arriving at a bathroom policy. See Doc. 161 at Tr. 67-68.

of untoward behavior involving a transgender student.  Doc. 162 at Tr. 112-13.

As for the safety aspect, the School Board seeks to assure that members of the opposite sex are not in an unsupervised bathroom together, citing as an example the risks of danger posed to a female freshman student who might find herself alone in the restroom with an 18-year old male student.  Id. at Tr. 69, 111, 115.  A related concern raised by the retired Director of Student Services was that under a relaxed policy, a student–a football player for example–could pose as being gender-fluid for the purpose of gaining access to the girls' restroom, but the school would have no way to know whether his belief that he is gender-fluid is sincere.  Doc. 161 at Tr. 213. However, the task force's research did not reveal any actual situations where a problem like that occurred.  Id. at Tr. 213.

The retired Director of Student Services also expressed concern for the safety of transgender students, worrying that they might be bullied or assaulted or ridiculed by other students if they are in the bathroom that matches their gender identity.  Id. at Tr. 217.  While the School Board's code of conduct would address any violations, by keeping boys and girls separate in the unsupervised restrooms, the School Board seeks to minimize the  opportunity for any such violation to occur.  Doc. 162 at Tr. 115.  However, the School Board is not aware of any bullying violations involving a transgender student in any St. Johns County School District restroom, id. at Tr. 115, nor did the task force hear of any such incidents in other school districts involving

transgender students using the restroom that aligned with their gender identity. Doc. 161 at Tr. 219-20. Moreover, the retired Director of Student Services acknowledged that for a transgender student who has made the social transition and whose appearance is consistent with his or her gender identity (for example, a transgender girl whose hair is long, whose breasts are enhanced, who is wearing lipstick), there may be safety, security, and privacy concerns if that student used the restroom that is consistent with the sex the student was assigned at birth; thus, she thought it would be preferable if such a student used a gender-neutral single-stall bathroom. Id. at Tr. 207-09; 217-18.

Additionally, if a transgender student enrolled in the St. Johns County School District having already changed their legal documents to reflect their gender identity, the student's school records would reflect that gender as well. Doc. 162 at Tr. 35. The school district has no process to determine if a student is transgender. Doc. 161 at Tr. 235. As the School Board Attorney said, "[t]he district does not play bathroom cop," and it accepts the information on the enrollment documents at face value. Doc. 162 at Tr. 53. Thus, unless there was a complaint, a transgender student could use the restroom matching his or her gender identity until he or she graduated and the school would be none the wiser. Id. at Tr. 35-36, 53. The School Board Attorney testified that he thought that scenario would be a rare occurrence and, if it became a problem, the School Board could re-examine the practice of using self-identifying

enrollment documents to determine gender.[26]  Id. at Tr. 54-55.  However, he agreed

that at this point, the School District would have no occasion to question a student

who used a restroom consistent with the gender recorded on the student's enrollment

documents.  Id. at Tr. 89.

The Nease campus is spread over several buildings.  There are four sets of

multi-stall, sex-segregated bathrooms available during class time to the school's

2,450 students.  Id. at Tr. 131-32.  An additional set is available in the locker rooms

for use by students while taking physical education classes.  Id. at Tr. 131.

Discounting the locker room, there are a total of ten bathroom stalls available in the

boys' restrooms on the Nease campus.  Id. at Tr. 133.  All of the boys' restrooms have

a set of urinals and stalls with doors.  The urinals in the boys' restrooms are not

divided by partitions, although a school official said perhaps they could be.  Id. at Tr.

32.  The campus additionally has eleven gender-neutral single-stall bathrooms in

various locations which are open to any student or staff member.  Id. at Tr. 134.  A

multi-stall boys' restroom and a multi-stall girls' restroom are accessible to students

in the cafeteria area, but there is not a gender-neutral bathroom in that area and

during certain lunch periods, students who wish to use a gender-neutral bathroom

---

[26]The School Board Attorney did not testify as to what a revised practice might be.
The retired Director of Student Services testified it would be "totally inappropriate" to
conduct physical inspections of students to determine what genitalia they had, and the
school would "never" do that.  Doc. 161 at Tr. 204.

must ask permission to leave the area.  Doc. 160-1 at Tr. 279-80.

The undersigned visited Nease and toured all of the bathrooms on campus. While they were clean, most of the multi-stall single-sex restroom facilities were dated and there were not nearly enough bathrooms for boys or girls considering the number of students at Nease.  The school principal said there are often lines to use those bathrooms.  The gender-neutral bathrooms were generally more modern than the multi-stall single-sex bathrooms.  Some of Nease's classrooms are in portable buildings.  There are no gender-neutral bathrooms or faculty bathrooms near those classrooms, and the multi-stall single-sex bathrooms there have very few stalls.  The principal said that faculty assigned to teach in the portable classrooms sometimes use the multi-stall single-sex bathrooms.  The undersigned observed that the boys' locker room is an open space with no room for privacy while changing.  There is a bathroom available in the coach's office, but the principal said it is not available to use for changing.  The boys' locker room shower is an open space with several shower heads and no curtains or dividers.  The showering space is visible to other areas of the locker room.

**D.    Adams' Experience with the Bathroom Policy at Nease High School**

School enrollment documents show that Adams enrolled in the St. Johns County School District as a female entering the fourth grade at PV/PV Rawlings Elementary in 2010.  <u>See</u> Doc. 170, Def. Ex. 142, 143, 144 (under seal).  During the

24

summer of 2015, before Adams began high school at Nease, Adams' mother informed the student services department that Adams was transitioning and would be attending high school as a boy. Doc. 160-1 at Tr. 251-52. When Adams began school in August, he presented as a boy and used the boys' restroom when needed without incident. Id. at Tr. 253. One day in September approximately six weeks after school started, Adams was called out from his classroom and told by his guidance counselor that someone had complained about him using the boys' restroom and that, going forward, he could use the gender-neutral bathroom in the school office. Id. at Tr. 114-15, 253. Adams was also advised that he could use the girls' restroom, something he found insulting. Id. at Tr. 117-18. It was not a boy or a boy's parents who had complained. Rather, it was two unidentified female students who reported that they had seen Adams entering the boys' restroom. Doc. 162 at Tr. 16-17.

To Adams, the school's refusal to let him use the boys' restroom meant that the school did not see him as a boy, and refused to accept who he was. Doc. 160-1 at Tr. 116. As Adams testified, "I was living in every aspect of my life as a boy and now they're taking that away from me." Id. Adams said he was confused, shocked, and angered by the school's reaction. Id. at Tr. 115-16. The school agreed to provide gender-neutral restrooms which Adams has used as necessary. Id. at Tr. 172-73. Adams would be subject to disciplinary action if he used the boys' bathroom. Doc. 162 at Tr. 17-18. Over the course of Adams' freshman and sophomore years, Adams'

25

mother met with various school and District personnel, sent them letters and emails, and pursued a complaint with the U.S. Department of Education's Office of Civil Rights; by the end of his sophomore year when those efforts had not resulted in any change to the school bathroom policy, Adams, through his mother, filed this lawsuit. Doc. 160-1 at Tr. 254-60.

For some of Adams' classes during his junior year, the gender-neutral bathrooms were considerably further away than the boys' restrooms.[27] Id. at Tr. 117, 119, 122-24, 176-79. Adams monitors his fluid intake to minimize his need to use the restroom and he now uses the school bathroom only once or twice a day.[28] Id. at Tr. 118-19, 172. Adams thinks ahead about where his classes are and which bathrooms he can access, worrying he will miss valuable class time if a gender-neutral bathroom is not nearby.[29] Id. at Tr. 118-19. Adams' has not registered for any physical

---

[27]Nease has increased the number of gender-neutral single-stall restrooms available for student use since Adams started as a student there. Originally, only one was available, in the school office. By the time Adams finished his junior year in the spring of 2018, eleven were available. Doc. 160-1 at Tr. 120; Doc. 162 at Tr. 133-34.

[28]Pediatric endocrinologist Dr. Adkins testified that limiting fluid intake to avoid bathroom use increases the risk of urinary tract infections and dehydration (Doc. 166, Ct. Ex. 2 at Tr. 32-33), but Adams has never complained to school officials about those issues (Doc. 160-1 at Tr. 179), and there is no evidence in the record of him having suffered from those problems.

[29]Having visited the Nease campus and toured the routes Adams took from his classes to the nearest gender-neutral bathroom, the Court did not find those distances to be so far as to disrupt Adams' class schedule.

education classes while at Nease (students enrolled in the International Baccalaureate program are not required to take physical education classes), and Adams did not testify about the school policy with respect to the locker rooms, which are only available to students taking physical education classes. Doc. 171, Def. Ex. 42 & 43 (under seal); Doc. 162 at Tr. 131.

Adams testified that he feels alienated and humiliated, and it causes him anxiety and depression to walk past the boys' restroom on his way to a gender-neutral bathroom, knowing every other boy is permitted to use it but him. Doc. 160-1 at Tr. 116-17. Adams thinks it also sends a message to other students who see him use a "special bathroom" that he is different, when all he wants is to fit in. Id. at Tr. 205.

There were no reported instances of privacy breaches during the time Adams used the boys' restroom at Nease. Although no one other than the two female students ever complained about Adams' use of the boys' bathroom at Nease, the parties stipulated that certain parents and students in the School District object to a policy or practice that would allow students to use bathrooms in accordance with their gender identity as opposed to their sex assigned at birth, because they believe such a practice would violate the bodily privacy rights of students and raises privacy, safety and welfare concerns. Doc. 116 at § I, ¶ 3 (p. 22). The School District has agreed to treat Adams as a boy in all other respects, but its position is that Adams' enrollment documents and official school records identify him as a female, and he has not

presented any evidence that he is a "biological male." Doc. 161 at Tr. 229-36, 253;

Doc. 162 at Tr. 12-13, 35-36; Doc. 173-1 at ¶¶ 42-43. The School District maintains

that Adams is welcome to use the gender-neutral bathrooms or the girls' bathroom.[30]

Doc. 161 at Tr. 250-51. But he cannot use the boys' bathroom.

### E.    Schools With Policies Permitting Transgender Students To Use The Bathroom that Aligns With Their Gender Identity

The Court heard testimony from three school administrators familiar with other

schools that have adopted the transgender bathroom policy that Adams is

advocating.[31] Broward County, also in Florida, has a public school policy that permits

students to use gender-neutral restrooms as well as the restrooms that match their

gender identity. Doc. 151, Pl. Ex. 66 at 40-41. Unlike St. Johns County, Broward

County also has a human rights ordinance that prohibits discrimination based on

---

[30]That latter position seems disingenuous. Adams presents as a boy and continues to exhibit more masculine physical features as his medical treatment continues. It would seem that permitting him to use the girls' restroom would be unsettling for all the same reasons the School District does not want any other boy in the girls' restroom.

[31]A group of school administrators, school districts, and educators from 29 states and the District of Columbia sought leave to file an amicus brief in support of Adams' position. Doc. 124. The School Board objected that their brief was filed just three business days before trial, it deprived counsel of an opportunity to cross-examine their positions, and would be cumulative of other evidence. Doc. 136. Two of the school administrators who testified are among the members who sought to file the brief. For the reasons raised by the School Board, and finding that the testimony of the three administrators ameliorates any prejudice to Adams, the Court will deny the amicus' motion (Doc. 124) (and finds their counsel's motion for leave to appear pro hac vice (Doc. 125) to therefore be moot).

gender identity.  Id. at 16.  Michaelle Valbrun-Pope, the Executive Director of the Student Support Initiatives for Broward County Public Schools (the sixth largest school district in the nation), testified that she is aware of nine other Florida school districts that have implemented some of their policies with regard to transgender students.[32]  Doc. 161 at Tr. 65-66.  Valbrun-Pope testified that Broward County Schools' transgender bathroom policy, which has been in effect for about five years, has not caused any issues related to safety or privacy.  Id. at Tr. 64-65.  She testified that she has never heard of a transgender student exposing himself or herself in the restroom and that doing so would be inconsistent with aligning themselves with their gender identity and being accepted as that gender.  Id. at Tr. 65.

Michelle Kefford, a principal at a high school in Broward County who also works district-wide answering questions about the district's LGBTQ policies, has worked with about a dozen transgender students over the years, and her high school presently has two transgender students out of a population of about 2,600.  Id. at 106, 109-110,

---

[32]At closing arguments, counsel for the School Board noted a few other counties within the Middle District whose school boards he believed have policies similar to St. Johns County's, and remarked that the Volusia County School Board was involved in similar litigation.  But apparently the Volusia County School Board accepts a birth certificate as proof of "sex" and, as the transgender plaintiff in that case has now obtained "an amended State of Florida birth certificate identifying his sex as male," the Volusia County School Board now permits him to use the boys' restrooms and locker rooms at his school.  See Doe v. Volusia Cnty. Sch. Bd., No. 6:18-cv-102-Orl-37GRK, Doc. 57 at ¶ 2 (filed June 19, 2018).

117.  Once a transgender student comes forward to identify herself or himself, an adult staff member meets with the student to discuss a variety of issues, including whether the student wants to be called a different name, whether the student's family is aware of the situation, whether a referral to any outside resources would be helpful to the student or the family, whether the student has disclosed his or her gender identity to others, whether the student is engaged in extracurricular activities or sports where support may be needed, and what restroom the student wants to use.  Id. at Tr. 111-12; Doc. 151, Pl. Ex. 66 at 49-51.  Broward County Public Schools do not require any legal documentation such as a birth certificate to permit students to be treated consistent with their gender identity, and students need only identify themselves as transgender to have access to the restroom that corresponds to the gender identity they assert at school.  Doc. 151, Pl. Ex. 66 at 35-36, 40-41.

Kefford testified that no students or parents have complained about transgender students in the bathrooms, although in the training sessions she conducts within the school district, she has encountered other adults who do not agree with the district's transgender policies.  Doc. 161 at Tr. 106, 118-19.  Based on her experience in meeting with these adults, Kefford's opinion is that "people are afraid of what they don't understand . . . [and] a lot of that fear [is because] they haven't experienced it, they don't know enough about it, and the first thing that comes to mind is this person wants to go into this bathroom for some other purpose. That's

not the reality. The reality is this child . . . just want[s] to be accepted" as a member of the gender with which they identify. Id. at Tr. 120-21.

Kefford also testified that there has never been a problem involving a transgender student in the bathroom, and any problem that did arise would be dealt with in accordance with the school's disciplinary guidelines. Id. at Tr. 106-07. Kefford said that any child who was uncomfortable with the policy or wanted additional privacy beyond that already afforded by a bathroom stall would have the option of using a gender-neutral single-stall bathroom. Id. at Tr. 120. She also testified that some transgender students who are in the early stages of their transition prefer to use a gender-neutral bathroom instead of the bathroom that matches their gender identity. Id. at Tr. 111-12. Kefford has never heard of a transgender student (or adult) going into a restroom for the purpose of engaging in any inappropriate predatory behavior and has never heard of a cisgender student pretending to be transgender to gain access to a bathroom opposite of their true gender identity. Id. at Tr. 107, 119.

Dr. Thomas Aberli, a principal with the Jefferson County Public Schools in Kentucky testified about his experience at a high school during the time that it adopted a policy to permit transgender students to use bathrooms and locker rooms that aligned with their gender identity. Doc. 160-1 at Tr. 22-23. That high school does not have any gender-neutral bathrooms but does have one single-stall girls' bathroom and one single-stall boys' bathroom in the front office. Id. at Tr. 25. Aberli

testified that the school had no problems implementing the policy, which was occasioned by a student who transitioned during the school year.  Id. at Tr. 26-27. Aberli explained that this was his first encounter with a transgender student and he had a steep learning curve but ultimately concluded that "being transgender was a real thing that the school would have to respond to."  Id. at Tr. 31.  Although many parents initially had concerns about safety and privacy, the school has disciplinary procedures to address any violations, and none have occurred.  Id. at Tr. 45-54.

## III.   Conclusions of Law

To prevail, Adams must prove by a preponderance of the evidence that the School Board violated his rights under the Equal Protection Clause and/or Title IX.[33] If Adams does so, it is also his burden to prove (again by a preponderance of the evidence) how this violation caused him damage.[34]  See Pattern Jury Instructions,

---

[33]Adams filed suit under 42 U.S.C. § 1983.  The School Board is a "person" acting under color of law within the meaning of 42 U.S.C. § 1983.  Doc. 151, Pl. Ex. 138 at Request for Admission 1.

[34]The evidence at trial was that Adams has no occasion to use the locker room at Nease (the use of which is limited to students taking physical education classes, which he does not) and none of his testimony related to those facilities or any desire to access them.  Likewise, when discussing the School Board's concerns, the testimony was about the multi-stall single-sex restrooms on campus that students use during class time, on the short breaks between classes, or during lunch.  While the Court viewed the locker room and showers as part of its tour of Nease, Adams did not attempt to show that the School Board policy as it relates to locker rooms and shower facilities has caused him any harm.  Thus, the Court's analysis of Adams' claims does not include consideration of his use of the boys' locker room or shower facilities and the Court's rulings do not apply to those spaces.  Outside of case citations, references

Civil Cases, Eleventh Circuit (2013 revision, last revised Jan. 2018) 1.1 Gen. Prelim. Instr.; <u>Texas Dep't of Comm. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981) (explaining that even in burden shifting cases, plaintiff bears the ultimate burden of persuading the trier of fact).

The Supreme Court has long recognized that the state has broad authority to protect the physical, mental, and moral well-being of its youth. <u>Planned Parenthood of Cent. Mo. v. Danforth</u>, 428 U.S. 52, 72-74 (1976). The Court is mindful that schools are traditionally locally controlled and that a federal court should tread lightly when asked to contravene a policy established by a local school board. Minor children are involved here and the concerns of their parents and school administrators charged with their safety cannot be minimized. Moreover, of all the areas in a school, bathrooms are where privacy considerations are at their peak. So, even if a school is otherwise prepared to accept a student as transgender, it is not surprising that allowing transgender students to use restrooms aligned with their gender identity is not an easy step. But neither was it easy when public restrooms were racially integrated. To be sure, what the law requires and what some are comfortable with are not always the same. Nonetheless, "[a]n individual can invoke a right to constitutional protection when he or she is harmed, even if the broader public

_____

to "restrooms" or "bathrooms" within this section of the opinion do not include those located in the locker room or shower facilities.

disagrees and even if the legislature refuses to act."   Obergefell v. Hodges, 135 S.

Ct. 2584, 2605 (2015).

A.    **Equal Protection Clause Claim**

The Equal Protection Clause of the Fourteenth Amendment provides that no

State may "deny to any person within its jurisdiction the equal protection of the laws."

U.S. Const. amend. XIV, § 1.   Accordingly, the St. Johns County School Board, a

political subdivision of the State of Florida,[35] must "treat all persons similarly situated

alike or, conversely, [must] avoid all classifications that are 'arbitrary or irrational' and

those that reflect 'a bare desire to harm a politically unpopular group.'"   Glenn v.

Brumby, 663 F.3d 1312, 1315 (11th Cir. 2011) (quoting City of Cleburne v. Cleburne

Living Ctr., Inc., 473 U.S. 432, 446-47 (1985)).   Generally, state action will be upheld

"if it is rationally related to a legitimate governmental purpose."   Id.   However,

classifications based on "sex or gender" are subject to intermediate scrutiny.   Id. at

1315-17; see also Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ., 858

---

[35]See Fla. Const. art. IX, § 4 (establishing governance of Florida's public education system in each county by elected members of district school boards); Fla. Stat. 1.01(8) (defining political subdivision to include "all other districts in this state"); Fla. Stat. § 120.52(1)(a) and (6) (defining state agency to include local school districts); Fla. Stat. Title XLVIII (Florida's K-20 Education Code, Ch. 1000-1013); NLRB v. Nat. Gas Util. Dist. of Hawkins Cty, 402 U.S. 600, 604-05 (1971) (explaining that an entity is a "political subdivision" under federal law if it is either "(1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate").

F.3d 1034, 1050-52 (7th Cir. 2017) (determining school district decision to exclude transgender students from bathrooms matching their gender identity was based on sex stereotyping, and thus subject to heightened scrutiny[36]); M.A.B. v. Bd. of Educ. of Talbot Cty., 286 F.Supp. 3d 704, 718-19 (D. Md. 2018) (reviewing Glenn and Whitaker and determining that heightened scrutiny applied in transgender school bathroom case); A.H. v. Minersville Area Sch. Dist., 290 F. Supp. 3d 321, 331 (M.D. Pa. 2017) (holding intermediate scrutiny applied in transgender school bathroom case); Evancho v. Pine-Richland Sch. Dist., 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017) (same); Stone v. Trump, 280 F. Supp. 3d 747, 768 (D. Md. 2017) (applying intermediate scrutiny to decision to exclude transgender individuals from the military); Doe 1 v. Trump, 275 F. Supp. 3d. 167, 210 (D.D.C. 2017) (same).

The School Board's bathroom policy cannot be stated without referencing sex-based classifications, as it requires what it terms "biological boys"--intended by the School Board to mean those whose sex assigned at birth is male--to use the boys' bathrooms or gender-neutral bathrooms, and it requires "biological girls"--intended by

---

[36]As explained by the Eleventh Circuit in Glenn, "heightened" scrutiny includes both intermediate and strict scrutiny. Glenn, 663 F.3d at 1316, n.4 (citing Clark v. Jeter, 486 U.S. 456, 461 (1988)). The "heightened" scrutiny test applied in Whitaker is the same as the "intermediate" scrutiny test applied in Glenn. Though Adams argued that strict scrutiny might apply here, the Court is not aware of any transgender bathroom case that has applied strict scrutiny, reserved for "classifications pertaining to race or national origin or to those affecting certain fundamental rights." Id. (citing Clark, 486 U.S. at 461).

the School Board to mean those whose sex assigned at birth is female--to use the girls' bathrooms or gender-neutral bathrooms. But Adams identifies as a boy, is identified by others as a boy, is legally deemed by the state of Florida to be a boy, lives as a boy, uses the men's restroom outside of the school setting, and is otherwise treated as a boy--except when it comes to his use of the school bathrooms. The School Board Attorney agreed that as a transgender boy, Adams is not treated the same as "biological boys" when it comes to using the restroom. Doc. 162 at Tr. 118. Thus, although the policy treats most boys and girls the same, it treats Adams differently because, as a transgender boy, he does not act in conformity with the sex-based stereotypes associated with the sex he was assigned at birth (female). "This policy is inherently based upon a sex-classification and heightened review applies." Whitaker, 858 F.3d at 1051 (explaining that school bathroom policy which relied on sex listed on students' birth certificates did not treat all boys and girls the same (and therefore violated the Equal Protection Clause) because transgender students, who fail to conform to sex-based stereotypes associated with their sex assigned at birth, are treated differently). As the Eleventh Circuit explained in Glenn, "[a]ll persons, whether transgender or not, are protected from discrimination on the basis of gender stereotype," which includes "perceived gender-nonconformity," "a form of sex-based discrimination that is subject to heightened scrutiny under the Equal Protection Clause." 663 F.3d at 1318-19. The School Board does not dispute that its bathroom

policy makes distinctions based on sex and is subject to intermediate scrutiny;[37] that

_____

[37]To the extent the School Board contends Adams must make a threshold showing of discriminatory intent to state an Equal Protection claim (Doc. 173 at 34), that may be a misreading of the circumstances here.  See Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 273-74 (1979) (explaining that if a statute is neutral on its face and its classifications are not based on gender, the court must inquire whether its effect nonetheless reflects invidious gender-based discrimination); see also Morrissey v. United States, 871 F.3d 1260, 1268-72 (11th Cir. 2017) (examining facially neutral tax law and finding homosexual taxpayer could not show that different treatment was motivated by an intent to discriminate).  Here, by contrast, defendant agrees that its bathroom policy makes distinctions based on sex and is subject to intermediate scrutiny.  Doc. 173-1 (Defendant's proposed findings of fact and conclusions of law) at 37.  Although the School Board did not have transgender students in mind when it originally established separate multi-stall restrooms for boys and girls, it has since become aware of the need to treat transgender students the same as other students and does so in all other respects, except when it comes to the bathroom policy: A student whose sex assigned at birth is female is subject to discipline if the student identifies as a male and uses the boys' restroom, whereas the same student would be free to use the boys' restroom if his sex assigned at birth was male or if he agreed to act in conformity with the School Board's expectations and use the girls' restroom.  Thus, even if it started out that way, the school bathroom policy is no longer a neutral rule because it applies differently to transgender students, as the School Board itself acknowledges.  See Romer v. Evans, 517 U.S. 620, 634 (1996) (noting that class separation raises an "inevitable inference" of animosity toward the affected class); Doe 1 v. Trump, 275 F. Supp. 3d at 209-10 (applying intermediate scrutiny to Equal Protection Claim brought by current and aspiring transgender military service members because the policy to exclude them "inherently discriminates" against them); Stone, 280 F. Supp. 3d at 768 (finding transgender service members met threshold of showing "intentional or purposeful discrimination" because there was "no doubt" that policy set apart transgender service members for different treatment).  See also A.H., 290 F. Supp. 3d at 331, n.5 (finding that to the extent plaintiff was required to allege intentional discrimination, she had done so by alleging that the principal said the school wasn't ready to handle transgender students in bathrooms and that his job was to protect other students from plaintiff).  The School Board's positions here echo those pled in A.H. and, to the extent it's necessary, the Court finds Adams has made the threshold showing of intentional discrimination.

is the standard the Court will apply.[38]

Under the intermediate scrutiny standard, the School Board must show that "'its gender classification is substantially related to a sufficiently important government interest.'" Glenn, 663 F.3d at 1316 (quoting Cleburne, 473 U.S. at 441). The justification for its policy must be "exceedingly persuasive." United States v. Virginia, 518 U.S. 515, 532-33 (1996). "Moreover, the classification must substantially serve an important governmental interest today, for in interpreting the equal protection guarantee, [the Supreme Court has] recognized that new insights and societal understandings can reveal unjustified inequality that once passed unnoticed and

_____

[38]Because of the School Board's concession and the Eleventh Circuit's clear statement in Glenn, the Court has no occasion to engage in the further analysis many other transgender bathroom cases have which additionally considered whether transgender people are a quasi-suspect class, deserving of heightened scrutiny per se. See, e.g., Grimm v. Gloucester Cty. Sch. Bd., 302 F. Supp. 3d 730, 749-50 (E.D. Va. 2018) (concluding transgender individuals are a quasi-suspect class) M.A.B., 286 F. Supp. 3d at 719-22 (same); Bd of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ., 208 F. Supp. 3d 850, 872-74 (S.D. Ohio 2016) (same); Evancho, 237 F. Supp. 3d at 288-89 (finding "all the indicia" supported application of intermediate scrutiny to classification involving transgender status); cf., Johnston v. Univ. of Pittsburgh, 97 F. Supp. 3d 657, 668 (W.D. Pa. 2015) (declining to recognize transgender status as a quasi-suspect class because neither the Supreme Court nor the Third Circuit had yet done so). The Third Circuit's recent decision in Doe v. Boyertown Area School District, though not an Equal Protection Clause case, suggests the Third Circuit would likely accord quasi-suspect class status to transgender individuals. 893 F.3d 179, 184 (3d Cir. 2018) (finding policies that exclude transgender individuals from facilities consistent with their gender identity have detrimental effects on their physical and mental health, safety and well-being, citing high rates of suicide, homelessness, and other problems afflicting transgender people).

unchallenged." <u>Sessions v. Morales-Santana</u>, 137 S. Ct. 1678, 2690 (2017) (internal

quotation and alterations omitted, emphasis in original) (citation omitted). The School

Board contends its bathroom policy is substantially related to its important interests

in student privacy and student safety, both of which fall within its statutory

responsibility for student welfare.

### 1. Privacy

The School Board claims that its long-standing policy of having separate boys'

and girls' bathrooms has created an expectation of privacy for students and parents

who do not expect students of the opposite sex to share the bathroom space. Doc.

162 at Tr. 67. The Court agrees that the School Board has a legitimate interest in

protecting student privacy, which extends to bathrooms. But allowing transgender

students to use the restrooms that match their gender identity does not affect the

privacy protections already in place. When he goes into a restroom, Adams enters

a stall, closes the door, relieves himself, comes out of the stall, washes his hands,

and leaves. Adams has encountered no problems using men's restrooms in public

places, and there were no reports of problems from any boys or boys' parents during

the six weeks of his freshman year when Adams used the boys' restrooms at Nease.

Nor was there any evidence that any school official associated with the St. Johns

County School District, including members of its LGBTQ task force, had ever heard

of any incident anywhere where a transgender student using a restroom acted in a

manner that invaded another student's privacy.

Likewise, the research and experience of the school officials from Broward County and Jefferson County Public Schools in Kentucky revealed no privacy concerns when transgender students used the restroom that matched their gender identity. While St. Johns County School personnel said girls may want privacy in the restrooms while talking to their peers, changing clothes (which can be done in a stall), putting on make-up, or removing stains from their clothing, none of that requires them to expose their anatomy to other students such that having a transgender student in the restroom would invade their bodily privacy. And, any student who wants additional privacy for any reason is permitted to use the gender-neutral single-stall bathrooms.

Admittedly, the boys' restrooms at Nease– which Adams would use if he could– have urinals without dividers, so if someone chose to be a voyeur, there is the potential that a boy's genitals could be viewed. But this is not a real concern for several reasons. First, Adams cannot use a urinal and always uses a stall. Second, there is no evidence that a transgender boy is more likely to be curious about another student's anatomy than any other boy. Third, any student engaging in voyeurism in the bathroom would be engaging in misconduct which is subject to discipline through the School District's code of conduct. Fourth, any boy who is concerned about other students seeing his anatomy can use a gender-neutral bathroom or a stall in the boys'

restroom (as Adams would when using the boys' restroom).

Nor was there any evidence that transgender students might expose themselves to other students in the restroom; in fact, the evidence was to the contrary– transgender students want to be discrete about their anatomy so other students do not recognize them as anything but the gender with which they identify. Indeed, as the School Board admitted, there could be transgender students whose enrollment documents are consistent with the students' gender identity, and no one would know they are using restrooms that are different from the ones that match their sex assigned at birth.

Based on the evidence at trial, the Court concludes that the School District's bathroom policy "does nothing to protect the privacy rights of each individual student vis-a-vis students who share similar anatomy and it ignores the practical reality of how [Adams], as a transgender boy, uses the bathroom: by entering a stall and closing the door." Whitaker, 858 F.3d at 1052; see also Boyertown, 893 F.3d at 193 (rejecting cisgender students' argument that transgender students in school locker rooms and multi-stall restrooms violated their constitutional right to privacy, noting "appellants are claiming a very broad right of personal privacy in a space that is, by definition and common usage, just not that private"). Thus, when the School District's stated privacy interest is "weighed against the facts of the case and not just examined in the abstract," Whitaker, 858 F.3d at 1052, it fails to provide an "exceedingly

persuasive justification" for the School Board's bathroom policy.[39] <u>Virginia</u>, 518 U.S. at 556.  <u>See also</u> <u>Grimm</u>, 302 F. Supp. 3d at 751 (finding School Board's privacy argument "[rang] hollow" and was based on conjecture given that the only complaints came from adults, not students (who had shared a restroom with the transgender student for weeks) and because a "'transgender student's presence in a restroom provides no more of a risk to other students' privacy rights than the presence of an overly curious student of the same biological sex'") (quoting <u>Whitaker</u>, 858 F.3d at 1052); <u>Evancho</u> 237 F. Supp. 3d at 289-90 (acknowledging school's obligation to protect student privacy but finding "facts on the ground" revealed school bathroom layout (composed of stalls with locking doors and partitioned urinals) did not pose any

---

[39]The School Board also relied on the privacy rights accorded under the Florida Constitution (Article I, Section 23), but did not explain how those rights would be infringed by the presence of a transgender student in a restroom conforming to his or her gender identity, nor why those rights should be given more weight than the Equal Protection rights at stake.  Moreover, the School Board Attorney acknowledged that the Broward County School District (also in Florida) was not violating any Florida law by following its policy, which permits transgender students to use the restroom that accords with their gender identity. <u>See</u> Doc. 162 at Tr. 122-23.  For the same reasons cited above, the privacy rights guaranteed under the Florida Constitution are not endangered when transgender students use multi-stall school restrooms that match their gender identity, particularly where all students have the option to avail themselves of the privacy afforded by the multi-stall and gender-neutral single-stall bathrooms.  The persuasiveness of the cases relied on in the above analysis is not diminished merely because their states do not have a constitutional right of privacy similar to Florida's.  Nor is their analysis less persuasive because a state law may have prohibited discrimination on the basis of gender identity.

actual risk of invasion of a student's personal privacy).[40]

## 2. Safety

The School Board also cites student safety as a basis to uphold its bathroom policy, expressing concern for transgender students who may be bullied or harassed in the bathroom matching their gender identity and for cisgender students who may not feel safe if a person with genitalia of the opposite sex is in the restroom with them. There was no evidence that Adams encountered any safety concerns during the six weeks he used the boys' restroom at Nease or when he does so in other public places. Likewise, there was no evidence that Adams presents any safety risk to other students or that transgender students are more likely than anyone else to assault or molest another student in the bathroom. Any incidents of misconduct are subject to the school's code of conduct and, if necessary, Florida criminal law.

None of the school officials who testified had ever heard of an incident where student safety was compromised by the presence of a transgender student in the restroom that matched his or her gender identity. Again, any student with safety concerns–including a transgender student–can use a gender-neutral single-stall bathroom. Consistent with a number of other courts that have considered the issue,

---

[40]The School Board relies on numerous cases for the general proposition that students have an interest in protecting their bodily privacy (see Doc. 173-1 at 37-40). The Court does not disagree, but the evidence at trial established that student privacy will not be infringed by permitting Adams to use the boys' restrooms.

this Court finds concern for student safety is not an "exceedingly persuasive justification" for upholding the school bathroom policy. Virginia, 518 U.S. at 556; see, e.g., Evancho, 237 F. Supp. 3d at 291 (finding safety concerns were unfounded given availability of disciplinary code and lack of record of any threat that a student would pose as transgender to gain access to a restroom); Highland, 208 F. Supp. 3d at 876-77 (finding testimony from other districts showed parents' safety concerns to be "wholly unfounded in practice" and noting that any worry about sexual activity in the bathrooms was "logical[ly] flaw[ed]" given that gay males were not excluded from boys' restrooms and gay females were not excluded from girls' restrooms).

### 3. Additional Considerations

Although the Court has found that the School Board's concerns about privacy and safety are only conjectural (and therefore insufficient to survive intermediate scrutiny), the School District says it creates policy with an eye toward minimizing the risk of future problems, even if none have ever occurred. With that in mind, the Court has carefully considered whether the eleven gender-neutral single-stall bathrooms on campus (which are open to all students) provide an appropriate accommodation for Adams such that more is not required. They do not. While there are more stalls available in gender-neutral bathrooms (eleven) than in the multi-stall boys' restrooms (ten), some of them are further away from Adams' classes. More importantly, however, Adams testified to the stigma that attaches to his use of gender-neutral

bathrooms, especially when he has to walk right past an available boys' restroom to find one. See Doc. 160-1 at Tr. 204 (describing the walk from his class to a gender-neutral single-stall bathroom as "feel[ing] almost like a walk of shame").

He also testified about the message it sends to other students that the school does not view him as a real boy. Using his words: "[B]ecause I'm using a special bathroom and I'm oftentimes passing a men's bathroom, everybody knows I'm different, and I just want to fit in. So it's the opposite of what I want." Id. at Tr. 205. In Boyertown, the Third Circuit rejected the suggestion from cisgender students that the school should offer transgender students the opportunity to use gender-neutral single-stall facilities, finding that policy "invite[s] more scrutiny and attention" from the transgender students' peers, "very publicly brand[ing] all transgender students with a scarlet "T" [which] they should not have to endure . . . as the price of attending their public school." 893 F.3d at 192 (quoting Whitaker, 858 F.3d at 1045).[41] The Court

_____

[41]Though not raised here, the court in M.A.B. rejected the argument that the use of a gender-neutral single-stall bathroom would cause cisgender students the same humiliation and embarrassment experienced by transgender students, finding, among other reasons, that requiring the transgender students to use that restroom was entirely different from providing cisgender students the option of using it if they wanted greater privacy. 286 F. Supp. 3d at 724-25. The court in Grimm adopted M.A.B.'s reasoning, finding an important difference between a boy who uses a gender-neutral single-stall bathroom because he has been singled out for differing treatment by the school because he is transgender and fails to conform to sex-based stereotypes, and a boy making a personal choice to change clothes in or use a single-stall restroom. 302 F. Supp. 3d at 752. While the St. Johns County School Board does not actually require Adams to use the gender-neutral single-stall bathrooms, in reality he is not welcome to use the girls' restrooms (and he does not) so his use of the gender-

finds the placement of the numerous gender-neutral single-stall bathrooms on campus, while useful and well-intentioned, does not remedy the Equal Protection violation.

The retired Director of Student Services testified that the task force was concerned about what to do about "gender-fluid" students if the School District strayed from its long-standing policy of only permitting "biological boys" to use the boys' restroom and only permitting "biological girls" to use the girls' restroom. The general point is well-taken, but merely hypothetical given where we are. This case does not raise the issue of what to do about gender-fluid students; rather, the question here is whether to permit a transgender boy who has taken significant social, medical and legal measures to present as a boy (and who never intends to use a girls' restroom) to have access to the boys' restroom. Thus, to the extent school officials are worried that gender-fluid students might be using a boys' restroom one day and a girls' restroom the next, that would not happen if relief is granted here because this case is only about permitting one transgender boy to use the boys' restroom.[42] For this

---

neutral single-stall bathrooms is not the same "option" provided to cisgender students.

[42]There was no evidence that any St. Johns County gender-fluid students have come forward requesting access to any particular restroom. The Court notes that the Broward County School District's LGBTQ guidelines(touted by Adams as an example worth following) do not include any specific restroom accommodation for gender-fluid students. Doc. 151, Pl. Ex. 66. See also Boyertown, 276 F. Supp. 3d at 344 (noting that the school district was not aware of any gender-fluid students enrolled at the high school, and did not yet have a plan to consider how to accommodate them).

same reason, the hypothetical worry that cisgender students might pose as gender-fluid for the purpose of gaining access to the restroom of the opposite sex is not a valid concern here.[43]  This case is not about eliminating separate sex bathrooms; it is only about whether to allow a transgender boy to use the boys' bathroom.

The Court likewise rejects the contention that permitting Adams to use the boys' restroom is just the beginning of a "slippery slope" which will result in the elimination of separate sex restrooms.  As explained by the Medical Amici, a transgender individual "'consistently, persistently, and insistently' identifies as a gender different than the sex they were assigned at birth."  Doc. 119, Ex. A at 7.  Transgender individuals are not gender-fluid and their sense of who they are is settled.  Adams does not want to use the girls' restroom.  The undisputed evidence is that he is a transgender boy and wants to use the boys' restroom.  There is no evidence to suggest that his identity as a boy is any less consistent, persistent and insistent than any other boy.  Permitting him to use the boys' restroom will not integrate the restrooms between the sexes.

Even so, the School Board contends that its policy is simply based on the realistic physical differences between the sexes.  The School Board cites Michael M. v. Superior Court of Sonoma County, 450 U.S. 464 (1981), in which a plurality of the

---

[43]There was no evidence of a student having ever posed as being gender-fluid at any school to gain entry to the bathroom of the opposite gender.  Any such behavior could be addressed through disciplinary means.

Supreme Court noted that it "has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." Id. at 469. The statute in Michael M. (which criminally punished males for engaging in sexual intercourse with females under the age of eighteen to whom they are not married, but did not similarly punish females) was based on the physiological fact that women can get pregnant and men cannot. Id. at 469, 471. As the plurality opinion explained, California sought to prevent illegitimate teenage pregnancies (the harmful consequences of which fall disproportionately on the teenage female and often result in costs to the state when unwanted illegitimate children become its wards) by deterring men from having sex with underage women to whom they are not married. Id. at 470-73. The Court agreed with California that having a gender-neutral statute would frustrate its effective enforcement because women would not report the crime if they, too, would be prosecuted. Id. at 473-74.

The bathroom policy here is distinguishable–everyone is subject to the same rule–both boys and girls must use the bathroom that aligns with their sex assigned at birth (or a gender-neutral one), and both boys and girls would be subject to discipline for disobeying the policy. The school bathroom policy does not depend on something innately different between the bodies of boys and girls or what they do in the bathroom. Michael M., by contrast, "upheld . . . the gender classification" because the

48

statute there aimed to prevent teen pregnancy and "realistically reflect[ed] the fact that the sexes were not similarly situated" because only women could become pregnant. Id. at 469. Nguyen v. I.N.S., 533 U.S. 53 (2001) is distinguishable for the same reason. 533 U.S. at 59-64 (upholding statute that set different requirements for proving parenthood for men and for women because giving birth is inherent proof of motherhood). No such difference is relevant here.[44] Rather, it is his failure to act in conformity with his sex assigned at birth that is causing the School District to treat Adams differently. See Glenn, 663 F.3d at 1316 (holding in transgender employment case that "discriminating against someone on the basis of his or her gender non-conformity constitutes sex-based discrimination under the Equal Protection Clause").

The School Board also relies on Johnston v. University of Pittsburgh, 97 F. Supp. 3d 657 (W.D. Pa. 2015), one of a minority of cases to reject an Equal Protection claim by a transgender student regarding bathroom use, and Carcano v. McCrory, 203 F. Supp. 3d 615 (M.D. N.C. 2016), which likewise rejected an Equal Protection challenge brought by transgender students and an employee of a state

_____

[44]As further support for their position that separating boys and girls based on "biological sex" is permissible, the School Board also points to language in the Supreme Court's Virginia decision, which recognized that [p]hysical differences between men and women . . . are enduring" and "the two sexes are not fungible." See Doc. 173-1 at 35, 38 (quoting Virginia, 518 U.S. at 533). But here, as in Virginia, those differences are not relevant to the question before the Court. See Virginia. 518 U.S. at 519 (holding the Constitution's equal protection guarantee required Virginia Military Institute (which had been a male-only institution) to admit female cadets).

university subject to North Carolina's "bathroom bill." But Johnston and Carcano are distinguishable. Their construction of the meanings of and relationship between the terms "sex" and "gender" are out of step with the Equal Protection analysis in Glenn (an Eleventh Circuit decision), the weight of other decisions which have construed those terms in this context, and with the medical community whose opinions were admitted in this case.[45] According to Glenn, "[a] person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes. The very acts that define transgender people as transgender are those that contradict stereotypes of gender-appropriate appearance and behavior." 663 F.3d at 1316 (quotation and citations omitted). Thus, "discrimination against a transgender individual because of her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender." Id. at 1317.

_____

[45]Johnston recognized that "the legal landscape is transforming as it relates to gender identity, sexual orientation, and similar issues" and that other courts had declined to adopt the definitions articulated in the thirty year old Seventh Circuit case upon which it relied, but determined that without Supreme Court or Third Circuit precedent, it would follow that earlier decision. See Johnston, 97 F. Supp. at 668, 671, n.14 (citing Ulane v. E. Airlines, Inc., 742 F.2d 1081, 1085 (7th Cir. 1984)). Both the Seventh Circuit and the Eleventh Circuit have found Ulane's analysis no longer tenable following the Supreme Court's decision in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), which held that Title VII's reference to "sex" encompasses both biological differences and gender discrimination. See Whitaker, 858 F.3d at 1047; Glenn, 663 F.3d at 1318, n.5. Moreover, the Third Circuit's Boyertown decision is precedent that would likely affect the outcome if Johnston were decided today. See Boyertown, 893 F.3d at 183-84 (providing definitions of "sex," "gender," "social gender transition" and related terms based on testimony of expert in gender dysphoria and gender-identity issues).

Though not an Equal Protection Clause case, the Third Circuit's recent Boyertown decision (which rejected claims by cisgender students that transgender students in the restrooms violated Title IX and Pennsylvania privacy law), likely eviscerates any persuasive value Johnston retained.  Boyertown, 893 F.3d 179. Likewise, the Equal Protection analysis in Carcano (which cites Nguyen and other authorities which permitted different treatment based on meaningful differences in physiology, 203 F. Supp. 3d at 642-45) is not persuasive in light of Glenn, the other authorities that have considered this issue, and the evidence in this case (which reveals that the multi-stall school bathrooms at Nease have individual stalls with doors that afford privacy and that all students have access to gender-neutral single-stall bathrooms for those who want additional privacy).[46]

Although there was no testimony on the issue, the parties stipulated that some parents and students in the St. Johns County School District object to a policy permitting transgender students to use a restroom matching their gender identity, believing the policy "would violate the bodily privacy rights of students and raise[s] concerns for their privacy, safety and welfare."  Doc. 116 at § I (p. 22).   There are cases where parents have removed their children from public school and/or have sued a school district over a transgender bathroom policy. See, e.g., Boyertown, 893

_____

[46]The privacy interests in Carcano were also implicated by shower and locker room facilities which are not at issue in this case.   Carcano, 203 F. Supp. 3d at 642.

F.3d 179 (suit filed by cisgender students objecting to the presence of transgender students in the school restrooms and locker rooms); Evancho, 237 F. Supp. 3d at 291-92 (noting that some parents had or intended to withdraw their children from school over transgender bathroom policy).

But the Court has addressed why privacy and safety concerns, though perhaps understandable, simply aren't realized when transgender students use school bathrooms aligned with their gender identity. See Doc. 161 at Tr. 64-65, 106-07 (testimony of Broward County school officials); see also Whitaker, 858 F.3d at 1052; Boyertown, 893 F.3d at 193. Moreover, while the Court finds that the gender-neutral bathrooms are not an adequate remedy for the breach of Adams' rights, they remain an alternative for any cisgender student who is uncomfortable sharing a restroom with Adams. Thus, while the School Board must take into account the concerns of cisgender students and their parents, it may not do so at the expense of Adams' right to equal protection under the law. "If adopting and implementing a school policy or practice based on [the] individual determinations or preferences of parents–no matter how sincerely held–runs counter to the legal obligations of the [School] District, then the District's and the Board's legal obligations must prevail." Evancho, 237 F. Supp. 3d at 292.[47]

---

[47]The School Board also contends that its policy cannot be held to violate the Equal Protection Clause when they are merely following distinctions between the sexes permitted by Title IX and its implementing regulations. As further discussed

The School Board has not shown that 'its gender classification is substantially related to a sufficiently important government interest,'" <u>Glenn</u>, 663 F.3d at 1316 (quotation omitted), let alone that the justification for its policy is "exceedingly persuasive." <u>Virginia</u>, 518 U.S. at 556. Nor has it shown a "foundation for the conclusion that allowing [Adams to use the boys' restroom] will cause the harmful outcomes they describe." <u>Obergefell</u>, 135 S. Ct. at 2607. Adams has therefore proven that the School Board has violated his rights under the Equal Protection Clause through its enforcement of the school bathroom policy.

## B.    Title IX

Adams also claims that the School Board bathroom policy violates his rights under Title IX of the Education Amendments Act of 1972. Under Title IX, no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). The statute's implementing regulations provide that a covered institution cannot provide different aid, benefits, or services; cannot deny aid, benefits, or services; and cannot subject any person to separate or different rules, sanctions, or treatment, "on the basis of sex." <u>See</u> 34 C.F.R. § 106.31(b)(2)-(4); <u>Whitaker</u>, 858 F. 3d at 1046-47. However, a covered

_____

below, the Court finds this argument unavailing.

institution "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

To prove his claim here, Adams must demonstrate that (1) he was subjected to discrimination in an educational program or activity; (2) the discrimination was "on the basis of sex;" (3) the School Board receives federal funding; and (4) the discrimination caused him harm. See Seamons v. Snow, 84 F.3d 1226, 1232 (10th Cir. 1996); Highland, 208 F. Supp. 3d at 865. The St. Johns County School Board receives federal financial assistance and is subject to Title IX. Doc. 116 at § I, ¶ 2; Doc. 151, Pl. Ex. 138 at Request for Admission # 3 & 4. The School Board does not contest that the use of the school restrooms is an "education program or activity" within the meaning of Title IX. See Highland, 208 F. Supp. 3d at 865 ("Access to the bathroom is . . . an education program or activity under Title IX."). The Court's consideration in the Equal Protection analysis of harm to Adams caused by the School Board policy excluding Adams from the boys' restrooms applies here too. Thus, as in a number of other cases where transgender students have raised Title IX challenges to their school's bathroom policies, the issue here is whether the bathroom policy which excludes Adams from the boys' restroom based on his transgender status is discrimination "on the basis of sex" as used in Title IX and its implementing regulations.

Title IX does not define the term "sex," nor do its regulations.  There is no Eleventh Circuit or Supreme Court authority directly on point.  Adams argues the term "sex" includes gender identity, whereas the School Board contends the term "sex" means "biological sex."  Given the lack of definition within the statute or regulation, and recognizing that a number of courts have struggled with this exact question, this Court finds the term "sex" as used in Title IX is ambiguous as applied to transgender students.  Cf. Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997) (Thomas, J., for the unanimous court) (explaining that statutory interpretation is unnecessary "if the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case") (emphasis supplied).

The School Board raises four main arguments in support of its interpretation: first, the meaning of the word "sex" as based on dictionary definitions at the time Title IX was enacted and its legislative history support a conclusion that "sex" means "biological sex;" second, Title IX permits schools to provide separate boys' and girls' bathrooms so it cannot be a violation to separate the sexes in the restrooms; third, the Department of Education's current interpretation of Title IX refutes the argument that "sex" includes "gender identity;" and fourth, court decisions that have utilized Title VII principles to glean a definition of sex (cases upon which plaintiff relies for his

interpretation) are inapplicable.[48]

Citing Judge Niemeyer's dissent from the affirmance of entry of a preliminary injunction in G.G. v. Gloucester County School Board, 822 F.3d 709, 736 (4th Cir. 2016), vacated and remanded, 137 S. Ct. 1239 (2017), the School Board contends that contemporaneous dictionary definitions of the word "sex" at the time Congress passed Title IX reveal it was "universally understood as referring to the biological or physiological characteristics that constitute a person's sex, and not an internal identification with one gender or the other." Doc. 173-1 at 27. However, the majority in G.G. did not find the meaning to be so universally clear, noting, for example, that a 1970 dictionary defined "sex" as "the character of being either male or female." G.G., 822 F.3d at 721 (quoting the American College Dictionary 1109 (1970)); see also Highland, 208 F. Supp. 3d at 866 (considering the parties' debate about the dictionary definition of "sex" at the time Title IX was enacted, stating "dictionaries from that era defined 'sex' in myriad ways" and did not reflect "a uniform and unambiguous meaning of 'sex' as biological sex or sex assigned at birth"); Students and Parents for Privacy v. United States, No. 16-cv-4945, 2016 WL 6134121, at *17-18 (N.D. Ill. Oct.

_____

[48]The first three of these arguments were initially raised in the School Board's motion to dismiss (Doc. 54, adopted as to the amended complaint by notice, Doc. 64). The Court carried the motion with the case, determining that the evidence at trial on the Equal Protection claim would essentially be the same regardless of whether the Title IX claim remained, and that it would be preferable to decide the motion on a full record. For the reasons stated here, the motion is denied.

18, 2016) (finding dictionary definitions of "sex" included room for "gender identity"). The Court does not find the plain meaning of the word "sex" as used in Title IX to be apparent from contemporaneous dictionary definitions.

Nor is the Court persuaded that the legislative history relied on by the School Board provides a definitive answer, as it merely emphasized that Title IX was not intended to integrate the sexes (something no one is advocating here). See Doc. 173-1 at 28-29 (relying on statements of Title IX's sponsor, Senator Birch Bayh). Subsequent uses of the terms "gender" and "gender identity" in other statutes likewise fail to convince the Court that the omission of those terms in Title IX was intentional. The presumption that terms are used consistently by Congress is "entitled to less force where, as here, the [School Board] points to terms used in different statutes passed by different Congresses in different decades." Zarda v. Altitude Express, Inc., 883 F.3d 100, 129 (2d Cir. 2018); see also Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 174-75 (2005) (holding that Title IX's use of broad term "discrimination" included retaliation, notwithstanding that Title VII showed Congress' ability to provide express prohibitions against specific kinds of discrimination, including retaliation); Robinson, 519 U.S. at 340-44 (holding that Title VII's use of the term "employee" included "former employee" even though later statutes specifically used "former employee" when describing category of persons covered by term "employee"); United States v. Wise, 370 U.S. 405, 414 (1962) (finding subsequent Congress' interpretation

of term used in earlier-enacted statute was not relevant in construing term's meaning); Whitaker, 858 F.3d at 1049 (rejecting argument that Congress' failure to add transgender status as a protected characteristic to Title IX signaled an intentional omission). As the Supreme Court has explained, "[c]ongressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 650 (1990) (quotation and citation omitted).

The School Board also argues that because Title IX explicitly allows "separate living facilities for the different sexes," 20 U.S.C. § 1686, and its implementing regulations permit schools to provide "separate toilet, locker room, and shower facilities on the basis of sex," 34 C.F.R. § 106.33, it cannot be a violation of the statute to provide school restrooms which are separated based on "biological sex." The Court is unpersuaded. Because neither Title IX nor the regulation define "sex" or "on the basis of sex," the statute and regulation cannot be presumed to mean "biological sex."[49] Adams is not contending that the school cannot provide separate restrooms for the sexes–he just wants the school to recognize that, interpreting sex to include

_____

[49]The FHSAA (which governs competitive interscholastic sports at Florida high schools (including Nease) and allows students to play on teams based on their gender identity) apparently finds Title IX's use of the word "sex" includes "gender identity." See 34 C.F.R. § 106.41(b) (Title IX regulation governing athletics, stating that schools may operate "separate teams for members of each sex").

gender identity, he is a boy and should be permitted to use the boys' restrooms.[50]

In 2017, the Department of Education withdrew earlier guidance which had instructed that the term "sex" under Title IX included gender identity and that schools must allow transgender students to use sex-segregated restrooms, locker rooms and shower facilities consistent with their gender identity. Doc. 152, Def. Ex. 84, 237. The School Board contends that the withdrawal of that guidance signifies that the Department of Education disagrees with an interpretation of "sex" that includes gender identity for purposes of Title IX. But the 2017 Guidance stated it was withdrawing the earlier guidance because it had not undergone any formal public process and had been issued without extensive legal analysis or explanation as to how it was consistent with Title IX. Doc. 152, Def. Ex. 237. Thus, the rescission of the old guidance without issuing new guidance does not provide any interpretation of Title IX from the Department of Education. See A.H., 290 F. Supp. 3d at 326-27 (rejecting contention that withdrawal of previous guidance meant that school could

_____

[50]The School Board argues that a finding that its policy violates the Equal Protection Clause renders Title IX unconstitutional. But even if the Court agreed with the School Board that "sex" as used in Title IX meant "biological sex" (using the term as the School Board defines it), Title IX does not mandate separate facilities, so a contrary Equal Protection ruling would not affect its constitutionality. See Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 259 (2009) ("Title IX exempts from its restrictions several activities that may be challenged on constitutional grounds;" some of which "may form the basis of equal protection claims.") (citations omitted); see also Boyertown, 893 F.3d at 195 (noting that "Title IX does not require [schools to] provide separate privacy facilities for the sexes").

rely on Title IX to prohibit transgender students from accessing bathrooms consistent with their gender identity). But see Evancho, 237 F. Supp. 3d at 297-301 (finding the uncertain legal landscape created by the 2017 withdrawal of the 2016 Guidance, coupled with the Supreme Court's decision to stay its consideration of the Fourth Circuit's G.G. decision in light of that withdrawal,[51] meant plaintiffs could not demonstrate a likelihood of success on their Title IX claim at that time to support entry of a preliminary injunction (which the court nevertheless granted on their Equal Protection claim)).

It is true, as the School Board notes, that some of the transgender school bathroom decisions which considered Title IX relied on the now rescinded guidance in reaching a result. See, e.g., G.G., 822 F.3d at 721 (applying Auer[52] deference to agencies' interpretation of ambiguous term "sex" to find transgender student alleged violation of Title IX), vacated and remanded, 853 F.3d 729 (4th Cir. 2017); Highland, 208 F. Supp. 3d at 869-70 (entering preliminary injunction on Title IX claim after giving Auer deference to ambiguous term "sex"). However, cases examining the question

_____

[51]The Supreme Court subsequently remanded G.G. for further consideration of the Title IX claim, 137 S. Ct. 1239 (2017), and, as noted below, the district court recently denied the school board's motion to dismiss the transgender student's Title IX claim. Grimm, 302 F. Supp. 3d at 748.

[52]Auer v. Robbins, 519 U.S. 452 (1997) (requiring that an agency's interpretation of its own ambiguous regulation be given controlling weight unless plainly erroneous or inconsistent with the statute or implementing regulation).

subsequent to that withdrawal have found a likelihood (or permitted cases to proceed on a claim) that a policy that prohibits transgender students from using a bathroom matching their gender identity have separated students "on the basis of sex" within the meaning of Title IX. See Whitaker, 858 F.3d at 1049-50 (affirming entry of preliminary injunction in favor of transgender student on Title IX claim); Grimm, 302 F. Supp. 3d at 742-48 (noting withdrawal of earlier guidance, but holding transgender student had stated a Title IX claim for sex discrimination); A.H., 290 F. Supp. 3d at 329 (same); Evancho, 237 F. Supp. 3d at 283, n.23 (denying school district's motion to dismiss on transgender students' Title IX claim, finding plaintiffs had crossed the pleading threshold despite not meeting the "extraordinary" standard needed to secure a preliminary injunction based on Title IX).

Finding that Title IX does not define the ambiguous terms "sex" and "on the basis of sex" for purposes of their application to transgender students, many courts have looked to decisions interpreting other anti-discrimination statutes, particularly Title VII, which prohibits employment discrimination based on, among other things, sex. 42 U.S.C. §§ 2000e et seq. See, e.g., Boyertown, 893 F.3d at 195, n.103 ("Courts have frequently looked to Title VII authority for guidance with Title IX cases."); Whitaker, 858 F.3d at 1047-49 (reviewing Title VII and Equal Protection Clause case law to decide Title IX transgender school bathroom issue); M.A.B., 286 F. Supp. 3d at 713-15 (same); Grimm, 302 F. Supp. 3d at 744-47 (same); see also

Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 616, n.1 (1999) ("This Court has also looked to its Title VII interpretations of discrimination in illuminating Title IX." (collecting cases)).

In looking for Title IX guidance, the transgender school bathroom decisions inevitably consider Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), which held in a Title VII case that discrimination on the basis of gender stereotype is sex-based discrimination. The transgender school bathroom cases also look to Price Waterhouse's progeny, including the Eleventh Circuit's Glenn decision which, though an Equal Protection case, turned to Title VII precedent for guidance and stands as authority for the proposition that "discrimination against a transgender individual because of [ ] gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender."[53]  Glenn, 663 F.3d at 1317; see, e.g., Boyertown, 893 F.3d at 199 ("We are not alone in reaching th[e] conclusion" that "Title

_____

[53]The Court rejects the School Board's crimped interpretation of Glenn, which it attempts to distinguish by claiming that, unlike Glenn, the School Board does not engage in gender or sex stereotyping when it excludes Adams from the boys' bathroom.  As explained in Glenn, "[a] person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes. The very acts that define transgender people as transgender are those that contradict stereotypes of gender-appropriate appearance and behavior."  663 F.3d at 1316 (quotation and citations omitted).  This is borne out by the facts of this case.  Adams' desire to use the boys' bathroom stems from his gender identity, which is not in accordance with the sex he was assigned at birth.  The School Board policy that excludes Adams is based on its belief that he is not acting in conformity with the sex he was assigned at birth.

IX prohibits discrimination against transgender students in school facilities just as Title VII prohibit[s] discrimination [against a gender non-conforming employee in the workplace]") (citing, inter alia, Glenn and Whitaker); Whitaker, 858 F.3d at 1048 (citing Glenn as support for the proposition that "[b]y definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth"; thus, when a person is punished for their gender non-conformity by refusing them use of a bathroom that accords with their gender identity, Title IX is violated); Grimm, 302 F. Supp. 3d at 746 (concluding a transgender student can state a claim of sex discrimination under Title IX by extension of the analysis of numerous Title VII and federal civil rights cases, including Glenn, which recognize that "claims of discrimination on the basis of transgender status are per se sex discrimination"); Parents for Privacy v. Dallas Sch. Dist. No. 2, ___ F. Supp. 3d ___, 2018 WL 3550267, *22-23 (D. Ore. July 24, 2018) (citing, inter alia, Glenn, Boyertown, Whitaker, M.A.B., and Grimm for support in concluding that "to require students to use only facilities that match their biological sex or to use gender-neutral alternative facilities would violate Title IX").

     This Court likewise follows the guidance of Glenn and other authorities cited above to conclude that the meaning of "sex" in Title IX includes "gender identity" for purposes of its application to transgender students. See Bostock v. Clayton Cty. Bd. of Comm'rs, 723 F. App'x 964, 965, n.2 (11th Cir. May 10, 2018) (unpub.) (per

curiam) (citing <u>Glenn</u> for proposition that in an equal protection claim, "discrimination based on gender nonconformity [is] sex discrimination"), <u>reh'g en banc denied</u>, ___ F.3d ___, 2018 WL 3455013 (11th Cir. July 18, 2018); <u>Evans v. Georgia Reg. Hosp.</u>, 850 F.3d 1248, 1254 (11th Cir. 2017) (same);[54] <u>Chavez v. Credit Nation Auto Sales, LLC</u>, 641 F. App'x 883 (11th Cir. 2016) (unpub.) (per curiam) (reversing entry of summary judgment in Title VII case where transgender employee created a triable issue of fact as to whether gender bias was a motivating factor in employer's decision to fire her); <u>Valentine Ge v. Dun & Bradstreet, Inc.</u>, No. 6:15-cv-1029-Orl-41GJK, 2017 WL 347582 (M.D. Fla. Jan. 24, 2017) (citing <u>Chavez</u>, 641 F. App'x at 884, for proposition that "[s]ex discrimination includes discrimination against a transgender person for gender nonconformity," but finding employee failed to show employer terminated her because she transitioned to be a woman); <u>see also</u> <u>Jackson</u>, 544 U.S.

---

[54]While acknowledging <u>Glenn</u>'s authority regarding claims of gender non-conformity, both <u>Evans</u> and <u>Bostock</u> held that Title VII does not recognize a claim for sexual orientation discrimination, which the Eleventh Circuit distinguishes from gender nonconformity. <u>See</u> <u>Evans</u>, 850 F.3d at 1255-57; <u>Bostock</u>, 723 F. App'x at 964. As explained by Judge William Pryor, "[d]eviation from a particular gender stereotype may correlate disproportionately with a particular sexual orientation, and plaintiffs who allege discrimination on the basis of gender nonconformity will often also have experienced discrimination because of sexual orientation[;] . . . [b]ut under Title VII, we ask only whether the individual experienced discrimination for deviating from a gender stereotype." <u>Evans</u>, 850 F.3d at 1259 (Pryor, William, J., concurring) (citations omitted). <u>But see</u> <u>Bostock</u>, 2018 WL 3455013, *4 (Rosenbaum, J., dissenting from denial of reh'g en banc) (arguing that the Eleventh Circuit should take the issue en banc to explain why, in the majority's view, "gender nonconformity claims are cognizable except for when a person fails to conform to the 'ultimate' gender stereotype by being attracted to the 'wrong' gender") (citation omitted).

at 175 (explaining that "broad" language of Title IX evidenced Congress' intent to give the statute a "broad reach").[55]

Adams has proven a Title IX violation because the School Board, a federally funded institution, prohibits Adams, a transgender boy, from using the boys' restroom "on the basis of sex," which discrimination caused him harm.

## III. Remedy

Having found that the School Board's bathroom policy violates Adams' rights under the Equal Protection Clause and Title IX, the Court must now consider the remedy. In his proposed findings of fact and conclusions of law, Adams has narrowed the scope of his requested injunctive relief from that requested in his amended complaint, and seeks to permanently enjoin the School Board "from enforcing any

---

[55]The School Board argues the Court's reliance on Title VII to inform the meaning of Title IX is misplaced because the Attorney General recently issued guidance rejecting an interpretation of "sex" to include "gender identity" in Title VII cases. See Doc. 152, Def. Ex. 248 (October 4, 2017 Attorney General Memorandum). But the EEOC, the agency responsible for the enforcement of Title VII, has acknowledged the Attorney General's contrary view and still maintains its position that Title VII prohibits discrimination based on gender identity. See https://www.eeoc.gov/eeoc/newsroom/wysk/enforcement_protections_lgbt_workers.cfm (last visited July 25, 2018). Moreover, the Attorney General's position is based on an analysis of precedent that is contrary to Glenn and other authorities cited above. See also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79 (1998) (Scalia, J., for the unanimous court) (holding Title VII covered same-sex harassment, explaining "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed"). The Attorney General's October 4, 2017 Memorandum does not persuade the Court to change course.

policy, practice, or custom of the St. Johns County School District that denies transgender students access to and use of restrooms that match a student's gender identity."[56]  Doc. 175 at 50.

The evidence has established that Drew Adams is a transgender boy.  Adams has undergone social, medical, and legal transitions to present himself as a boy. Adams wears his hair short; he dresses like a boy; his voice is deeper than a girl's; his family, peers, classmates and teachers use male pronouns to refer to him; he takes hormones which suppress menstruation and make his body more masculine, including the development of facial hair and typical male muscle development; he has had a double mastectomy so his body looks more like a boy; the state of Florida has provided him with a birth certificate and driver's license which state he is a male; and when out in public, Adams uses the men's restroom.  As a transgender boy, Adams must be permitted to use the boys' restroom at school.

However, the Court has had no occasion in the context of this case to determine what threshold of transition, if any, is necessary for the School Board to accommodate other transgender students, nor did the parties ask the Court to do so. The Court received no evidence concerning any other transgender student.  Thus, the

---

[56]While his amended complaint sought access to "multi-user facilities" (Doc. 60 at 21-22), there was no testimony or argument at trial about locker rooms or showers, and the Court's ruling does not address access to those spaces.

injunction that will enter in this case will be limited to the plaintiff, Drew Adams.[57]

"[D]amages for emotional distress or mental anguish are at best difficult to measure." Benton v. Rousseau, 940 F. Supp. 2d 1370, 1379 (M.D. Fla. 2013) (quotation and citation omitted). The School Board argued that Adams is in therapy only as needed, he is not taking medications for anxiety or depression, and he suffered from pre-existing medical conditions, so it is hard to say that not using the boys' restroom is really the cause of his distress. See, e.g., Doc. 160-1 at Tr. 90, 131, 188. The Court also finds that Nease faculty and staff have operated in good faith and tried to accommodate Adams' situation, lessening the emotional trauma. Nevertheless, while there was no expert testimony about a diagnosis of gender dysphoria for Adams, the Court is persuaded by the evidence that he suffered

---

[57]Of course, nothing prevents the School Board from using this decision as guidance for future situations involving other transgender students. Notably, for some transgender students, the policy the school currently has may be sufficient, as the evidence revealed that not every transgender student is prepared to use the restroom corresponding to their gender identity. Boyertown may be instructive. Permission for transgender students to use gender-specific facilities consistent with their gender identity at Boyertown Area Senior High School is granted on a case-by-case basis only after a student meets with trained and licensed counselors, and other school administrators as needed. Once a transgender student is granted permission to use the facilities matching his or her gender identity, that student is no longer permitted to use the facilities corresponding to his or her sex assigned at birth. 893 F.3d at 185. See also Doc. 151, Pl. Ex. 68 (FHSAA) at § 4.3.2 (listing documentation needed for a student athlete to participate on a team consistent with his or her gender identity, including a statement from the student, other individuals such as parents, teachers, or friends, and a health care professional, affirming the student's consistent gender identity and expression).

emotional damage, stigmatization and shame from not being permitted to use the boys' restroom at school. See Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1199 (11th Cir. 2007) ("As a matter of both common sense and case law, emotional distress is a predictable, and thus forseeable, consequence of discrimination."); "Humiliation and insult are recognized, recoverable harms, and a plaintiff's own testimony of embarrassment and humiliation can be sufficient to support an award for compensatory damages." Bogle v. McClure, 332 F.3d 1347, 1359 (11th Cir. 2003) (quotation and citation omitted) (upholding awards of punitive and compensatory damages in § 1983 race discrimination case); see also Goodin v. Bank of Amer., N.A., 114 F. Supp. 3d 1197, 1213 (M.D. Fla. 2015) (awarding emotional distress damages based on plaintiffs' testimony, even though they did not seek medical attention and no expert or doctor testified);   Adams proposes $25,000 but that seems too high.  After all, as Adams himself has argued (through counsel), the point of this case is not money.  Based on the evidence, the Court will award Adams $1,000.00 in compensatory emotional distress damages.[58]

---

[58]This $1,000.00 award will compensate Adams for his injuries arising out of the violations of the Equal Protection Clause and Title IX (the injuries from which are identical).  See Fitzgerald, 555 U.S. at 254-55 (explaining that damages may be awarded for violations of both the Equal Protection Clause and Title IX).  Adams is not entitled to double recovery so the total damages award remains $1,000.00.

## IV.    Conclusion

There is no doubt that the teachers and administrators of Nease High School and the St. Johns County School District are caring professionals who have the best interests of their students at heart.  Likewise, Drew Adams presented himself as a polite, forthright individual who is, without rancor, seeking to vindicate his civil rights. The lawyers for both sides have also conducted themselves professionally.   All involved are to be commended for the way they have handled a difficult and sensitive situation.

Accordingly, it is hereby

**ORDERED**:

1.    By separate entry, the Court will enter Final Judgment, finding in favor of plaintiff, Drew Adams, a minor, by and through his next friend and mother, Erica Adams Kasper, and against the defendant, St. Johns County School Board, on Counts I (Equal Protection Clause) and II (Title IX) of Adams' Amended Complaint (Doc. 60).  The Court's Final Judgment will incorporate an injunction preventing the St. Johns County School Board from enforcing its policy which prohibits Drew Adams from using the boys' restrooms at Nease High School;[59] and a compensatory damages award of $1,000.00.

---

[59]For the reasons previously stated, the injunction will not apply to locker rooms and showers.

2. The Court will retain jurisdiction to enforce the injunction and to address the matter of attorney's fees and costs.

3. No later than **September 4, 2018**, plaintiff shall file his motion for attorney's fees and costs under 42 U.S.C. § 1988. No later than **October 1, 2018**, the School Board shall respond. Any motion for bill of costs should follow this briefing schedule.

**DONE AND ORDERED** at Jacksonville, Florida this 26th day of July, 2018.

TIMOTHY J. CORRIGAN
United States District Judge

s.
Copies:

counsel of record